**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**–BROWNSVILLE DIVISION–**

| | | |
|---|---|---|
| **ASARCO LLC, SOUTHERN PERU** | § | |
| **HOLDINGS, LLC,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CIVIL NO. 1:07-CV-00018** |
| | § | |
| **AMERICAS MINING CORPORATION,** | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION & ORDER

The plaintiffs, ASARCO LLC and Southern Peru Holdings LLC (both of which are currently in bankruptcy), filed this action in their capacities as debtors in possession and on behalf of ASARCO's creditors to recover from Defendant Americas Mining Corporation ("AMC") the stock representing 54.18% of the outstanding shares of Southern Peru Copper Company ("SPCC") and damages resulting from having been wrongfully deprived of this stock ownership.[1] Alternatively, they request damages due to the actions of the defendant. They also seek punitive damages. Plaintiffs assert five causes of action: (1) actual fraudulent transfer; (2) constructive fraudulent transfer; (3) breach of fiduciary duty; (4) aiding and abetting a breach of fiduciary duty; and (5) conspiracy.

The defendant has denied these allegations and has pursued a counterclaim for recoupment against ASARCO based on: (1) breach of representation; (2) breach of good faith and fair dealing; and (3) breach of warranty. The Court and the parties have agreed that the Court has jurisdiction over all claims and counterclaims under 28 U.S.C. § 1334 and that venue is proper in this Division and District.

---

[1] The Court recognizes that through a variety of business maneuvers, the stock is no longer the discrete 54.18% of SPCC that it was at the time of the transaction, but it will refer to it in the manner in which it existed at the time of the transfer. It will also refer to Southern Peru Copper Company as SPCC, although its name has also been changed.

1

The Court held a four-week bench trial and hereby issues this opinion to partially resolve this matter.  The Court prefers to address these issues in a narrative form.  Nevertheless, the factual statements made hereinafter (except where the Court specifically notes a factual dispute) should be considered as findings of fact regardless of any heading or lack thereof.  Moreover, for virtually every finding, the record is replete with testimony and exhibits that support the finding.  Similarly, the legal conclusions, except where the Court discusses the various competing legal theories and positions, should be taken as conclusions of law regardless of any label or lack thereof.

Pending before the Court as the trial began were: (1) Americas Mining Corporation's Motion for Summary Judgment on Plaintiffs' Claims (Doc. No. 251); (2) Americas Mining Corporation's Motion for Summary Judgment on Plaintiffs' Standing to Bring Counts I and II (Doc. No. 253); and (3) Plaintiffs' Motion for Public Trial. (Doc. No. 301).  Also pending were various *Daubert* motions filed by both sides.  (Doc. Nos. 302, 304, 305, 306, and 307).  Prior to beginning the presentation of the evidence, the Court granted the Motion for Public Trial.  It deferred ruling on either of the motions for summary judgment.  Since the trial was to the bench, and no harm could result, the Court also deferred ruling on the *Daubert* motions as they were very fact intensive, and the Court preferred to resolve the objections in the context of the evidence as it was being presented and to allow both the direct-examination and cross-examination to fully develop each matter.  The rulings expressed herein resolve the *Daubert* motions and also resolve the issues raised by the motions for summary judgment.

During the trial, the parties presented various motions.  The defendant made a motion for judgment or directed verdict which the Court, in effect, overruled from the bench preferring to rule on all of the issues raised with a full record.  (Doc. No. 392).  Also, Plaintiffs filed a motion to enforce trial subpoenas for Daniel Tellechea, German Larrea, and Genaro Larrea. All three witnesses had previously testified in the trial by video deposition.  During the arguments on this motion, counsel for Plaintiffs conceded that, despite the fact that hours of these videos had been played, the witness Plaintiffs really needed to testify live was German Larrea.  After hearing arguments from both sides, the Court decided it needed to hear from Mr. Larrea for a number of reasons and ordered his appearance.  Further, in entering its order on this motion, the Court took into consideration the

many representations made by defense counsel that Mr. Larrea would appear live.[2]  Counsel for Plaintiffs relied upon these representations.  The Court found that it would result in "unfair gamesmanship" to allow the defendant to shield its CEO, German Larrea, from testifying after having represented to counsel that he would appear live.  The Court hereby notes that it found his testimony to be quite valuable, particularly on the history of the relationship between Grupo and ASARCO and on the copper mining industry.  He provided information not offered by any other witness for either side and not contained in his previously played video deposition.  In formulating this Memorandum Opinion and Order, this Court has not utilized his live testimony, with one exception, as support for any ruling on any contested issues.[3]  While the Court did not, in fact, grant the plaintiffs' motion, the practical consequence of the Court's ruling was the granting of Plaintiffs' motion with regard to German Larrea.  Plaintiffs' counsel's statement with regard to the necessity, or lack thereof, to hear from Genaro Larrea and Daniel Tellechea live had the practical effect of withdrawing the remaining portion of their motion. (Doc. No. 384).  The Court's ruling also had the effect of overruling Defendant's Motion for Reconsideration. (Doc. No. 395).

## I. BACKGROUND OF THE DISPUTE

### A. The Players

As of 2003, ASARCO Incorporated (hereinafter "ASARCO") had been involved in the mining industry, both domestically and internationally, for over a century.  During the pertinent time-period involved in this dispute, ASARCO was incorporated in New Jersey and headquartered in Phoenix, Arizona.  In February of 2005, ASARCO Incorporated was merged into ASARCO LLC, a Delaware limited liability company.[4]  One of the primary products from its mining operations was, and is, copper.  In 1999, when this saga began, ASARCO also owned two non-mining subsidiaries,

---

[2]  For example, *see* Stipulation Regarding Witness Testimony [Doc. No. 345].

[3]  The exception is the issue of why SPHC was created.  The Court herein holds that SPHC was created for a genuine business reason and not to defraud creditors.  Larrea's live testimony in this regard was somewhat cumulative, not only of his own video deposition, but also that of many other witnesses.

[4]  For purposes of this opinion, unless necessary, ASARCO LLC and ASARCO Incorporated will be simply referred to as ASARCO.  References to ASARCO also include both capacities in which it sues.

Enthone-OMI, Inc., a specialty chemicals maker, and American Limestone Company, which produces construction aggregates, ready-mixed concrete, and limestone.

Grupo Mexico, S.A.B. de C.V. (hereinafter "Grupo") is a Mexican corporation that has been involved in the mining industry since the 1960's. Grupo is essentially a holding company involved primarily in two different industries: mining and railroads. Its railroad operations are concentrated in a subsidiary called Infraestructura y Transportes Mexico, S.A. de C.V. (hereinafter "ITM"), while its mining interests are vested in another subsidiary called Grupo Minera Mexico (hereinafter "Minera Mexico"). Grupo's Chairman of the Board and Chief Executive Officer is German Larrea. He has worked for Grupo for decades. He succeeded his father, who had founded Grupo and headed it for a number of years. The Larrea family and their company, Empresarios Industriales de Mexico, S.A. de C.V. (of which German Larrea is also the Chairman of the Board and Chief Executive Officer), own the controlling interest in Grupo. The record establishes without a doubt that German Larrea rules Grupo and all of its affiliates and no major decision is made without his approval.

For many years prior to 1999, Grupo and ASARCO had various business relationships. In Grupo's early ventures in the mining arena, it actually partnered with ASARCO. In fact, at one point in time, ASARCO had an ownership position in Grupo and had a representative on Grupo's Board of Directors. ASARCO even had a subsidiary named ASARCO Mexicana, which over time became a Grupo entity. As Grupo's mining operations grew, it became a more integrated operation, one that took the ore from the ground all the way through the smelting or refining process. Its mining operations, in addition to copper, include mining for silver, zinc, and gold. As time progressed, ASARCO abandoned its position in Grupo, and the two companies eventually seemed to have switched roles. Grupo liked ASARCO's assets and numbers and began to acquire its shares. ASARCO had large copper ore reserves in the United States, in addition to its ongoing copper production and international assets. By 1999, Grupo had accumulated 10 percent of the stock of ASARCO.

One of the international assets that ASARCO owned was the controlling interest (54.18%) in Southern Peru Copper Company (hereinafter "SPCC")—a publicly traded Peruvian copper company. ASARCO's ownership equated to approximately 43,348,949 shares of the Class A Common Stock of SPCC. These shares, as will be discussed in detail below, were "Founder's

4

Shares" with enhanced voting rights. Phelps Dodge and Cerro Trading Co., Inc., both copper mining competitors of ASARCO (and with Grupo for that matter), owned the other Founder's Shares. The remaining shares of common stock were "thinly traded." In an average month, less than one percent (1%) of the shares of SPCC were actively traded on the open market. These publicly traded shares did not possess equal voting rights with the Founder's Shares.

In the late 1990's, Grupo began to look for opportunities to expand its mining investments. While Grupo was not necessarily looking for product diversification, it was seeking geographic diversity. Grupo wanted to globalize and take advantage of NAFTA. It also wanted access to the financing available on the New York Stock Exchange. Two companies attracted its interest: ASARCO and Cypress Minerals. Grupo hired Lehman Brothers to study an acquisition of Cypress and Chase to study a possible acquisition of ASARCO. While Grupo was seriously looking at these merger possibilities, it had not begun to actively pursue either target. Consequently, it was somewhat surprised and spurred to action by the fact that one of its competitors, Phelps Dodge, in the latter half of 1999, made a tender offer for ASARCO. In reaction, Grupo accelerated its analysis and decided to enter the bidding war for ASARCO instead of pursuing Cypress. Grupo preferred ASARCO's reserves and production numbers. According to Grupo's thinking, ASARCO had better properties in the United States than Cypress and also had reserves in Chile and Peru. Phelps Dodge's offer was approximately of $26.75 per share, which was more than the stock market price of the stock. A bidding war ensued and ultimately Phelps Dodge's bid was topped by Grupo's bid of $29.75 a share for the remaining 90% of the shares of ASARCO that Grupo did not already own. Due to the fact that the acquisition was the result of a contested bidding war, Grupo was unable to do complete due diligence into ASARCO's condition before acquiring ASARCO. At the time of the acquisition, Grupo did not feel that either the potential environmental or asbestos liabilities of ASARCO were a major concern.

Grupo's total purchase price exceeded $2 billion, which included $1.16 billion in cash and the assumption of ASARCO's outstanding debts. A formal agreement between ASARCO and Grupo was entered into in late October of 1999, which was accepted by the stockholders of ASARCO the next month. To finance the acquisition, Grupo negotiated an $817 million loan from Chase Manhattan Bank and Chase Securities Inc. (hereinafter referred to jointly as "Chase") to a

subsidiary that Grupo had formed specifically to acquire ASARCO. Its name was ASMEX. This loan was guaranteed by Grupo. The remainder of the cash portion, approximately $430 million, came from equity capital contributed by Grupo or one of its affiliates. After the acquisition was completed, ASMEX was merged into ASARCO, and ASARCO became a wholly owned subsidiary of Grupo. ASARCO's new board of directors consisted of German Larrea, Genaro Larrea, Hector Calva, Daniel Tellechea, Oscar Gonzalez Rocha, Xavier Garcia de Quevedo, Alfredo Casar, Daniel Chavez, Manuel Calderon, Alberto de la Parra, Francis McAllister, and Kevin Morana. All of the individuals, with the exception of Francis McAllister and Morana, were affiliated with Grupo.

Consistent with the practice in many leveraged buyout situations, the debt created by the acquisition was transferred to the acquired company. This greatly increased ASARCO's debt load. The $817 million debt from the Tender Offer Facility was added to its pre-existing debt of approximately $950 million—thus, saddling ASARCO with a total long-term debt of $1.767 billion. ASARCO also had an additional $450 million debt added to its ledger as part of a Revolving Credit Agreement that was financed by a consortium of 19 banks, again headed by Chase. This replaced a pre-acquisition debt facility. This new Revolving Credit Agreement (referred to many times in the record as the "Chase Revolver" or "Revolver") had a maturity date of November 15, 2002. It was to be secured by many of ASARCO's assets including inventory, accounts receivable, and the stock ASARCO held in SPCC. It was also guaranteed by Grupo.

It was this anticipated pledge of SPCC stock that is one of the building blocks of the current controversy. Plaintiffs claim that the following described transaction was motivated by an intent to defraud the creditors of ASARCO. Grupo and Americas Mining Corporation (hereinafter "AMC"), of course, deny this claim. The merits of and defenses to these allegations will be discussed in more detail below. Suffice it to say, Chase sought security for this new Revolver and Grupo, attempting to satisfy this need, sought to offer the SPCC shares as collateral. The ability to "pledge" these shares was arguably limited by the controlling SPCC corporate documents. These documents include the SPCC Shareholders Agreement and the Restated Certificate of Incorporation. ASARCO's stock ownership (being Founder's Shares) was such that it was allowed to nominate a majority of the SPCC directors and it, along with the other Founding Stockholders, had the right to elect 13 of the 15 members of the Board, as well as the SPCC President. SPCC was, and is, a

6

successful mining operation in Peru. Thus, regardless of whose point of view one adopts, this stock was a very valuable asset.

Under the terms of section 4.9 of the Restated Certificate of Incorporation (and under the terms of the SPCC Stockholders Agreement), any Founding Stockholder who transferred its Founder's Shares to a party that was not an affiliate would cause those shares to lose their super-voting rights. Those remaining Founder's Shares would retain their super-voting features as long as the three Founding Stockholders continued to hold at least an aggregate of 35% of the outstanding SPCC stock. If the percentage of Founder's Shares owned by the three founding entities dipped below 35%, all of the shares would convert to regular common stock.

Grupo was worried about triggering the provision whereby ASARCO's SPCC shares would lose their superior voting rights when it pledged them as the collateral for the Revolver provided by the Chase Bank consortium. It consulted with its legal and financial advisors to devise a strategy to avoid this occurrence. To avoid this possibility, on November 8, 1999, Grupo created Southern Peru Holding Company (hereinafter "SPHC") as a totally owned subsidiary of ASARCO. Its Board of Directors consisted of German Larrea, Genaro Larrea, and Agustin Santamaria, all individuals who owed their loyalty to Grupo. Grupo then had ASARCO transfer ownership of the stock to SPHC. Since SPHC was wholly owned by ASARCO, it was, therefore, an affiliate of a Founding Stockholder and the transfer did not trigger the loss of Founder's Share status. Then ASARCO pledged the SPHC stock, not the SPCC stock, to Chase, thus avoiding a claim that it might have triggered a conversion of its Founder's Shares to common stock by transferring ("pledging") the SPCC shares directly. SPHC's sole function was to hold and own the SPCC stock. During the time of the events in question, SPHC had no employees, no business to perform, and no debt.[5]

Grupo had a long-range goal of establishing an entity that would encompass producing interests in different geographic areas and ultimately taking that company public. In furtherance of this goal, Grupo next formed Americas Mining Corporation as a wholly owned subsidiary in October of 2000. At all of the pertinent times involved in this matter, AMC had no full-time employees and

---

[5] In fact, SPHC's purpose was so limited that it did not even have a bank account to receive the SPCC dividends. Those went directly to ASARCO. At one point in 2001, there was even consideration given to transferring to SPHC some other business purpose so that it would appear to "demonstrate a corporate existence with substance" for tax purposes.

it did no business other than hold ASARCO's stock. AMC is a Delaware company headquartered in Phoenix, Arizona. Like SPHC, its Board consisted only of Grupo employees or retainers. Grupo then transferred its ASARCO stock to AMC. The stated purpose for this maneuver was the eventual goal of having AMC own all of Grupo's mining interests (in the United States, Mexico, Peru, and anywhere else that they may be acquired) and having this American company have access to domestic capital markets. By the end of this restructuring, for all purposes relevant to this case, a four-tier corporate family was established. Grupo wholly owned AMC, which wholly owned ASARCO, which wholly owned SPHC, which owned the majority of stock in SPCC.[6] Grupo's practice of stocking the boards of its subsidiaries with Grupo employees or loyal retainers was described as a "uniform practice" and was one that continued up through the transaction in question, contrary to the advice of its corporate counsel at Sidley Austin Brown & Wood, LLP (hereinafter "Sidley Austin").

## B. The Market

While somewhat in dispute in this case, all of the evidence from individuals who have been intimately involved in the mining industry portrays the copper market as a cyclical market—one in which prices go through periods of high prices and then fall into periods of low prices. Those in the business essentially described the prediction of copper prices to be an exercise in futility. One veteran of 30-plus years in the mining industry, Bernard Guarnera, basically denied being an "expert" in the area of price predicting because "no one is ever right." This will be discussed in more detail below, but suffice it to say that the five-year period between 1999 and 2004 was one of low prices. In 1999, at the time Grupo acquired ASARCO, average copper prices were approximately 70-80 cents a pound. Subsequently, they were 70-80 cents (in 2000) and 60-70 cents (in 2001 and 2002). In 2003, the average prices inched back above the 80 cents per pound figure and then in 2004 jumped to an average price well above $1.00. These lower prices put a great deal of financial stress on the copper industry as a whole and on ASARCO, specifically—especially given its newly acquired debt.

---

[6] There are actually more members to this corporate family tree, as ASARCO has many more subsidiaries in addition to SPHC. None of these are directly pertinent to the issues herein, although some of these subsidiaries are the sources of alleged asbestos liability that contributed to some of the ongoing difficulties ASARCO faces.

Prices in 2008 now exceed $3.50 per pound based primarily on increased demand. This is compared to a 1990's pre-transaction high of 95 cents per pound of copper in 1995.[7]

Copper companies, despite their size, have little direct effect on prices. The market sets the price, and most companies sell at this price. Even the long-term contracts were and are primarily based upon the current price. It is not customary for prices to be set for a number of years. This is true for Grupo, its subsidiaries, and its competitors. The recent rise in prices has been primarily fueled by demand from China and India. Prior to this new trend, the United States was the world's largest consumer, but now China has replaced it. Predictions are that India's consumption will also continue to rise.

## C. ASARCO's Post-Acquisition Financial Position And The Transfer Of The SPCC Stock

The transaction at the heart of this conflict is the 2003 transfer of SPCC stock from SPHC to AMC. AMC claims that this transfer was the most viable option, at the time, to save ASARCO from its financial problems. ASARCO alleges that the transfer was based upon Grupo's assessment that ASARCO's viability was questionable and that the SPCC stock was its most prized asset. Plaintiffs contend that the sale, therefore, was not made to improve ASARCO's financial position, but was solely a means for AMC/Grupo to "cherry-pick" ASARCO's most prized asset before it was lost to creditors or by bankruptcy. There is a general agreement between the parties that whatever the prevailing intent, the actions were taken because of low copper prices, the increased debt load at ASARCO, and the mounting level of contingent environmental and asbestos claims.

### 1. The Department Of Justice (Hereinafter "DOJ") Lawsuit

While there is a dispute over the motivation and intent for the transfer of the SPCC stock, there is no dispute over the fact that ASARCO's environmental problems (in addition to its exposure to asbestos claims) were an overriding and complicating factor that plagued ASARCO and consequently AMC/Grupo. At the time of its acquisition by Grupo, ASARCO had numerous

---

[7] In the 1980's, prices had actually been higher, having peaked at about $1.30 per pound.

environmental problems. The extent of these problems was not known by Grupo because of its inability to conduct meaningful due diligence prior to its tender offer. In 2001, after Grupo had time to evaluate its new acquisition, one Grupo official described ASARCO as a company with very high operating costs, high real liabilities, and very high contingent liabilities. These problems continued to multiply in the post-acquisition years. The environmental problems were complicated by numerous asbestos-related claims.[8] As ASARCO's financial problems began to mount, the number of times it failed to comply with various environmental obligations also increased.

As ASARCO's troubles increased, it became apparent to those concerned that someone, and in all likelihood AMC/Grupo, would try to acquire the SPCC stock, since that stock was ASARCO's "crown jewel." As early as December of 2001, AMC/Grupo/ASARCO discussed selling the SPCC stock as a means to solve ASARCO's outstanding liabilities. These discussions with lenders and others continued throughout 2002 and as will be seen below, culminated with the sale in March of 2003. These discussions become so widely known that on October 4, 2002, Grupo issued a press release to calm the growing speculation that the SPCC stock would be sold on the open market. The release announced instead that the stock would be transferred in such a fashion that there would be no change in beneficial ownership or control.

The clearer it became that the SPCC stock would be transferred to someone, the more uneasy some of ASARCO's creditors became. One of the largest creditors was the United States. Ultimately, the Department of Justice became so concerned about ASARCO's ability to satisfy its environmental responsibilities if the stock was sold that in August of 2002, it filed a lawsuit in federal court to enjoin the sale of the stock. The DOJ was successful in obtaining a temporary injunction. As the plans (detailed below) for the sale of the SPCC and AMC/Grupo began to take shape and gain traction inside the Grupo corporate family, the attempts to resolve the injunction situation with the DOJ intensified. AMC/Grupo's goal in these negotiations was to satisfy the DOJ that the sale of the stock would not jeopardize ASARCO's ability to fulfill its environmental obligations and to otherwise sufficiently satisfy the DOJ such that it would be willing to agree to a

---

[8]   The epicenter of the asbestos claims was, and is, two subsidiaries of ASARCO, Capco Pipe Company (hereinafter "Capco") and Lac D'Amiante du Quebec Ltee (hereinafter "Lake Asbestos of Quebec" or "LAQ"), against whom the claims number in the tens of thousands.

dissolution of the injunction. The ASARCO directors at this point were all directors officers or employees of Grupo and/or AMC with the exception of Alberto de la Parra, who was Grupo's outside counsel and is currently its General Counsel.

In late 2001, the DOJ commissioned a study from Behre Dolbear and Company (hereinafter "Behre Dolbear") to estimate the fair value of the SPCC stock[9]. Their report, issued in April of 2002, indicated the value ASARCO's interest in SPCC was $817.2 million. AMC/Grupo was, and is to this day, critical of that evaluation. Grupo, after the acquisition, hired PricewaterhouseCoopers (hereinafter "PWC") to help it assign a value to the recently acquired assets. It assigned a business enterprise value of $893 million, which when adjusted to a value of the SPCC stock, results in a $672 million valuation. In the spring of 2001, AMC/Grupo/ASARCO retained Houlihan Lokey Howard & Zukin (hereinafter "Houlihan") to provide opinions on the fairness of the transaction and ASARCO's solvency post-transaction. Later, in light of the government's report from Behre Dolbear, ASARCO asked Houlihan to update valuation reports it had previously made, which had put the value of the stock at $720 million. Houlihan eventually concluded in a July 2002 report that the stock was worth $662 million. The pertinent Houlihan employees met with the DOJ and pointed out that if one corrected for the flaws it perceived in the Behre Dolbear report, the "accurate" valuation would be $634.8 million, a figure less than the Houlihan evaluation.

The negotiations between AMC/Grupo/ASARCO and the DOJ continued well into the fall of 2002.[10] Ultimately, the Grupo entities agreed to temporarily resolve their differences with the DOJ by agreeing to fund a $100 million trust in return for a three-year moratorium on any attempt by the federal government to seek judicial enforcement of environmental liabilities. The trust was to be funded by a note that was part of the sale proceeds, and it was to be guaranteed by Grupo. In exchange, the DOJ conceded that ASARCO could proceed with the proposed sale. The settlement agreement was reduced to an agreed judgment ("Consent Decree") which was signed by a federal

---

[9] Behre Dolbear is an international minerals industry consulting firm.

[10] The evidence concerning the duration and extent of the AMC/Grupo/ASARCO negotiations with the DOJ is somewhat limited. No witness described these talks in detail. Nevertheless, some exhibits indicate that the negotiations were ongoing for a number of months and that various terms and conditions were discussed in addition to the amount that the DOJ would receive in trust.

judge in Arizona on February 3, 2003. The Consent Decree took into consideration the possibility that a lawsuit, like the instant one, might be brought by other interested parties and that the transaction might ultimately be set aside. If the sale were set aside, the agreed judgment would become null and void. An additional term required ASARCO to remain in business (i.e., not seek bankruptcy) for at least one year. The United States remains one of the largest creditors of ASARCO and is pursuing a large claim in the ASARCO bankruptcy.

## 2. Post-Acquisition ASARCO And The Transfer Of The SPCC Stock

To reduce the debt from the 1999 acquisition, ASARCO almost immediately had to begin selling its "non-core" assets. The two most important sales were those of Ethone-OMI, which was sold for $503 million in December of 1999, and American Limestone in May of 2000 for $232 million. ASARCO used these funds to pay off the Tender Offer Facility in 2000.

This left ASARCO with approximately $300 million at its disposal to use as working capital according to Daniel Tellechea, Grupo's Chief Financial Officer. Nevertheless, as the new century began, financial pressures began to mount. In addition to the fact that it was having problems meeting its day-to-day financial obligations, ASARCO was beset with legal liabilities from environmental and asbestos claims. Adverse judgments and settlements resulted in additional financial drain, and at times ASARCO was even having great difficulties paying its defense counsel and experts.

By the fall of 2001, ASARCO's financial difficulties had reached a point where they could no longer be ignored. In September 2001, ASARCO technically defaulted on the $450 million Revolver. In October, it engaged the law firm of Sidley Austin to provide bankruptcy and restructuring advice. Also, in October, ASARCO's debt far exceeded the sales volume and profit it was generating. ASARCO was falling behind on payments to many of its critical vendors. Some even refused to supply the parts or fuel for the vehicles necessary for ASARCO's mining operations. Instead of rebounding, copper prices fell to the vicinity of 60 cents per pound by November 2001. ASARCO did not have the $50 million it needed to pay a bond debt that came due in December. In

late 2001, the Larrea family (through AMC) loaned $41.75 million to ASARCO to keep it afloat.[11] In 2002, ASARCO's auditors, reviewing 2001 numbers, indicated that there was "substantial doubt about ASARCO's ability to continue as a going concern." Arthur Anderson reported a loss for ASARCO of $392 million in 2001 and predicted that ASARCO would need an additional $200 million cash infusion in 2003. Late in 2001, AMC/Grupo/ASARCO and their advisors began to seriously discuss plans for some kind of major restructuring, including discussions of filing bankruptcy. By December, they were also in negotiations with their lenders about the best course of action.

The financial problems continued to mount in 2002. In January, ASARCO stopped paying various creditors and contractors. It owed over $80 million in past-due debt by February 2002. Throughout 2002, ASARCO could not even make the payments on the principal or interest it owed to the Larrea family, thus incurring interest charges, which were not paid until October of 2003. ASARCO was not even able to pay the very experts it had retained to help with the cash crisis. Midway through 2002, Sidley Austin noted that Houlihan could not render a solvency opinion for ASARCO and if one was needed, AMC/Grupo would have to hire another firm. Houlihan had valued the shares at $641 million but stated that the purchase price would need to include a premium of $193 million for Houlihan to be comfortable rendering a fairness or solvency opinion. Daniel Tellechea testified that in 2002 ASARCO had a negative stockholder's equity. The record is replete with examples of a variety of debts that ASARCO could not pay.

As more debts became past due, there seemed to be very few options that could resolve ASARCO's financial position. Those included cutting costs and reducing production, high-grading mines, borrowing money, selling assets, or hoping for a quick and/or drastic move upward in copper prices.[12] ASARCO had already begun to high grade and to cut production and costs, but these measures were not enough. Since copper prices seemed mired in the range of 70-80 cents, no help

---

[11] The "loan" was actually documented as an advance payment on the purchase of the SPCC shares, despite the fact that the details of any such transaction were still very much in a state of flux.

[12] "High grading" is a mining term used to describe a process in which a mine operator mines only the high grade ore because it is cheaper to process. Since it generally means the mine operator also stops stripping (uncovering the waste off the ore), it is considered a technique one does only in times of financial hardship or at the very end of the life of a mine. Once one high grades a mine, in order to restart a proper mining program, one must start stripping over again. That process can take a lot of time with little or no resulting production.

was forthcoming in that area.  The only options left available to attempt to right the ship were borrowing more money or selling more assets.  With its income already not covering the debts it was incurring, as well as the past-due liabilities, the chances of obtaining successful financing seemed remote.  Due in part to the unpaid bills, default on loan covenants, cross-default positions, and looming bond obligations, Chase began to apply increasing pressure on ASARCO for payment in full on the Revolver.  Chase threatened to foreclose on its security interests (including the SPHC stock) if the debt was not paid.  Most AMC/Grupo/ASARCO insiders and consultants felt that there were only plausible two courses of action:  bankruptcy or the sale of assets.  At least one bankruptcy expert testified at trial that either course of action would have been reasonable.  ASARCO's best and most valuable asset was ASARCO's stock in SPCC.  Beginning as early as 2001, AMC/Grupo concluded that the most viable option was to sell the SPCC shares.  However, AMC/Grupo did not want to relinquish control of this valuable asset.  Even in the midst of this prolonged copper price downturn, the SPCC operations remained profitable—this being another indication of the quality of the Peruvian operation.

To stay afloat, ASARCO monetized insurance policies, sold equipment, high graded certain mines, and failed to make payments and cash calls on certain legal obligations, investment properties, and/or mining prospects.[13]  Between 1999 and 2002, apart from its ownership in SPCC, ASARCO had net losses in excess of $680 million.  This was true despite the fact that it monetized insurance policies in an amount exceeding $170 million.

Various legal and financial experts were hired to help effectuate a restructuring and, if possible, an intra-company sale of the SPCC stock.  Houlihan had already been hired to provide opinions regarding the fairness of any proposed consideration and the post-transaction solvency of ASARCO, and Sidley Austin had also been hired by AMC/Grupo/ASARCO. AMC/Grupo/ASARCO hired the law firm of Squire Sanders & Dempsey (hereinafter "Squire Sanders") in early July of 2002 to help formulate and analyze possible options.  In August of 2002, they also hired Ernst and Young Corporate Finance (hereinafter "EYCF") to advise them with regard to possible restructuring.  Later, ASARCO expanded the duties of EYCF to evaluate the SPCC stock.

---

[13]  ASARCO's competitors, to varying degrees, were faced with similar problems and implemented some of these same remedies.

As noted, a year earlier, Houlihan estimated that a $720 million sales price for the SPCC stock would be fair from a financial standpoint and also opined that this sale would leave ASARCO solvent. By May of 2002, however, Houlihan reported that ASARCO would need to realize $834 million for the price to be fair from a financial standpoint and for ASARCO to continue operating properly. It also suggested, for the first time, that ASARCO might be better off financially if it kept the shares of SPCC.[14] In July of 2002, Houlihan concluded, somewhat in response to the Behre Dolbear figure of $817.2 million, that the fair market value of the shares was $662 million.

With looming financial deadlines and no expectation for a surge in copper prices, EYCF and Squire Sanders along with company executives began to seriously consider refinancing and restructuring alternatives, including the possibility of filing bankruptcy. From its first meeting with Squire Sanders in Mexico City in July of 2002, AMC/Grupo stressed their desire to transfer the SPCC stock to AMC and do it in such a manner as to avoid a fraudulent conveyance action. The record clearly reflects the continual desire of Grupo to keep control of the SPCC stock. While it saw the need to sell the stock to generate funds for ASARCO, neither AMC/Grupo/ASARCO nor any third party marketed the SPCC stock in any kind of public fashion. While German Larrea testified that he told Chase that he would review any third-party offers, AMC/Grupo/ASARCO did nothing to solicit or seek out such offers. For example, they never hired an investment bank, mining consultant, or financial institution to help place the stock on the market. Numerous witnesses testified and multiple exhibits support the conclusion that it was AMC/Grupo's constant desire to retain the SPCC stock.[15] Additionally, the notes from that same meeting indicate a secondary goal of AMC/Grupo was to find a means of putting cash into ASARCO in a manner whereby the "value of new cash investment does not automatically flow to creditors but is retained by [AMC/Grupo]." Shortly thereafter, Squire Sanders recommended that ASARCO add independent directors to ASARCO's Board to help serve on a Restructuring Committee. That Committee was formed in

---

[14] A Sidley Austin email in May of 2002, citing Houlihan as the source, stated that the sale of SPCC was cash positive for ASARCO only in the first year and that after that ASARCO was better off keeping the stock.

[15] The Court should note that there were two reasons for an intra-company transfer that did not originate with Grupo's management strategy. The first was the issue of the Founder's Shares losing their unique voting rights. The second was the potential tax consequences of a sale to a third party, although all experts admitted at trial that an adjustment in the purchase price could have compensated for any adverse tax consequence.

October of 2002 and consisted of the two new independent directors, Al Frei and Jock Patton, plus Genaro Larrea, ASARCO's President (and brother of German Larrea, who was Chairman and CEO of Grupo and AMC). This Committee met five times over the subsequent four months.

By late 2002, Squires Sanders reported that ASARCO was in danger of running out of cash. Tellechea was predicting in October of 2002 that there would be a cash shortfall of $11-31 million by the year's end. AMC/Grupo also entered negotiations with the Chase Bank group for an extension of the Revolver, which otherwise would come due in November of 2002. As part of those negotiations, AMC took a $50 million participation interest in the $450 million obligation. This resulted in a two-month extension of the due date to January 31, 2003. This extension agreement was reached in tandem with the near-completion of the ASARCO/DOJ negotiations to dissolve the injunction. The decision was ultimately reached by Grupo to have ASARCO sell the SPCC shares to AMC.[16] It was recognized by all involved, including the boards of Grupo, AMC, and ASARCO as well as their legal and financial advisors, that such a transaction would be viewed by everyone as an intra-company transaction. That being the case, and in order to get the benefit of the business judgment rule, it was decided that the transaction must not only be for reasonably equivalent value, but that it must also be blessed by the outside directors.

Of additional concern was the upcoming deadline to redeem the so-called "Yankee Bonds." At issue were $100 million worth of outstanding bonds coming due on February 3, 2003. The bonds were unsecured. The bonds were drawing periodic interest, which ASARCO was not paying. These bonds and the Chase Revolver were the only upcoming fixed debt obligations. The next long-term financing obligations were bonds coming due in 2013. As will be seen below, there was significant internal debate over the need to and/or wisdom of paying the Yankee Bonds at par. The individuals at AMC/Grupo wanted ASARCO to pay the bonds at par plus interest, which is what eventually happened. Various individuals at ASARCO and its advisors suggested at least two separate avenues: (1) buying the bonds at discount (they were trading on the open market at 50-60 cents on the dollar at various times during 2002); or (2) not paying them at all and treating the bond holders as any other unsecured creditor. AMC/Grupo officials testified at trial that the "banks" were forcing it to pay

---

[16] Various scenarios had been discussed. For example, at one point it was suggested that the bank debt be transferred to AMC along with stock.

these bonds as a condition of refinancing.  There were exhibits introduced at trial to support this assertion, especially with respect to AMC/Grupo's ongoing negotiations with one bank in particular, Barclays.  Similarly, there was testimony, verified by at least three witnesses and multiple exhibits, that Genaro Larrea told individuals involved in the restructuring that the bonds had to be paid because Inbursa, a Mexican bank that owned, or whose principals owned, a large number of the bonds, was demanding payment as a condition of its financing the Grupo purchase of the SPCC stock.  These statements were later retracted by Genaro Larrea.  There was also evidence that several banks expressed the contrary opinion, i.e. that the bonds should not be paid.  Suffice it to say, as the proposed sale began to take shape, a second critical debt deadline loomed, and a strategy had to be devised to deal with it.

As stated above, Squire Sanders and EYCF recommended two local businessmen to serve as independent directors.  Both were local Phoenix businessmen who had worked with Squire Sanders before, and both had experience in companies that were in or on the verge of bankruptcy. When it became clear that Chase would grant an extension beyond the November 2002 deadline, it became less certain that bankruptcy was the only way to protect the SPCC stock from foreclosure. Given that a sale was possible, the role of the two independent directors was changed to include the duties of being the independent eyes and ears on this intra-company transaction.

In the meantime, EYCF (based in part upon the work of its affiliate Ernst and Young LLP) found that the fair market value of the shares in December of 2002 was $640 million and in January of 2003 opined that the $765 million being paid in consideration was greater than the value of the stock at year-end 2002.  On January 27, 2003, the Restructuring Committee met to consider the proposed transaction along with other pressing problems.  Doug McAllister, General Counsel of ASARCO, presented the latest draft of the Consent Decree, which in substance allowed the stock sale to proceed.  On behalf of EYCF, Grant Lyon presented Ernst & Young's analysis of its valuation method and its final analysis concerning the value of the SPCC stock.[17]  The Directors questioned this $640 million figure as being too low since the stock market price of the SPCC shares was $670 million at the time in question, but were apparently satisfied by Lyon's explanation.  Lyon discussed

_____

[17] EYCF associated its affiliate company, Ernst & Young LLP (hereinafter "E&Y"), to help with the valuation process.

17

his reasoning as to why the DOJ/Behre Dolbear figure of $817 million was not accurate. He also discussed the tax consequences of the sale and the various values that could be ascribed to the non-cash portion of the proposed consideration. Ultimately, the Committee's conclusion was that, regardless of which of the various values was used, the total package exceeded the $640 million figure. Based upon the advice and the numbers presented to it, the Committee conditionally voted to recommend approval of the sale to AMC.

Nevertheless, the Committee refused to approve the payment of the Yankee Bonds, which were due on February 3, 2003, despite the representation by Genaro Larrea that such payment was a condition of the Banco Inbursa financing. Lyon explained that in 2003 significant cash flow and capital deficits were expected and that the proposed payment of the Yankee Bonds would leave ASARCO with no apparent means of meeting these needs. The Restructuring Committee agreed to defer the consideration of this issue pending updated cash flow projections. The Committee expressed its willingness to approve the payment of the bonds if ASARCO could still maintain operations and meet its obligations to other creditors.

At this point in time, the cohesiveness of the Restructuring Committee seemed to evaporate. The outsider members of the Committee along with some of its advisors sought to confer with senior management on these cash flow and creditor issues. (It was expected that the management team would present figures indicating a $60 million deficit or "hole.") Genaro Larrea, the Committee's third member, allegedly thwarted these efforts by sending the management team to Tuscon, Arizona. On January 29, 2003, the Committee reconvened. The AMC/Grupo financing for the transaction was discussed. At that meeting, Genaro Larrea presented "new cash projections," but no one could verify their accuracy. Patton insisted that management be made available to EYCF and the Committee members to verify these projections. The legal advisors present acknowledged that the Committee was undertaking proper procedures.

Then the discussion again turned to the payment of the Yankee Bonds. Larrea told the assembled group that contrary to what he had told them earlier, the payment of the Yankee Bonds was not a prerequisite of the financing that Grupo was seeking from Inbursa. The attorneys from Squire Sanders reiterated to the Committee that, in light of ASARCO's financial position, ASARCO's directors had a fiduciary duty to all of ASARCO's creditors. "This duty requires that

the Corporation preserve the value of its assets for the benefit of its creditors and attempt to treat, as much as possible, similarly situated creditors fairly and equitably." They also instructed the Committee "if the payment of the Yankee Bonds did jeopardize the Corporation's ability to continue its operations or meet its other scheduled obligation . . . and essentially preferred one group of creditors over other similarly situated creditors, the directors would likely be considered to have breached their fiduciary obligations to creditors." After this caution, the Committee agreed that no payment of the Yankee Bonds would be made until and unless EYCF verified that ASARCO would have the ability to continue after the bonds were paid. The meeting concluded, much like the one two days earlier, with the Committee deciding to wait for further information on the company's cash position.

No sooner had they adjourned when Grupo issued a press release under ASARCO's name. In that release were several statements that were not true or at the very least were misleading, including the statement that " . . . ASARCO will receive the funds necessary to pay $550 million in debt due next week." This statement is somewhat misleading in that the plan was for ASARCO to receive only $500 million in cash. Further, the statement, in effect, announced that the Yankee Bonds would be paid—an act that had specifically been tabled by the Restructuring Committee. ($450 million of the cash would go toward paying the Revolver, and the remaining $50 million would go towards paying the Yankee Bonds. The additional $50 million owing on the Yankee Bonds would come from ASARCO.)

The press release also stated: " . . . [T]his agreement provides a structure under which ASARCO can meet near-term obligations . . . " and "[T]he value of the transaction and the terms under which it will occur were validated in an independent analysis conducted by the international accounting firm of Ernst & Young." Neither of these statements were completely true, as EYCF had not approved the "terms under which it would occur."

Initially, ASARCO could not, at the time, meet its short-term obligations, and the agreement did not enable ASARCO to meet any of its other obligations (with the exception of the Chase Revolver, the Yankee Bonds, and the Larrea debt).[18] Further, EYCF later told the Board that it did

---

[18] The Court notes that the proposed payments of the Revolver and the Yankee Bonds did alleviate ASARCO's immediate need to pay long-term debt obligations, as the next major debt facility did not mature until 2013.

not believe the payment of the Yankee Bonds would bring ASARCO to a position of financial stability. To the contrary, EYCF emphasized that the payment of the Yankee Bonds would cause ASARCO to face severe liquidity deficits. While upset at the press release for the reasons expressed above and because it violated their engagement agreement and was not cleared with the individuals working on the transaction, EYCF continued to take its directions from the Restructuring Committee. It reviewed the new financial projections and reported back on February 3, 2003. Even using the "new" figures, EYCF predicted negative cash balances of over $50 million during 2003. Further, they noted at least $75 million of unpaid debts to entities such as Glencore ($30 million), Dresder ($11 million), Mitsui ($13 million), the states of New York and Connecticut ($12 million), and $9 million in miscellaneous obligations.[19] Even using the Revised Projections, EYCF stated:

> . . . we do not believe that ASARCO can continue its obligations without significant cash infusions. Such cash infusions could come from both the residual cash of $50 million from the sale of the SPCC stock (after the Chase $450 million facility is satisfied) . . . or the monetization of certain insurance policies in the approximate amount of $49 million . . . However, if the Residual Cash and the Insurance Proceeds are used to pay the $100 million Yankee Bonds . . . , we believe that ASARCO will face the possible inability to continue to fund its operations.

EYCF made it clear that paying the Yankee Bonds would compromise ASARCO's viability and that it expected ASARCO to immediately clarify the press release.

Having received EYCF's analysis, the legal team at Squire Sanders immediately sent the Restructuring Committee a memo that detailed the Committee's duties and obligations. The firm concluded that ASARCO was in the "'zone of insolvency,' if not actually insolvent and that the Board owed a fiduciary duty to ASARCO's creditors. They concluded that "[b]ased upon the currently available information regarding ASARCO's financial condition, we believe that it is extremely difficult for ASARCO to articulate a supportable business justification consistent with its

---

[19] The concerns over outstanding debts and paying the Yankee Bonds were communicated to German Larrea, Grupo's Chairman, on a number of occasions. During this same January 2003 time period, ASARCO, in addition to not paying these debts, among others, had to layoff 250 employees, as it had trouble meeting its payroll.

fiduciary duty to all creditors for paying the Yankee Bonds . . . . Rather, the motivation for payment . . . seems primarily related to AMC's interest in securing financing . . . ."

Genaro Larrea asked Squire Sanders to expand its memo, which it did on February 5, 2003. In addition to the advice it offered, it warned the Board that:

> . . . it is well settled that the fact that ASARCO may be receiving reasonably equivalent value in exchange for the sales of the SPCC shares is immaterial to the question of intent and voidability in a fraudulent transfer lawsuit alleging actual intent to hinder, delay or defraud ASARCO's creditors.  The projected cash flow deficits of ASARCO materially jeopardize its ability to continue to operate outside of a bankruptcy proceeding.  *When coupled with the $75 million dollars in Other Obligations that ASARCO has no present ability to satisfy, the payment of the $100 million to the holders of Yankee Bonds not only jeopardizes ASARCO's ability to continue to operate but also prefers, in a distressed company scenario, one group of creditors* (i.e., the Yankee Bonds) over all other similarly situated creditors (i.e., environmental and asbestos claimants holding unsecured claims, trade creditors, the more than $300 million dollars of unsecured notes outstanding and the $75 million dollars of Other Obligations).  [emphasis added]

The opinion concluded that the payment of the Yankee Bonds " . . . will give creditors a credible basis to challenge the SPCC sales as a fraudulent conveyance under the actual intent to hinder, delay, and defraud creditors standard, not withstanding the Ernst & Young 'reasonable equivalent value' opinion."  The firm then predicted this very lawsuit if the Yankee Bonds were paid.

Over the next few days, Squire Sanders, Genaro Larrea, and Daniel Tellechea continued to play out various scenarios, including: (1) paying the Yankee Bonds without filling the deficit/hole; (2) paying the Yankee Bonds and filling the deficit/hole; and (3) not paying the Yankee Bonds.  The firm opined that the first scenario involved a significant risk of a successful challenge to the SPCC sale.  Despite being warned by its financial and legal advisors, AMC/Grupo insisted on the payment of the Yankee Bonds without filling the hole.

The fallout between ASARCO and its independent directors and EYCF escalated when Grupo had ASARCO announce on February 20, 2003 that ASARCO would use proceeds from the stock transfer to pay the Yankee Bonds at par plus all accrued interest.  All the while, ASARCO's

financial condition continued to deteriorate. Societe Generale, which had a judgment against ASARCO, sought to execute its judgment on whatever assets it could reach, including the SPCC stock. Millions of dollars were owed to outside creditors. It was noted on February 27, 2003, that even the independent members of the Restructuring Committee had not been paid in months. As of March 3, 2003, the Pozia law firm, ASARCO's national asbestos counsel, was owed over $3.5 million. There also was over $30 million in "held checks." Genaro Larrea wrote German in February telling him that ASARCO had no operating funds. Genaro Larrea believed ASARCO had only three real options: (1) not pay the Yankee Bonds; (2) secure a keep-well agreement from AMC/Grupo; or (3) put ASARCO into Chapter 11. On behalf of AMC/Grupo, German Larrea considered these suggestions, but rejected all of these options.

Since ASARCO made the Yankee Bonds announcement without the approval of the Restructuring Committee and despite the warnings from its professional advisors, Jock Patton emailed Genaro Larrea after the February 20th announcement with multiple objections and questions. He questioned the fact that no final cash projections were provided as promised. He further complained that the payment of the Yankee Bonds as announced was contrary to the decision in their last meeting. Finally, he reiterated the amount of the debt that still surrounded ASARCO, including a partial list of over $75 million of outstanding debts. He refused to sign any documents related to the matter. In late March of 2003, Squire Sanders informed Patton that he should resign unless the decision to pay the Yankee Bonds was reversed.

Ultimately, on March 26, 2003, Patton and Frei did resign from the Board and withdrew their consent from the entire transaction—not just the payment of the Yankee Bonds.[20] The next day, EYCF resigned over the intended payment of the Yankee Bonds. It also refused to issue the bring-down opinion that had been contemplated and that Sidley Austin had advised AMC/Grupo to get. EYCF considered withdrawing the reasonably equivalent value opinion, but ultimately left it in place after AMC/Grupo threatened it with litigation if it withdrew the opinion.

On March 31, 2003, AMC/Grupo closed the transaction. At this point, ASARCO had numerous creditors, including contingent and liquidated creditors that were unsecured. The

---

[20] Frei and Patton had earlier conditionally signed a draft of the unanimous consent approving the transaction, in order to make the closing easier.

transaction was approved by the remaining board members of ASARCO without dissent, primarily because the dissenting board members had resigned and the remaining board members were all affiliated with AMC/Grupo. The funds were dispersed according to a Funds Flow Memorandum. The funds, transferred on this date, which totaled $672,653,400, came from the following sources:

(A)     $ 200,000,000 from Servicios Agent Acct;

(B)     $ 310,000,000 from AMC's Agent Acct;

(C)     $ 102,353,400 from Servicios;

(D)     $  10,300,000 from Grupo; and

(E)     $  50,000,000 from ASARCO

The ultimate recipients of the consideration at the end of the day were:

(A)     Chase Bank Group (including AMC)—$450 million principal plus interest on the Revolver (cash payment) (AMC received $50 million plus interest back because of its participation in the Revolver).

(B)     SPHC—$123.25 million note from AMC (to be paid in 7 equal annual installments with 7% interest)

(C)     The United States—$100 million Trust Note (to be paid in 8 equal annual installments with 7% interest and a AMC/Grupo guarantee)

(D)     ASARCO/SPHC—forgiveness of the AMC/Larrea $41.75 million note (the "advance" payment)

23

(E)          Yankee Bond Holders—$100 million plus interest (cash payment)

Before closing, Daniel Tellechea, Armando Ortega, and Douglas McAllister conferred with Michael Fitzgerald of Sidley Austin, their long-standing corporate counsel, about the propriety of going forward with the transaction, given the resignations of Frei, Patton, and EYCF. At the time, Sidley Austin represented Grupo, AMC, and ASARCO. He did not opine on the future legal consequences, but did tell Grupo that there was no legal prohibition against proceeding ahead with the transaction.

The transaction was completed and the funds were distributed. While ASARCO was relieved of its overdue obligations on the Revolver and Yankee Bonds, it continued to have financial problems. Less than two weeks later, there was at least $23 million in "held checks"—some that had been held for over a year. In June of 2003, Fitzgerald noted in a memo to Grupo that "ASARCO's current operations are under severe financial pressure. It has limited cash flow and numerous creditors are demanding payment." The memo went on to discuss the fact that several individuals from AMC/Grupo still served on the Board of ASARCO and that they would have fiduciary duties to creditors of ASARCO. Fitzgerald emphasized that "[t]hroughout the consideration of this sale, one of the issues has been a potential attack on the sale as being a fraudulent conveyance . . . ." Fitzgerald advised AMC to immediately prepare to defend such an attack either outside of, or as a part of, an ASARCO bankruptcy proceeding. He also advised that the AMC/Grupo representatives on the ASARCO Board of Directors resign if a bankruptcy occurred. Fitzgerald testified that he had consistently advised Grupo's representatives not to sit on the boards of the company's subsidiaries. He repeated this advice in a memorandum on June 27, 2003. He explained that the overlapping directorships might enable creditors (and particularly asbestos and environmental claimants) to pierce the corporate veil, and he warned that a judge might allow ASARCO's creditors to make claims against AMC or Grupo. Three weeks later (on July 18, 2003), all nine representatives of Grupo resigned from ASARCO's board, and Grupo's representatives resigned from SPHC's board.

Before resigning, these executives decided to postpone paying $2 million worth of ASARCO bond interest, so that the money could be directed to pay freight and power charges. At the time of the resignations, cash flow was short even for making payroll (as it had been all year). At that point,

24

however, the accounting department described the situation as a "crisis." This confirmed earlier predictions by EYCF that ASARCO would suffer a cash deficit of $61.1 million in 2003, with a cash balance of a negative $46 million. Arthur Anderson had also previously (in 2002) estimated that ASARCO would need $200 million of additional funds in 2003.

Throughout the years prior to its bankruptcy filing (2003-2005), ASARCO continued to survive from hand to mouth. It cannibalized assets, sold or abandoned other assets, fired employees, high-graded mines, monetized badly needed insurance policies, and cut costs. It also maintained a pattern of delaying or refusing to pay creditors. In layman's terms, it was constantly "robbing Peter to pay Paul." Operational personnel also complained that the lack of cash was hurting ASARCO's ability to maintain operations. Years of under-funding had caused a deep drop in performance. They complained that the lost revenues due to lack of funding were nearly $100 million and that the company was losing valuable workers. Two months prior to the March 2003 closing, George Burns had presented in great detail the production problems that 2002 had presented and why he thought ASARCO would suffer the same problems throughout 2003. He complained that he could not meet the 2003 forecast due to lack of cash. According to Burns, the cash shortage prevented ASARCO's operational divisions from: (1) stripping (resulting in large shortfalls); (2) maintaining pumping operations; (3) making prompt payments, and in many instances any payments, to suppliers (causing curtailment of operations in the Ray, Hayden, Mission Underground, and Mission Pit mines).

These problems continued in the post-closing years. As the cash flow problems continued to mount, ASARCO's legal problems also continued to skyrocket. In November of 2004, Mesirow Financial Consulting assumed that ASARCO's asbestos-related liabilities would climb from $86 million to $550 million and that its environmental liabilities would climb to $900 million, assuming a 2005 bankruptcy. By July 12, 2005—two to three months after five of ASARCO's non-operating subsidiaries filed bankruptcy—Standard & Poor's Rating Service had lowered its credit rating on ASARCO from BB− to CCC. Its outlook was downgraded from "Positive" to "Negative." S&P noted only two positives: rising copper prices and minimal long-term debt maturities in the next seven years. The negatives it noted were: minimum support from AMC and Grupo, high exposure to environmental and asbestos claims, poor operating performance, high production costs, and a recent strike. It especially noted corporate restructuring design "with the intention of isolating the

company [AMC] from ASARCO." It questioned the fact that ASARCO was relying on the AMC note payments to "meet its short-term obligations" and pointed out that it did "not have access to bank lines." Other financial rating organizations had also downgraded ASARCO. According to the Fitch credit rating on August 10, 2005, ASARCO was in the category of imminent default.

By the time ASARCO was looking seriously at bankruptcy in 2005, there were thousands of asbestos claims involving ASARCO or its subsidiaries and they were increasing on a daily basis. ASARCO had also been hit with a labor strike. ASARCO put its subsidiaries, Capco and LAQ, into a prepackaged 524(g) bankruptcy on April 11, 2005. Ultimately (and reluctantly), on advice of counsel, ASARCO followed these subsidiaries into Chapter 11 on August 9, 2005. SPHC filed a voluntary petition for Chapter 11 protection the next year. Plaintiffs now bring these claims in their capacities of debtors in possession and on behalf of ASARCO's unpaid creditors.

## II.  FRAUDULENT TRANSFER

Plaintiffs bring fraudulent transfer claims pursuant to §§ 544 and 550 of the Federal Bankruptcy Code. (Plaintiffs' Second Amended Complaint (hereinafter "Complaint" or "Compl.") ¶ 3.) According to § 544(b), a "trustee may avoid any transfer of an interest of the debtor in property. . . that is voidable under applicable [state] law by a creditor" holding an allowable unsecured claim.[21] 11 U.S.C. § 544(b)(1). Trustees and debtors in possession use § 544(b) as a conduit to assert state-law-based fraudulent transfer claims in bankruptcy.[22] In bringing the fraudulent transfer claims, the trustee or debtor in possession is given the same avoiding powers that an unsecured creditor with an allowable claim might have under applicable law. In its Order on Defendant's Motion to Dismiss, the Court determined that the applicable law for Plaintiffs' fraudulent transfer claims is Delaware's version of the Uniform Fraudulent Transfer Act (hereinafter "UFTA"). *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 64 (S.D. Tex. 2007). Plaintiffs assert claims under Delaware's constructive fraudulent transfer and actual intent fraudulent transfer provisions.

---

[21]  Although the statute says "trustee," for purposes of the fraudulent transfer claims, Plaintiffs, as debtors in possession, have the same rights to sue and be sued as a trustee does. 11 U.S.C. § 1107(a). Plaintiffs have not claimed, under applicable bankruptcy statutes, that these transfers are illegal preferences.

[22]  Section 550 provides the remedies available if a plaintiff prevails on its § 544 cause of action.

## A. Standing

In order for Plaintiffs to prevail on the fraudulent transfer claims under Delaware law, Plaintiffs must prove the threshold requirements stated in Bankruptcy Code § 544: (1) there are actual, unsecured creditors that would have standing to avoid the challenged transfer; and (2) the challenged transfer involved an interest of the debtor in property, i.e. the debtor transferred property in which it had an interest. *See* 11 U.S.C. § 544.

## 1. ACTUAL, UNSECURED CREDITORS

Plaintiffs must first establish the existence of an actual creditor with a viable cause of action against the debtor that is not time barred or otherwise invalid. COLLIER ON BANKRUPTCY ¶ 544.09 (15th ed. rev.). In other words, each Plaintiff must prove: (1) at the time of the challenged transfer, there was in existence one or more creditors holding unsecured claims against the debtor; (2) the transfer could have been set aside by such creditor under Delaware law; and (3) at least one of the unsecured creditors with the right to challenge the transaction, or its successor in interest, continued to have a claim against the plaintiff until the commencement of the case and is entitled to an allowed claim against the estate. Commercial Bankruptcy Litigation § 10:4; COLLIER ON BANKRUPTCY ¶ 544.09 (15th ed. rev.).

There is no evidence that SPHC had any debts or obligations at the time of the challenged transfer, much less any evidence of a creditor with an unsecured claim against SPHC. For this reason, SPHC, as debtor in possession, lacks standing to pursue any fraudulent transfer claims via § 544.

ASARCO presented evidence at trial and the Court so finds that it had a number of unsecured creditors at the time of the challenged transfer. (*See, e.g.*, PX 0212). The Court finds that, all other elements being satisfied, these creditors could have set the transfer of the SPCC stock aside pursuant to Delaware law. At least one of the unsecured creditors who could have challenged the transfer existed at the commencement of this case and is entitled to an allowable claim against the estate. (*See, e.g.,* PX 1374, PX 1397, PX 1377, PX 1378, PX 1375, PX 1386, PX 1388, PX 1392, PX 1372, PX 1389). ASARCO, therefore, has satisfied the first requirement to bring a claim under § 544.

## 2. INTEREST OF THE DEBTOR IN PROPERTY (ALTER EGO)

In order to have standing to pursue its fraudulent transfer claims, ASARCO must also prove it had an interest in the stock that was transferred.[23] If ASARCO cannot prove that it had an interest in the transferred property pursuant to Delaware state law, it does not have standing to bring either fraudulent transfer claim.  To meet this requirement, ASARCO asserts a reverse-veil-piercing argument, urging this Court to disregard the separateness of ASARCO and SPHC so as to expand ASARCO's estate to include the asset (stock) that formerly belonged to SPHC.  In other words, ASARCO asks the Court to find that SPHC was its alter ego so that it can claim an interest in the SPCC stock that was transferred from SPHC to AMC.

### a. Elements Of Alter Ego

Although Delaware courts have not yet recognized the availability of reverse-veil piercing, this Court, in a previous Order (Doc. No. 156), predicted that Delaware would adopt this doctrine if presented with a similar factual scenario.  The Court also predicted that in determining whether to reverse pierce a corporate veil, Delaware would use similar equitable considerations as it would under a traditional veil-piercing claim.[24]  Under Delaware law, in order to pierce the corporate veil on an alter-ego theory, traditionally a plaintiff must prove: (1) the parent and subsidiary operated as a single economic entity; and (2) an overall element of injustice or unfairness is present.  *In re Foxmeyer Corp.* 290 B.R. 229, 235 (Br. D. Del. 2003).  In short, the question is whether the two corporations operated as a single economic entity such that it would be inequitable to uphold the legal distinction.  *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp 1076, 1085 (D. Del. 1990) (applying Delaware law).

---

[23] There is no question that SPHC had an interest in the property that was transferred, as it was the legal holder of the SPCC stock.  As discussed above, however, SPHC does not have standing to pursue the fraudulent-transfer claims because it failed to establish the existence of any unsecured creditors who could have avoided the transfer.

[24] Numerous other jurisdictions have used the same alter-ego considerations to justify reverse-veil piercing in similar situations.  *See, e.g., Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006)(applying Texas law); *In re Mass.*, 178 B.R. 626, 628-30 (M.D. Pa. 1995) (applying Pennsylvania law); *In re Schuster*, 132 B.R. 604, 609 (Bankr. D. Minn. 1991).

*b. Burden Of Proof*

Before discussing whether reverse-veil piercing is warranted in this case, the Court must determine what burden of proof Delaware would apply to an alter-ego claim. Delaware courts have not directly addressed the burden of proof required to prevail on a veil-piercing claim. There is a presumption in Delaware, however, that the burden of proof in civil cases is a preponderance of the evidence. *Warwick v. Addicks*, 157 A. 205, 206-07 (Del. Super. Ct. 1931). Courts applying Delaware law often discuss alter ego and veil piercing without mentioning any heightened evidentiary standard. *See, e.g., Harper*, 743 F.Supp at 1085-86 (applying Delaware law). This seems to indicate that the traditional burden, preponderance of the evidence, applies to alter-ego claims under Delaware law.

Nevertheless, numerous Delaware courts have noted that convincing a Delaware court to pierce the corporate veil is a difficult task. *See Wallace ex. rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999); *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, Civ. A. No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989). At least one Delaware court noted that it would not disregard the corporate form absent "compelling cause." *Midland Interiors, Inc. v. Burleigh*, No. Civ.A. 18544, 2006 WL 3783476, at *3 (Del. Ch. Dec. 19, 2006). Federal courts applying Delaware law have noted that Delaware requires a strong case to pierce the corporate veil and that there is a high burden on a party seeking to disregard the corporate form. *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205-07 (5th Cir. 1995); *TransUnion LLC v. Credit Research, Inc.*, No. 00 C 3885, 2001 WL 648953, at *8 (N.D. Ill. June 4, 2001).

However, only one case applying Delaware law has actually held that the burden might be higher than a preponderance of the evidence. *See In re Foxmeyer Corp.*, 290 B.R. 229, 237 (D. Del. 2003). In that case, the bankruptcy court found it nonsensical that the preponderance of the evidence standard could apply where numerous Delaware courts had noted that the party seeking to pierce the veil had a heavy burden and that persuading a Delaware court to disregard the corporate form was a difficult task. *Id.* at 237. Based on this reasoning, *Foxmeyer* held "the appropriate standard of proof by which one must prove a case for a piercing of the corporate veil under Delaware law is, if not a clear and convincing evidence standard, at least somewhat greater than merely a preponderance of the evidence standard." *Id.* Notably, however, even this court did not find that the standard was

clear and convincing evidence, and it failed to elaborate on what this potential intermediate standard would be because it found that the bankruptcy trustee did not even satisfy the minimal preponderance of the evidence standard. *Id.*

Despite the suggestion in *Foxmeyer*, this Court finds that Delaware would apply the preponderance of the evidence standard to Plaintiffs' reverse-veil-piercing claim. There is no authority stating that the standard under Delaware law is clear and convincing evidence, and there is little indication from the Delaware courts that preponderance of the evidence is not the appropriate standard. Moreover, the majority of jurisdictions apply a preponderance of the evidence standard to veil-piercing actions.[25] Furthermore, the prevailing default standard in Delaware civil cases dictates the use of the preponderance of the evidence. This Court acknowledges that it is not easy for a party to prevail on a veil-piercing claim, but this is due to the difficulty in demonstrating that the corporate form was used for a fraud or an injustice, not because there is a heightened burden of proof. Therefore, the Court will analyze the alter-ego claim under the preponderance of the evidence standard.

### c. Single Economic Unit

The first element of an alter-ego claim is that the two corporations operated as a single economic unit. To determine whether a plaintiff meets this first requirement, courts look to a number of factors "which reveal how the corporation operates and the particular [party's] relationship to that operation." *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp 1076, 1085 (D. Del. 1990) (applying Delaware law). These factors include: (1) whether the corporation was adequately capitalized for the corporate undertaking; (2) whether the corporation was solvent; (3)

---

[25] *See, e.g., Rimade Ltd. v. Hubbard Enters., Ltd.,* 388 F.3d 138, 145 (5th Cir. 2004) (Texas law); *In re Thomas,* No. 01-21302, 01-6321, 2003 WL 21981707, at *7-8 (D. Idaho Jul. 17, 2003) (Idaho law); *Sequoia Prop. and Equip. Ltd. P'ship. v. United States,* No. CV-F-97-5044, 2002 WL 31409620 (E.D. Cal. 2002) (California law); *Shapiro, Lifschitz & Schiram, P.C. v. Hazard,* 90 F. Supp. 2d 15, 26 (D.D.C. 2000) (District of Columbia law); *George Hyman Constr. Co. v. Gateman,* 16 F. Supp. 2d 129, 160 (D. Mass. 1998) (Massachusetts law); *In re Lupo,* 353 B.R. 534, 542 (Bankr. N.D. Ohio 2006) (Ohio law); *Ize Nantan Bagowa, Ltd. v. Scalia,* 577 P.2d 725, 729 (Ariz. Ct. App. 1978) (Arizona law); *Litchfield Asset Mgmt. v. Howell,* 799 A.2d 298, 310 (Conn. App. 2002) (Connecticut law); *Seminole Boatyard, Inc. v. Christoph,* 715 So. 2d 987, 989 (Fla. Dist Ct. App. 1998) (Florida law); *Escobedo v. BHM Health Assocs., Inc.,* 818 N.E.2d 930, 933 (Ind. 2004) (Indiana law); *J.L. Brock Builders, Inc. v. Dahlbeck,* 391 N.W.2d 110, 115 (Neb. 1986) (Nebraska law); *Wyatt v. Bowers,* 747 P.2d 881, 883 (Nev. 1987) (Nevada law); *Boles v. Nat'l Dev. Co.,* 175 S.W.3d 226, 249 (Tenn. Ct. App. 2005) (Tennessee law).