whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant shareholder siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for the dominant shareholder. *Id.* No single factor can justify a decision to disregard the separateness of corporate entities. *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir. 1995) (applying Delaware law).

It is clear from the evidence that SPHC functioned as a single economic unit with ASARCO. SPHC was a shell corporation whose sole purpose was to hold the SPCC stock.[26] SPHC had no other assets besides the 54.18% ownership of SPCC, nor did SPHC have any debts. (Tellechea Depo (2008) 469:23-25; Williams Depo. 40:10-13). SPHC did not engage in any business or activity other than the ownership of SPCC stock. (PX 0411; Tellechea Depo. (2008) 683:23-684:2). SPHC had no independent officers or directors. (Jt. Pretrial Order Admission No. 14; McAllister Depo. 262:318, 265:18-266:3; Tellechea Depo. (2008) 470:1-6).[27] It had no separate office space and no employees. (Keegan Depo. 42:4-8; Tellechea Depo. (2008) 683:11-13). Additionally, the record indicates that SPHC did not recognize corporate formalities. For example, SPHC's Vice President, Genaro Larrea, could not recall conducting any activity as an officer or director of this company, and Mr. McAllister, General Counsel for ASARCO, also indicated that corporate formalities were not kept. (Genaro Larrea Depo. 71:19-72:1, 76:7-9; McAllister Depo. at 262:3-1, 265:18-266:3). Further, the Grupo conglomerate treated ASARCO as the owner of the SPCC stock before, during, and after the transaction in question. For example, the SPCC dividends were paid directly to ASARCO prior to the transfer. (PX 0853; PX 0164; PX 0861; PX 0171, PX 0501; PX 0549; PX 0861; Tucker 10-23-11:2). Also, the $41.75 million loan was made to ASARCO as an advance on AMC's purchase of the SPCC shares (which were technically held by SPHC). (PX 0042). Similarly,

---

[26]   Milbank Tweed Hadley McCloy LLP, the corporate law firm for Grupo and its family of companies, acknowledged in a memo on September 2, 2004, that SPHC was a shell holding company. (Plaintiff's Exhibit (hereinafter PX) 0312). Doug McAllister, General Counsel, acknowledged that SPHC existed for no reason other than to hold SPCC stock. (McAllister Depo. 262:3-18).

[27]   The directors of SPHC at the time of the transfer were: German Larrea, Genaro Larrea, Daniel Tellechea, Oscar Gonzalez Rocha, Xavier Garcia de Quevedo Topete, Alfredo Casar Perez, Alberto de la Parra Zavalia. (PX 0277).

after the transfer, payments on the $123 million note, which were part of the consideration for the SPCC stock, were paid by AMC directly to ASARCO, not to SPHC. (PX 0307; PX 0324; PX 0316). The testimony indicated that for most of SPHC's existence prior to the transfer, it did not even have a bank account. (PX 0164). Also, although not binding upon this court, the Consent Decree, signed by all parties involved, stated that "ASARCO and SPHC intended to sell *their* stock holdings and majority ownership interest" in SPCC to AMC, indicating that both entities had an interest in the stock. (PX 0214 (emphasis added)). This same document referred to the stock interest as belonging to "ASARCO/SPHC." (PX 0214).

Although it is arguable that not all of the factors are met in this case, the overwhelming weight of the evidence indicates, and the Court finds, that SPHC and ASARCO operated as a single economic unit. Corporate formalities were not observed, and all of SPHC's officers and directors were also officers or directors of ASARCO, AMC, or Grupo. The dividends from SPHC's only asset went directly to ASARCO, its dominant shareholder, which had total control of the funds. In general, SPHC functioned as a facade for ASARCO. For these reasons, the Court finds that ASARCO has proven the first prong of its alter-ego claim, that ASARCO and SPHC were a single economic unit.[28]

### d. Fraud, Unfairness, Or Injustice

The second prong recognizes that, under Delaware law, the alter-ego theory requires that the corporate structure cause fraud or some similar injustice. *Outokumpu Eng'g Enters., Inc. v. Kvaerner*, 685 A.2d 724, 729 (Del. Super. 1996). Fraud is frequently cited as a basis for piercing a corporate veil, but it is not the only justification. *PSG Poker, LLC v. DeRosa-Grund*, No. 06 Civ. 1104 (OLC), 2008 WL 190055, at *10 (S.D.N.Y. Jan. 22, 2008). Delaware courts recognize that veil

---

[28] As noted above, there is some debate on the burden of proof applicable to an alter-ego claim under Delaware law. Although the Court believes that the appropriate standard is preponderance of the evidence, there is some indication that the burden might be clear and convincing evidence. Clear and convincing evidence is that evidence which "when weighed against the evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." *State v. Williams*, 2001 WL 1403032, at *3 (Del. Super. Sept. 4, 2001) (citing *Edward H. and Dixie H. v. Div. of Child Protective Servs.*, 535 A.2d 1050, 1052 (Del. 1985)). Even if the burden were clear and convincing evidence, the Court would still find that Plaintiff proved ASARCO and SPHC operated as a single economic unit.

piercing is permitted "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved." *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968); *see PSG Poker, LLC*, 2008 WL 190055, at *10;. In short, although fraud is not required, an inherent trait of Delaware's alter-ego theory is injustice or unfairness. This is because veil piercing is an equitable concept, and the Court must determine whether it would be inequitable to uphold a legal distinction between SPHC and ASARCO.

AMC argues that the fraud, injustice, or unfairness supporting the alter-ego claim "must be distinct from the allegations of the underlying cause of action." *Id.* AMC contends that this means ASARCO cannot rely on "any alleged wrongdoing involved in the underlying fraudulent transfer cause of action."[29]

Under Delaware law, a plaintiff must show fraud or inequity in the use of the corporate form, i.e., the corporate structure itself must be used to effect the fraud or injustice. *Outokumpu Eng'g Enters*, 685 A.2d at 729. Most of the cases in which a court states that the requisite unfairness or injustice cannot be the underlying cause of action are cases in which the underlying claim is for breach of contract or some other allegation that is wholly unrelated to the manipulation of the corporate form. *See id.* at 729. In *Outokumpu*, the plaintiff failed to show that affiliated corporations were "involved in an elaborate shell game or [were] otherwise abusing the corporate form to effect a fraud." *Id.* Presumably, had this been shown, the court might have pierced the corporate veil. Similarly, in *Mobil Oil Corp. v. Linear Films, Inc.*, the court noted that every breach of contract or tort is in some way an injustice. 718 F. Supp. 260, 268 (D. Del. 1989). The court went on to state that for this reason, the underlying cause of action does not supply the necessary fraud or injustice, and to hold otherwise would sanction bootstrapping. *Id.* It concluded that the fraud, injustice, or unfairness must be in the *use of the corporate form. Id.* at 269. The *Mobil Oil* court did not find the requisite injustice to justify piercing the corporate veil. *Id.* at 270. That court noted that the defendant did not use the corporate form to perpetrate a fraud or work an injustice on the plaintiff, nor did it use the corporate form to operate a sophisticated shell game, shuttling assets between

---

[29] *See* AMC's Summary Judgment on Standing Brief, at 8; AMC's Proposed FoF and CoL.

entities. *Id.* In these cases, if the plaintiffs had proven that the corporate form was somehow used to perpetrate a fraud, work an injustice, or operated as part of a sophisticated shell game, the result might have been different. The plaintiffs in these cases, however, simply attempted to use the underlying allegation to justify piercing the veil, rather than to demonstrate how the corporate form was misused or manipulated to accomplish the alleged wrongful conduct.

The Court agrees with AMC's assertion that ASARCO must prove more than simply that a fraudulent transfer occurred in order to prevail on its alter-ego claim. ASARCO must show that SPHC's corporate form was somehow used to perpetrate a fraud, work an injustice, or as part of a sophisticated shell game, culminating in a fraudulent transfer. If ASARCO shows that the corporate form was somehow used to accomplish the allegedly fraudulent transfer, then there is no legitimate reason to conclude that ASARCO cannot rely on the wrongdoing surrounding the challenged transaction to justify piercing the corporate veil. In short, a fraudulent transfer, standing alone, cannot be the fraud or injustice that justifies veil piercing; however, if ASARCO proves that the corporate form was manipulated or misused so as to accomplish a fraudulent transfer, it may be equitable to pierce the veil. To hold otherwise would be stating that a party seeking to recover for the fraud or injustice that resulted from a sophisticated shell game is unable to pierce the corporate veil. In effect, a contrary conclusion would essentially recognize that a conglomerate can utilize each subsidiary to work one instance of fraud or injustice with impunity. This has never been the law in Delaware.

### i. SPHC Was Not Created As A Sham To Perpetrate A Fraud

ASARCO alleges that SPHC was formed as a sham to perpetrate a fraud. (Compl. ¶ 4.) That allegation, if true, would certainly be grounds for piercing the corporate veil. This Court, however, finds that SPHC was created in 1999 for a valid business purpose. As part of the acquisition of ASARCO in 1999, Chase Bank Group sought to perfect a security interest against ASARCO's interest in SPCC. (Tellechea Depo. 571:7-22.) There were concerns, however, that under the SPCC Shareholder's Agreement and Restated Certificate of Incorporation, a direct pledge of the SPCC stock would trigger a conversion of the SPCC shares from "super-voting" stock to ordinary common stock, which would reduce the value of those shares. (Williams Depo. 163:3-15; Tellechea Depo.

471:3-25; 571:7-572:23; Fitzgerald, June 3, 2008, 40:1-24).  For this reason, Grupo and ASARCO created SPHC, transferred the SPCC stock to SPHC, and pledged the SPHC shares to Chase as a security for the Revolver, instead of pledging the SPCC shares directly.  (Williams Depo. 163:3-15; Tellechea Depo. (2008) 571:7-572:23).  This was an effective means by which Chase could have the benefit of a security interest in the SPCC shares without any risk of converting those shares into less valuable stock.  (Williams Depo. 163:3-15; Fitzgerald, June 3, 2008, 40:1-24).  Thus, the Court finds that SPHC was created for a legitimate reason and not to effect a fraud, injustice, or unfairness.

*ii. SPHC's Corporate Form Was Used To Effect Fraud, Injustice Or Inequity*

The fact that SPHC was created for a legitimate purpose, however, does not necessarily negate ASARCO's argument that the corporate form was later misused or manipulated to accomplish the alleged fraudulent transfer.[30]  For the purpose of the analysis in this section, the Court assumes, without deciding, that the challenged transfer was in fact fraudulent.  This fact, standing alone, however, would be insufficient to justify piercing the corporate veil.  ASARCO must also show that the corporate form was used to commit this fraud or injustice or that recognizing the separateness of the two entities would perpetrate a fraud or an injustice such that equity would require the Court to disregard the corporate veil.

Again assuming arguendo that the transfer was indeed fraudulent, the only reason that AMC would escape liability for this wrong would be because SPHC, the legal owner of the stock at the time of the transaction, did not have any creditors with standing to avoid the transfer.  Yet, ASARCO's creditors would be deprived of ASARCO's most valuable asset and its best means of paying its outstanding debts.  If the transfer was fraudulent, AMC unjustly enriched itself at the expense of ASARCO and its creditors.  It would be inequitable to allow Grupo to saddle ASARCO with the LBO debt and orchestrate the creation of SPHC and the transfer of SPCC stock first to

---

[30] Plaintiff's Second Amended Complaint merely alleges that SPHC was created as a sham to perpetrate a fraud, not that the corporate form was used to effect a fraud, injustice, or unfairness.  Nevertheless, the Court finds this latter issue was tried by consent.  In the joint pretrial order (Doc. 303, Ex. A-1), ASARCO lists as a contested issue of fact: "whether SPHC is the alter ego of ASARCO because there was a misuse of the corporate form or there was an overall element of injustice or unfairness."  The testimony at trial regarding alter ego was not solely directed to SPHC's creation but also to the use of its corporate form to accomplish and avoid liability for the alleged fraudulent transfer.

SPHC (and then AMC/Grupo to wrongly dictate the subsequent stock transfer to AMC), and then also allow AMC to hide behind the fact that SPHC had no unsecured creditors in order to dodge liability for the transfer. If ASARCO had held the stock at the time of the transfer, then there would be no question that ASARCO, as debtor in possession, would have standing to challenge the transfer. Also, if SPHC had any unsecured creditors, then SPHC as debtor in possession could seek to set aside this transfer. Since SPHC was created solely as a holding company for the SPCC stock, neither SPHC nor ASARCO has standing to challenge the transaction. AMC would be shielded from liability for the fraudulent transfer, unless ASARCO can prevail on its veil-piercing claim.

The Court finds that equity does not permit AMC to now claim that ASARCO and SPHC are separate entities solely for the purposes of allowing AMC to take advantage of the corporate form to escape potential liability. Since the creation of SPHC and the transfer of the SPCC stock thereto, AMC/Grupo have treated ASARCO as the owner of the SPCC stock. For example, in November 2001, AMC loaned ASARCO (not SPHC) $41.75 million as an advance payment on the SPCC stock. (PX 0042). This document contemplated entering into an agreement where "ASARCO, directly or indirectly, would sell to AMC and AMC would purchase from ASARCO, directly or indirectly, the total aggregate amount of its direct and/or indirect equity participation in Southern Peru Copper Corporation . . . ." (PX 0042). In 2002, Grupo issued a press releases regarding the contemplated transfer of the SPCC shares. It represented that Grupo was considering transferring the stock from one subsidiary "ASARCO Inc., to another, the Americas Mining Corp. holding company." (PX 0133). The press release also quoted Grupo as stating that its plans "do not contemplate any change of control in SPCC nor any modification in its ultimate beneficial ownership of SPCC." (PX 0133). Similarly, in the press release issued January 30, 2003, AMC/Grupo represented to the public that ASARCO held the SPCC shares. (PX 0200). In fact, the press release did not even mention SPHC, but rather discussed the benefits to ASARCO that would result from the transfer of "ASARCO's 54.2% interest in SPCC." (PX 0200). At all relevant times, AMC/Grupo not only treated ASARCO and SPHC as a single economic unit but expressly acknowledged ASARCO's interest in SPCC, going so far as to represent to the public that ASARCO owned the SPCC shares. The record is full of references, both within the Grupo corporate family, as well as in representations made to creditors and the public, that the stock in question was

36

ASARCO's stock.  To allow AMC/Grupo to ignore four years (1999-2003) of conduct and now claim the corporate forms protects it from attack would be a great inequity that Delaware courts, sitting in equity, would not allow.

It was not until the instigation of this litigation that AMC/Grupo treated ASARCO and SPHC as separate corporations, and AMC does so now solely as a tactic to shield itself from liability for the alleged fraudulent transfer.  After AMC disregarded the corporate separateness of these two entities and treated ASARCO as the owner of the SPCC shares for years, it would be inequitable and unjust to now permit AMC to hide behind the corporate form that it ignored at the time of the challenged transaction.

Although SPHC was not created to perpetrate a fraud, AMC subsequently used its corporate form as a tool to perpetrate an unjust and inequitable transfer and now asks the Court to recognize SPHC's corporate separateness (even though AMC never did so before this litigation) so that it may be shielded from potential liability.  In such a situation, equity demands that the Court disregard the corporate separateness of ASARCO and SPHC.[31]

### iii.  ASARCO Is Not Barred From Claiming Alter Ego Because ASARCO "Created" SPHC

AMC argues that ASARCO should be precluded from asking this Court to disregard the corporate separateness of ASARCO and SPHC, since ASARCO created SPHC.  Various jurisdictions have noted that a request to pierce the corporate veil made by the one who voluntarily created the corporate structure should be viewed with greater skepticism, especially if a third party will be disadvantaged thereby. *Schreiber Foods Inc. v. Beatrice Cheese, Inc.*, 305 F.Supp. 2d 939, 953 (E.D.Wis. 2004); *Sharkey v. Ultramar Energy Ltd.*, 867 F. Supp. 258, 259 (S.D.N.Y. 1994) *rev'd on other grounds*, 70 F.3d 226 (2d Cir. 1995); 1 Fletcher Cyclopedia § 41.70.  Part of the rationale behind this principle is that the alter-ego doctrine is an equitable concept that should be used as a sword, not a shield.  *See United States v. Aiello*, D.C. No. CR-94-00142-1-DFL, 1999 WL 891333, at *2 (9th Cir. Oct. 15, 1999); *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 460 (7th Cir. 1991).

---

[31]  Although Plaintiff met the lesser standard of preponderance of the evidence, based on the evidence before the Court on the second prong of the alter-ego claim, the Court finds that if the burden is heightened to clear and convincing evidence, ASARCO would fail to meet that standard and would not have standing to pursue the fraudulent-transfer claims.  This would not affect either Plaintiff's ability to pursue the other causes of action.

The present situation, however, is distinguishable from the authorities AMC cited. ASARCO pled, and the Court finds, that the creation of SPHC was not a wholly voluntary act of ASARCO, but rather Grupo dictated the creation of SPHC. But for Grupo's desire to pledge the SPCC shares to Chase in order to help finance the LBO of ASARCO, SPHC would never have existed, and ASARCO's creditors would unquestionably have the ability to challenge the transfer to AMC. This is not a situation in which the parent corporation seeks to prevail on the alter-ego claim in order to avoid liability.

Also, AMC did not allege, and the Court could not identify, any third party who would be harmed if the Court disregards the corporate separateness of ASARCO and SPHC. Piercing the corporate veil in this case will not result in harm to any innocent shareholders or corporate creditors. ASARCO was the sole shareholder of SPHC, and Grupo, who dictated the creation of SPHC and who received the benefit of the challenged transfer, was, at the time, ASARCO's sole shareholder. The only entities "harmed" by disregarding the corporate form would be the company that created it, Grupo, and Grupo's wholly owned subsidiary, Defendant AMC, which received the stock in question. No corporate creditors will be harmed by disregarding the corporate separateness. In fact, ASARCO's creditors might benefit from such a finding. SPHC had no creditors that could be injured.

Unlike the cases cited by AMC, in the case at hand, the parent, as debtor in possession, is using the doctrine as a sword, requesting the Court to pierce the corporate veil to allow it to pursue a claim for fraudulent transfer on behalf of its creditors against a defendant that is the wholly owned subsidiary of the entity who controlled the shell subsidiary. The Court finds it would be inequitable to recognize the corporate separateness of ASARCO and SPHC. It further finds inapplicable the concept behind the argument that ASARCO, as SPHC's creator, should be barred from making such assertion. For the above reasons, the Court finds that ASARCO proved its alter-ego claim by a preponderance of the evidence, and equity dictates reverse-veil piercing in this case.

### e. Defenses To The Alter-Ego Claim

Before the Court can discuss the substance of the various defenses that Defendant claims bar Plaintiff's alter-ego claim, the Court must first determine whether the alter-ego claim is subject to

the same defenses that the debtor would be subject to if this claim were brought outside of bankruptcy or, alternatively, whether ASARCO stands in the shoes of its unsecured creditors for purposes of the alter-ego claim such that it is only subject to defenses that would be good against the unsecured creditors in whose shoes it stands.

In order to fully answer this question, the Court finds it helpful to understand certain provisions from the Bankruptcy Code regarding the capacity of trustees and debtors in possession to sue and be sued. Section 323(b) of the Bankruptcy Code gives trustees the right to prosecute any action belonging to the bankruptcy estate.[32] Actions commenced on behalf of the estate by a trustee or debtor in possession "fall into two broad categories: (1) actions brought by the trustee as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541, and (2) actions brought under one of the trustee's avoidance powers." *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996) (citing 2 COLLIER ON BANKRUPTCY 323.02[4] (now COLLIER ON BANKRUPTCY ¶ 323.03 (15th ed. rev. )).

The filing of a petition in bankruptcy creates the bankruptcy estate pursuant to 11 U.S.C. § 541(a). The estate consists of all legal and equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1). Causes of action that, according to applicable state law, were available to the debtor at the time that the bankruptcy case commenced become property of the estate pursuant to § 541. *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 245 (5th Cir. 1988).[33] These actions fall within the first category of cases a trustee may bring on behalf of the estate. The trustee steps into the shoes of the debtor at the commencement of the case and may assert those claims that are part of the debtor's estate. For suits brought in this capacity, the trustee is subject to all of the same defenses that would have been available against the debtor. COLLIER, ¶ 323.03.

---

[32] Debtors in possession have the same rights to sue and be sued as a trustee does. *See* 11 U.S.C. § 1107. Plaintiffs, ASARCO and SPHC, are debtors in possession; however, the term used in the applicable provisions of the Bankruptcy Code is "trustee." Because there is no distinction between the two terms for purposes of the present discussion, the Court will use the terms interchangeably.

[33] There is no question that the alter-ego claim, to the extent it is available in this context under Delaware law, is part of the bankruptcy estate. Neither side disputes this.

Under certain circumstances, trustees have power to bring actions pursuant to their avoiding power.[34] These are the second category of cases. When the trustee exercises its avoiding powers, i.e., sues as an assignee of the creditors, it accedes to a superior status and possesses extraordinary rights. *In re Ostrom-Martin, Inc.*, 188 BR 245, 251 (Bankr. C.D. Ill. 1995). The trustee stands in the shoes of the creditor and is subject only to the defenses that would be available against the creditor, not the debtor. COLLIER, ¶ 323.03. For example, the doctrine of *in pari delicto*, which applies to actions brought under the first category (where the trustee stands in the debtor's shoes), does not apply in this situation. *Id.*

Section 544 of the Bankruptcy Code is an example of one of the trustee's avoiding powers. *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996) ("Because § 544 gives a trustee certain avoidance powers, actions brought under the section fall within the second category of types of trustee actions."); *see also In re Porter McLeod, Inc.*, 231 B.R. 786, 792 (D. Colo. 1999).[35] According to § 544(b), the section under which ASARCO brings its fraudulent transfer claims in this case, a trustee or debtor in possession "may avoid any transfer of interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1). This gives trustees and debtors in possession the ability to avoid pre-petition transfers that are avoidable by an actual, existing unsecured creditor under non-bankruptcy law. COLLIER, ¶ 544.02. Section 544(b) does not indicate the requirements of avoiding a transfer; rather the trustee's powers are predicated on the non-bankruptcy law that is applicable to the action (in this case Delaware's enactment of the UFTA). *Sender*, 84 F.3d at 1304. The trustee's rights are derivative of an actual unsecured creditor's rights, meaning that the trustee steps into the shoes of the creditor. The trustee is subject to the same defenses as the creditor would be (but not those defenses available only against the debtor). *Smith v. American Founders Fin., Corp.*, 365 B.R. 647, 659 (S.D.Tex. 2007)(J. Rosenthal). Thus, if the creditor is estopped or barred from recovery, so is the trustee. *Id.*

---

[34] These are often causes of action that are included as property of the debtor's estate under § 541, but because of the nature of the cause of action, they qualify as claims that can be brought under the trustee's avoiding power.

[35] A debtor in possession in Chapter 11 can exercises the trustee's "strong arm" powers under § 544 pursuant to 11 U.S.C. § 1107. *Gandy v. Gandy*, 299 F.3d 489, 497 (5th Cir. 2002). For this reason, "trustee" and "debtor in possession" will continue to be used interchangeably.

40

As noted above, Plaintiff seeks to avoid the stock transfer based on its state-law fraudulent transfer claims, pursuant to § 544(b). (Compl. at ¶ 82, 94). Therefore, with regard to the fraudulent transfer claims, the Plaintiff, as debtor in possession, stands in the shoes of its unsecured creditors, and its claims are subject to defenses that would be available against the creditors, but not those that would prevail against the debtor. This is undisputed. The issue this Court must answer, however, is whether the alter-ego claim, under which ASARCO must prevail to pursue its fraudulent transfer claims, is brought pursuant to the debtor in possession's avoidance powers under § 544(b) or, alternatively, is a claim brought on behalf of the debtor.

Defendant asserts that the alter-ego claim falls into the category of actions "brought by the trustee as successor to the debtor's interests included as property under § 541," and thus, for purposes of this claim, the debtor in possession stands in the shoes of the *debtor* not the *creditor*. If this is true, Plaintiff's alter-ego claim would then be subject to any defenses that would have been available against the pre-petition debtor. In other words, Defendant essentially contends that even though the fraudulent-transfer claim itself is only subject to defenses that would be available against the unsecured creditors, the alter-ego claim, which ASARCO must prove to succeed on its fraudulent-transfer claim, is not an avoidance action, and, therefore, is subject to defenses that would be available against the debtor.[36]

In support of this argument, AMC cites a district court case applying Delaware law, holding that the alter-ego claim is an asset of the estate under § 541, meaning it is an action the debtor in possession can pursue in the shoes of the debtor. AMC's Proposed Findings of Facts and Conclusions of Law at ¶ 29 (citing *MC Asset Recovery, LLC v. Southern Co.*, Civil Action No. 1:06-cv-0417-BBM, 2006 WL 5112612, at *9 (N.D.Ga. Dec. 11, 2006)). However, the fact that the alter-ego claim qualifies as property of the estate under § 541, standing alone, does not mandate that it falls solely within the first category.[37] Often times an action can fall into both categories, and a

---

[36] The cases AMC cites in its brief are only applicable if this alter-ego claim falls within the first category of cases under § 323, and is not an action brought pursuant to ASARCO's avoidance powers.

[37] Recall that actions commenced on behalf of the estate fall into one of two broad categories: "(1) actions brought by the trustee as successor to the debtor's interests included as property under 11 U.S.C. § 541, and (2) actions brought under one of the trustee's avoidance powers." *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996).

trustee may choose under which provision to proceed. Also, the alter-ego claim in that case was not pursued as a threshold matter for a fraudulent-transfer claim.

Another argument in support of AMC's position is that the first category (claims brought as successor to the debtor's interests) seems to be a default rule. Out of all the claims that belong to the estate pursuant to § 541, some of these claims may also qualify as "avoidance actions." For those special claims that qualify, the trustee may choose to bring them under its avoidance powers so that the trustee can stand in the creditors' shoes, rather than the debtor's, for purposes of that claim. As noted above, § 544, the applicable avoidance-power provision in this case, requires, as a threshold matter, that the debtor have an interest in property. *See* 11 U.S.C. § 544. Without this threshold showing, § 544 does not apply, and so the claim never qualifies as one that can be brought pursuant to the debtor in possession's avoidance powers. ASARCO must prevail on its reverse-veil piercing alter-ego claim in order to establish this threshold issue—that ASARCO, as the debtor, had an interest in the property that is the subject of the allegedly fraudulent transfer it seeks to avoid.

On the other hand, one can view the alter-ego claim as being so intertwined with the fraudulent-transfer claim that it is a claim brought pursuant to its avoidance powers. If ASARCO's unsecured creditors brought the fraudulent-transfer claims outside of bankruptcy they would have to prevail on the alter-ego claim in order to have standing to challenge the transfer from SPHC to AMC. Without piercing the corporate veil, neither ASARCO nor its creditors could show the interest in property needed to challenge the transfer. Similarly, if Plaintiff had not pursued the fraudulent-transfer claims, there would be no need to assert the alter-ego claim. Under this reasoning, the alter-ego claim could be viewed merely as a sub-issue to the greater fraudulent transfer claim brought pursuant to § 544(b), making the alter-ego claim part of the claim brought pursuant to the debtor in possession's avoiding powers.

The Court finds that the better-reasoned argument is that the alter-ego claim is interrelated with the fraudulent-transfer claims to the point that the alter-ego claim should be viewed as brought under the debtor in possession's avoiding powers. This is not an independent action that the debtor would otherwise bring; rather, the debtor in possession seeks to pierce the corporate veil only so that it may pursue fraudulent-conveyance actions for which it clearly stands in the unsecured creditors' shoes. If ASARCO's creditors were to challenge the stock transfer from SPHC to AMC outside of

bankruptcy, they would have to prevail on this alter-ego claim to do so. Therefore, the Court finds ASARCO's rights regarding the alter-ego claim are derivative of the rights of Plaintiff's actual unsecured creditors. Thus, ASARCO, as debtor in possession, is subject only to defenses that would be available against the unsecured creditors if the claim were brought outside of this bankruptcy action.

AMC argues, however, that the alter-ego claim is barred even if ASARCO stands in the creditors' shoes because ASARCO's creditors failed to pursue an available legal remedy. Specifically, Defendant states that the alleged harm to the creditors occurred in 1999 when the SPCC shares were transferred from ASARCO to SPHC, and ASARCO's creditors could have brought a fraudulent-transfer claim at that time.

Although it is well settled that for a court to award equitable relief, there must be no adequate legal remedy available, Defendant's argument would not necessarily operate as a complete bar to the equitable remedy of veil piercing. If the creditors had asserted a fraudulent-transfer claim based on the 1999 transfer within the statute of limitations period, the creditors would not have been required to prove up this alter-ego claim to do so. This is because the transfer at issue would have been between ASARCO, the debtor, and SPHC. The Court also noted that the transfer of the SPCC stock from ASARCO to SPHC was a separate transaction than the one challenged in this lawsuit. The unsecured creditors, in whose shoes Plaintiff stands, may not have existed at the time of that transfer.[38]

Assuming arguendo that the running of the statute of limitations on the fraudulent-transfer claim for the 1999 transfer does not mean that an adequate legal remedy was unavailable, AMC's argument may not be a complete bar to the equitable remedy of veil piercing. This "adequate remedy at law" defense only bars the alter-ego claim to the extent that ASARCO's veil-piercing argument relies on the creation of SPHC and the initial transfer of the SPCC stock to prove the requisite fraud, injustice, or unfairness. As noted above, however, the Court does not find the requisite fraud, injustice, or unfairness in the *creation* of SPHC or the transfer of the SPCC stock thereto, but rather

---

[38] The Court also observes that from the time of SPHC's creation and the transfer of the SPCC stock to that entity until the challenged transfer in 2003, AMC/Grupo treated ASARCO as the owner of the SPCC stock. It would have been reasonable for ASARCO's creditors to feel like the SPCC stock was still within their reach, even after it was transferred to SPHC.

in the subsequent use of SPHC as a shield to effect the transfer of the SPCC stock.   Therefore, AMC's "adequate remedy at law" argument does not bar Plaintiffs' veil-piercing claim based on the subsequent use of SPHC to effect a fraud, injustice or unfairness.

AMC's remaining defenses would not be available against the unsecured creditors.  AMC, therefore, cannot prevail on these defenses because Plaintiff brings the alter-ego claim pursuant to its avoiding power and stands in its unsecured creditors' shoes. Even though the Court finds that the alter-ego claim is part of the fraudulent-transfer claims so as to fall under the debtor in possession's avoiding power, the Court acknowledges the strong argument to the contrary and will, therefore, briefly discuss AMC's alleged defenses that could be brought against the Plaintiff if it stands only in the debtor's shoes for purposes of the alter-ego claim. The potential defenses raised by AMC are: (1) judicial estoppel; (2) acquiescence; (3) unclean hands; and (4) *in pari delicto*.

### i. Judicial Estoppel

Before discussing the judicial estoppel argument, the Court must first determine whether state or federal law should apply to this defense.  The Fifth Circuit has recently noted that many courts faced with judicial estoppel questions conclude that "federal law should apply because a federal court should have the ability 'to protect itself from manipulation' and this ability should not vary in a diversity action because it is a matter of federal procedure and not a substantive concern." *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 395 (5th Cir. 2003) (internal citations omitted).  The Fifth Circuit has generally considered judicial estoppel a matter of federal procedure and has applied federal law. *Id.* (citing *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 600 (5th Cir. 1996)).  In the present case, both the prior proceeding and the current litigation were and are in federal courts; thus, "it is the federal court that is subject to manipulation and in need of protection," further justifying application of federal law to the judicial estoppel issue. *See id.* at 395-96.  For these reasons, the Court concludes that federal law applies to the judicial estoppel defense.

The policies underlying the doctrine of judicial estoppel include "preventing internal inconsistency, precluding litigants from 'playing fast and loose' with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993).  The purpose of the doctrine is to protect the

integrity of the courts; it is not designed to protect litigants. *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001); *In re Food Fast Holdings, Ltd.*, Civil Action No. 6:04cv562, 2006 U.S. Dist. LEXIS 54761, at *10 (E.D. Tex., Aug. 7, 2006). It is not intended to eliminate all inconsistencies. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). Judicial estoppel is an extraordinary remedy that should only be used when a party's inconsistent behavior will result in a miscarriage of justice. *Id.* at 365.

The Supreme Court has noted that the circumstances under which judicial estoppel may be invoked are not reducible to any general formulation of principle. *New Hampshire*, 532 U.S. at 750. Nevertheless, the high court has discussed several non-exclusive factors that can help guide a court in determining whether the doctrine applies. *Id.* Factors a court may consider include whether: (1) the position of the party against which estoppel is sought is "clearly inconsistent" with its prior legal position; (2) the party against which estoppel is sought succeeded in persuading a court to accept its prior position; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750-51. The Supreme Court also noted that it may be appropriate to resist the application of judicial estoppel when the prior statement is the result of inadvertence or mistake. *Id.* at 753. The Supreme Court emphasized that judicial estoppel is an equitable concept, and additional considerations may aid a court's decision in different factual contexts. *Id.* at 751.

AMC argues that ASARCO is estopped from bringing the alter-ego claim because of Plaintiff's pre-petition position before the Arizona District Court. The Government's Complaint in that case alleged, inter alia, that: "ASARCO dominates and controls SPHC through its ownership of all of SPHC's stock and the identity or overlap of ASARCO's and SPHC's officers and directors;" "SPHC conducts no other business than that of owning the Stock, has no employees, has no creditors" and "has no assets other than the Stock;" "as a result of the Banks' secured lien encumbering the Stock, SPHC is grossly undercapitalized;" "SPHC has failed to respect corporate formalities;" and "SPHC is a mere instrumentality and alter ego of ASARCO and its corporate identity must be disregarded to prevent fraud or injustice to the United States and the other creditors of ASARCO." (PX 0106). In their answer to this complaint, ASARCO and SPHC responded to each of these allegations by stating, "[t]hey deny the averments of [each paragraph]." (DX 0289).

This document was signed by an attorney from Sidley Austin, the firm that represented both ASARCO and AMC in connection with the Consent Decree and the SPCC stock transfer. (Lazalde Depo., 414:11-415:20). Based on ASARCO's and SPHC's denial of alter ego in these documents, AMC contends that ASARCO is judicially estopped from claiming alter ego in the present litigation.

The first factor the Court should consider is whether the position of the party against which estoppel is sought is clearly inconsistent with its prior legal position. *New Hampshire*, 532 U.S. at 750. ASARCO's and SPHC's denial that SPHC was ASARCO's alter ego is a clearly inconsistent position from the opposite position ASARCO currently holds. This factor weighs against ASARCO.

The next factor is whether the party against whom estoppel is sought succeeded in persuading a court to accept its prior position. *New Hampshire*, 532 U.S. at 750. AMC argues that this factor is met because, by disputing the alter-ego claim, ASARCO convinced the Arizona Court that the underlying litigation would be prolonged and complicated, thus persuading the court to enter the Consent Decree to avoid prolonged litigation and to implement a fair and reasonable settlement. Although AMC's argument is not baseless, an equal inference could be drawn that the Arizona Court believed the two were alter egos, and, thus, was not persuaded by ASARCO and SPHC's denial of such status. In fact, the Consent Decree repeatedly refers to *their* stock holdings and majority ownership interest in SPCC, meaning both ASARCO's and SPHC's interest, and the decree often referred to "ASARCO/SPHC's ownership in SPCC." (PX 0004). Additionally, the Consent Decree sets forth the terms and conditions to be included in the Agreement of Sale, which specifies payment by AMC to "ASARCO/SPHC" and that "ASARCO/SPHC" pay indebtedness under the Revolver. (PX 0004). The Consent Decree also provides that any dividends paid by SPCC for the fourth quarter of 2002 be paid to ASARCO, regardless of which party is the shareholder of record the date the right to the dividend vests. (PX 0004). These statements in the Consent Decree indicate that the District Court did not accept ASARCO and SPHC's denial that SPHC was ASARCO's alter ego. Based on the record before this Court, the Court finds that in entering the Consent Decree, the Arizona Court did not make any decision as to whether the two entities were alter egos; therefore, ASARCO did not "succeed in  persuading a court to accept its prior position.". This factor weighs in ASARCO's favor.

The third factor considers "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751. This factor also weighs in favor of ASARCO. Although the statements made in ASARCO and SPHC's answer in the DOJ case are inconsistent with ASARCO's alter-ego claim, this is not a case in which a plaintiff is changing its position so as to derive an unfair advantage or impose an unfair detriment on the defendant. ASARCO will not derive an unfair advantage by "changing its position" because its prior position was dictated, at least in part, by the defendant in this case. For the same reason, it would not impose an unfair detriment on AMC for ASARCO to assert a position inconsistent with its prior statements that were made pursuant to AMC/Grupo's direction.

Throughout the course of this trial, ASARCO has consistently alleged that it was under the control of AMC and Grupo with respect to the pertinent events of this case. There has been a plethora of testimony in support of these contentions. For example, Mr. McAllister, ASARCO's in-house counsel, testified that ASARCO could not do anything without Grupo's, i.e. German Larrea's, approval. (McAllister Depo. 168:9-168:25). Also, Genaro Larrea, ASARCO's CEO at the time, indicated that Grupo controlled ASARCO's board. (Genaro Larrea Depo. 164:3-165:11). There is also evidence of Grupo's and AMC's control over ASARCO and SPHC's answer in the DOJ case. This answer was signed by a lawyer from Sidley Austin. There was conflicting testimony throughout the course of the trial regarding which entities Sidley Austin represented.[39] Even ASARCO's in-house counsel believed Sidley Austin's loyalty was to Grupo and AMC, not ASARCO and SPHC. (McAllister Depo. 401:13-403:3). Because AMC/Grupo controlled ASARCO and SPHC with regard to the Arizona case, and the SPCC transfer as a whole, defendant AMC cannot now claim that Plaintiff would derive an unfair advantage or impose an unfair burden on AMC by now asserting a position different than the one AMC forced ASARCO to take in the DOJ case.

---

[39] Jaime Collazo believed Sidley Austin only represented Grupo (Collazo Depo. 220:18-226:20; PX077); Jorge Lazalde Psihas stated Sidley Austin represented ASARCO and AMC (Lazalde Depo. 414:4-415:20); McAllister asserted that Sidley Austin's principal loyalty was to Grupo and that it put AMC's and Grupo's interests above ASARCO (McAllister Depo. 401:13-403:3); Fitzgerald believed Sidley Austin represented AMC and Grupo, and was not looking out for ASARCO's creditors (Fitzgerald, June 3, 2008, 58:7-58:20; 115:10-14).

Another factor courts often consider is whether the prior statement is the result of inadvertence or mistake. This consideration is not directly applicable here. ASARCO does not contend that its prior denial of alter ego was a result of inadvertence or mistake but instead was the result of being controlled by its parent, the defendant in this case.[40]

Judicial estoppel is an equitable remedy that courts should only use when a party's inconsistent behavior will result in a miscarriage of justice. Considering the facts of this case, the Court does not find that justice would be served by declaring that ASARCO cannot pursue its case against AMC because of an inconsistent statement made in a prior proceeding that ASARCO was forced to make, in part, by its parent AMC. The Court finds that ASARCO's alter-ego claim would not be barred by judicial estoppel even if the claim were not brought under Plaintiff's avoiding powers.

## ii. Acquiescence

AMC next argues that ASARCO's alter-ego claim is barred by the doctrine of acquiescence. Specifically, AMC alleges that ASARCO's request to reverse pierce SPHC's corporate veil is an attempt to undo the corporate form that ASARCO created. AMC contends that Delaware law prohibits a shareholder from seeking to unwind his own acts and, for this reason, ASARCO is precluded from bringing its alter-ego claim.

According to the Supreme Court of Delaware, "[a]cquiescence is an equitable defense which is assertable against a party who remains inactive for a considerable period of time, or who recognizes the validity of the complained of act or who acts in a manner inconsistent with the subsequent repudiation and thus leads the other party to believe the act has been approved." *Julin v. Julin*, 787 A.2d 82, 84 (Del. 2001). A determination of whether this defense applies is fact

---

[40] Although ASARCO does not rely on this evidence to prove inadvertence or mistake, Mr. McAllister testified that the reason he allowed the answer to be filed with these denials was because he may not have looked at every complaint and every response and that the denials might have been made because he "didn't pay particular attention to this document before it was filed." (McAllister Depo. 261:17-263:05).

intensive, often requiring an evaluation of the knowledge, intention, and motivation of the allegedly acquiescing party.[41]  *Id.*

The doctrine has traditionally included a showing that the plaintiff, by words or deed, has acknowledged the legitimacy of the conduct it now wishes to challenge. *Clements v. Rogers*, 790 A.2d 1222, 1238 n.46 (Del. Ch. 2001); *In re PNB Holding Co. Shareholder Lit.*, No. Civ. A. 28-N, 2006 WL 2403999, at *21 (Del. Ch. Aug. 18, 2006).  A Delaware chancery court has found that this test was met when "an uncoerced stockholder, acting on an informed basis, casts an affirmative vote in favor of a transaction." *In re PNB*, 2006 WL 2403999, at *21.  In other words, the stockholder cannot cast an affirmative vote at the election and then try to go back on that vote in court, if the vote was informed and uncoerced. *Id.*

Some Delaware courts, in cases outside of the merger context, have included, as an element of an acquiescence defense, a showing that the party to be estopped benefitted from the transaction. A Delaware chancery court stated that "one who has full knowledge of and accepts the benefits of a transaction may be denied equitable relief if he or she thereafter attacks the same transaction." *Con't Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1240 (Del. Ch. 2000).  In *Continental Ins.*, a limited partner sued the general partner and its sole shareholder. *Id.* at 1223.  One of the general partner's defenses was that it could not be liable for self-dealing because the limited partner (the plaintiff) acquiesced. *Id.* at 1240-41.  The court found the defense inapplicable because the plaintiff "had not at that time accepted any benefit from any self-dealing transactions." *Id.* at 1241.

AMC contends that ASARCO's alter-ego claim is barred by acquiescence because ASARCO approved the creation of SPHC and the transfer of the SPCC stock to SPHC. The Court has already determined, however, that the creation of SPHC and the transfer of the SPCC stock to SPHC was done for a legitimate business purpose and did not effect a fraud, injustice, or unfairness. ASARCO's alter-ego claim does not rest only on the purpose of SPHC's creation, but also, on how the corporate form was subsequently used to transfer the SPCC stock from SPHC to AMC and the

---

[41]  This equitable defense often is raised against shareholders who bring suit in the context of mergers and acquisitions. *See, e.g., In re PNB Holding Co. Shareholder Lit.*, No. Civ. A. 28-N, 2006 WL 2403999, at *1 (Del. Ch. Aug. 18, 2006); *Clements v. Rogers*, 790 A.2d 1222, 1237 (Del. Ch. 2001); *Siegman v. Columbia Pictures Entm't, Inc.*, Civ. A. No. 11152, 1993 WL 10969, at *1 (Del. Ch. Jan. 15, 1993).  Nevertheless, the doctrine does have application outside the merger context. *See Julin v. Julin*, 787 A.2d 82 *passim* (Del. 2001).

injustice that would result if AMC were now allowed to use the corporate form as a shield. Assuming arguendo that ASARCO did acquiesce to the creation of SPHC and the transfer of the SPCC shares thereto, this would not prevent ASARCO from prevailing on its alter-ego claim, which is based on the use of SPHC subsequent to its creation.

### iii. Unclean Hands

AMC next contends that ASARCO is barred from bringing its veil-piercing claim because of the doctrine of unclean hands. AMC contends that to prove its reverse-veil-piercing claim, ASARCO must demonstrate its own inequitable conduct in the creation or use of the corporate form of SPHC.

It is a well-known maxim that one who comes into equity must do so with clean hands. *Nakahara v. NS 1991 Am. Trust*, 739 A.2d 770, 791 (Del. Ch. 1998). The doctrine of unclean hands provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim, regardless of merit." *Portroy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80-81 (Del. Ch. 2008) (quoting *Nakahara*, 739 A. 2d at 791-92). This equitable doctrine "is not strictly a defense to which a litigant is legally entitled. Rather, it is a rule of public policy to protect the public and the court against misuse by persons who, because of their conduct, have forfeited the right to have their claims considered." *Gallagher v. Holcomb & Salter*, Civ. A. No. 9337, 1991 WL 158969, at *4 (Del. Ch. 1991). In order for the plaintiff's claim to be barred, its inequitable conduct must relate directly to the matter in controversy. *Nakahara*, 739 A.2d at 792. The question is whether the plaintiff's conduct is so offensive to the integrity of the court that its claim should be denied. *Portroy*, 940 A.2d at 82 (citing *Gallagher*, 1991 WL 158969, at *4). Delaware courts have noted that this doctrine does not apply if its application would work an inequitable result. *Id.*

There is no dispute that veil-piercing and alter-ego claims in Delaware are only available in courts of chancery, i.e., they are only available in equity. *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, France*, Consolidated C.A. No. 19760-NC, 2004 Del. Ch. LEXIS 21, at *8 (Del Ch. 2004). Thus, ASARCO must pursue this equitable relief with clean hands. The Court disagrees with AMC's argument that ASARCO must prove its own inequitable conduct in order to prevail on its

50

alter-ego claim. ASARCO has successfully proven that its conduct related to the SPCC transfer was dominated and controlled by AMC and Grupo, and that ASARCO's parents, not an independent ASARCO, dictated the creation of SPHC, the transfer of the SPCC stock to it, and the subsequent transfer of the stock to AMC. ASARCO had no choice in those transactions. Its actions were compelled by AMC/Grupo, and, therefore, AMC/Grupo cannot now argue that equity precludes ASARCO from challenging those actions. It would be inequitable to allow AMC to blame ASARCO for the conduct in which it was forced to participate.[42]

### f. Proof of Claim

AMC next contends that ASARCO's alter-ego claim is barred because ASARCO did not file a proof of claim against SPHC. ASARCO responds that it was not required to file a proof of claim and, alternatively, that its complaint, constitutes an informal proof of claim.

A creditor is required to timely file a proof of claim or interest if the claim is disputed, contingent, or unliquidated. 11 U.S.C. § 502. The bankruptcy court sets the deadline, or bar date, for creditors to file their proof of claims. FED. R. BANKR. P. 3003(c)(3). Failure to file such a claim means that the claim may be disallowed and that the creditor may not be treated as such with respect to such claim for the purpose of voting and redistribution. Id., see 11 U.S.C. § 502; FED. R. BANKR. P. 3003(c)(3).

The Bankruptcy Code defines "creditor" as an:

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor; (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or (C) entity that has a community claim. 11 U.S.C. § 101(10).

A "claim" is defined as:

---

[42] Similarly, AMC raises the defense of *in pari delicto* based on its claim that ASARCO must show that it created SPHC for a wrongful purpose. As noted above, the Court believes SPHC was created for a legitimate purpose, but was later used for an improper purpose. In any event, this defense would fail against the debtor because Grupo (AMC's sole shareholder) completely controlled the creation of SPHC and the transfer of the SPCC stock to SPHC.

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.  11 U.S.C. § 101(5).

The Court finds that ASARCO is not a "creditor" as the term is defined in the Bankruptcy Code, because it does not have a "claim" against SPHC; therefore, it was not required to file a proof of claim against SPHC.  ASARCO is not asserting any right to payment by SPHC, nor is it seeking an equitable remedy for breach of a performance.  Rather, the alter-ego claim is a threshold issue in ASARCO's efforts to hold AMC, who is not a debtor in bankruptcy, liable for an alleged fraudulent transfer.  Since ASARCO is not a creditor with a claim against SPHC's estate, it was not required to file a proof of claim.

Even if a proof of claim were required, ASARCO contends that it met the requirement because the complaints filed in this case and in the bankruptcy court constitute an informal proof of claim.  In *In re Nicoloutsos*, the Fifth Circuit stated that the following elements must be met in order for a document to qualify as an informal proof a claim: (1) the claim must be in writing; (2) the writing must contain a demand by the creditor on the debtor's estate; (3) the writing must evidence an intent to hold the debtor liable for such debt; (4) the writing must be filed with the bankruptcy court; and (5) based upon the facts of the case, allowance of the claim must be equitable under the circumstances. 199 F.3d 233, 236 (5th Cir. 2000).

To qualify, the informal proof of claim must be filed by the bar date.  The bar date in this case was May 21, 2007.[43]  The Original Complaint in this case was filed on February 2, 2007.  In that Complaint, ASARCO alleged that SPHC had no business other than owning the SPCC shares, was a mere instrumentality and alter ego of ASARCO, and was formed as a sham to perpetrate a fraud.

---

[43] Defendant states, in one of its summary judgment briefs, that the bar date was May 17, 2007, but the "Notice of Setting Bar Date for Certain Subsidiary Debtors" filed in the bankruptcy case states that the bar date was May 21, 2007.

(Doc. No. 1, n.4). This Complaint was also filed in the bankruptcy court on the same date. (Case No. 05-21207, Doc. No. 3697). On May 4, 2007, ASARCO filed its First Amended Complaint containing similar allegations and adding SPHC as a plaintiff in this action.[44]

The first requirement, that the claim be in writing, was met by both complaints. The second requirement is that the writing contain a demand by the creditor on the debtor's estate. This Court does not find ASARCO's alter-ego allegation constitutes a "demand on the estate," nor is it an effort to hold the debtor liable for any debt; however, the Original Complaint makes the same alter-ego allegations as are currently asserted and, to the extent possible, satisfies the third and fourth requirement. Lastly, based upon the facts of the case, allowance of the claim is equitable under the circumstances. Although ASARCO does not actually assert any "claim" against SPHC, to the extent AMC believes the alter-ego allegation constitutes a claim, the Original Complaint satisfies the requirements of an informal claim.

For the reasons stated herein, ASARCO's failure to file a proof of claim does not bar Plaintiff from asserting that ASARCO and SPHC were alter egos in order to pursue its fraudulent-transfer claims against AMC.

### g. Conclusion

In summary, the Court finds ASARCO has standing to pursue the fraudulent-transfer claims under Delaware law, but SPHC does not. ASARCO (but not SPHC) demonstrated that it had an actual, unsecured creditor who existed at the time of the transfer and who still has a claim against ASARCO. ASARCO also prevailed on its reverse-veil-piercing claim by proving, by a preponderance of the evidence, that ASARCO and SPHC were alter egos. This finding, in effect, expands Plaintiff's estate such that ASARCO my claim an interest in the asset transferred (the SPCC stock) and have standing to pursue its fraudulent-transfer causes of action.

---

[44] The current live Complaint is the Second Amended Complaint. (Doc. No. 169). It was filed in October 2007, after the bar date passed. For this reason, it cannot constitute an informal proof of claim.

**B. Constructive Fraudulent Transfer**

All parties agree that Delaware's enactment of the UFTA provides that a transfer is constructively fraudulent if the debtor made the transfer: (1) "[w]ithout receiving a reasonably equivalent value in exchange for the transfer . . . ," and (2) the debtor: (a) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;" (b) "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due;" or (c) "was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 6 Del. C. §§ 1304(a)(2), 1305(a). In short, to prevail on its constructive fraudulent-transfer claim, ASARCO must prove, by a preponderance of the evidence, that (1) it did not receive reasonably equivalent value ("REV"); and (2) it was "insolvent" under any of the above three tests.[45]

1. Reasonably Equivalent Value

ASARCO must first demonstrate that it did not receive reasonably equivalent value for the SPCC stock it transferred to AMC. The question of whether a debtor received REV is a two-step analysis. *See In re MDIP Inc.*, 332 B.R. 129, 133 (Bankr. D. Del. 2005). The Court must first decide whether ASARCO received any "value." *Id.* Second, the Court must determine whether the value received was reasonably equivalent to that transferred. *Id.* The Court finds, and neither party disputes, that each piece of consideration given by AMC constituted "value."[46] The more difficult issue is whether the value ASARCO/SPHC received was reasonably equivalent to the value of the SPCC stock.

---

[45] The Court recognizes that the high court in Delaware has not yet determined the burden of proof applicable to a constructive fraudulent transfer claim under its enactment of the UFTA. Both parties agree, however, that Delaware would likely adopt a preponderance of the evidence standard. After considering the available case law, the Court agrees with this prediction.

[46] "Value" is a defined term under the statute. "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." 6 Del. C. § 1303(a).

Prior to 1996, Title 6, Chapter 13 of the Delaware Code was called the "Fraudulent Conveyances Act."[47] In 1996, Delaware adopted the Uniform Fraudulent Transfer Act. The UFTA replaced the term "fair consideration" with "reasonably equivalent value." Neither the UFTA nor Delaware's enactment of the UFTA offers a universal definition of REV. *See* 6 Del. C. § 1303; *see also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631(3d Cir. 2007).[48] The Court has not found, and neither of the parties provided the Court with, any reported decision from Delaware indicating how that state would define or determine "reasonably equivalent value." As the law in Delaware on this question is unsettled, the Court must predict how the high court in Delaware would determine REV. In undertaking this analysis, the Court may be guided by: (1) the Uniform Fraudulent Transfer Act, which Delaware adopted; (2) cases interpreting other states' versions of the UFTA; and (3) the manner in which other courts have defined REV in the context of the Bankruptcy Code's fraudulent transfer provision, § 548.[49]

All jurisdictions agree that courts should measure the value of the property transferred and the consideration received at the time of the transfer. *See, e.g., Matter of Fairchild Aircraft Corp.*, 6 F.3d 1119, 1126 n.8 (5th Cir. 1993) (citing *In re Morris Comm'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990). The Court should not consider subsequent events, such as the exponential improvement in copper prices. *See id.* By analyzing whether ASARCO received reasonably equivalent value at the time of the transfer, courts avoid valuing an asset "through the 20/20 vision of hindsight." *In re*

---

[47] This was Delaware's enactment of the Uniform Fraudulent Conveyances Act, "UFCA."

[48] The UFTA does define REV for use in foreclosure contexts, but that provision is inapplicable to the case at hand. Section 1303(b) states, "[f]or the purposes of §§ 1304(a)(2) and 1305, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust or security agreement."

[49] In states that have adopted the UFTA, courts have held that they may look to cases decided under the Bankruptcy Code's fraudulent transfer provision, as well as cases interpreting other states' versions of the UFTA, to determine the meaning of REV. *See, e.g., Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007); *In re Chapman Lumber Co., Inc.*, Adv. No. 06-09112, 2007 WL 2316528, at *2 (Bankr. N.D. Iowa Aug. 8, 2007); *In re W.R. Grace & Co.*, 281 B.R. 852, 857 (Bankr. D. Del. 2002) (noting that the court could seek guidance from cases interpreting similarly worded statutes, like the Bankruptcy Code); *In re Hemstreet*, 258 B.R. 134, 139 (Bankr. W.D. Pa. 2001). Numerous courts interpreting REV under the UFTA rely on the test used in that circuit for REV under § 548. *See, e.g., VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007); *Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007).

*Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (C.D. Ill. 2006). This also means that courts should use the industry standards in place at the time of the transaction to determine the fair market value of the SPCC stock because these standards determine what a hypothetical sale of such property would yield for the company. *In re WRT Energy Group*, 282 B.R. 343, 406 (Bankr. W.D. La. 2001); *Union Bank of Switzerland v. Deutsche Fin. Servs., Corp.*, 98 Civ. 3251 (HB), 2000 U.S. Dist. LEXIS 1481 (S.D. N.Y. Feb. 16, 2000).

The REV inquiry is focused on the value that the debtor received in exchange for the property transferred. "The touchstone is whether the transaction conferred realizable commercial value on the debtor . . . ." *In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996) (quoting *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991)). The determination of whether the debtor received REV should be made from the standpoint of the debtor's creditors, by looking at the net effect of the transfer on the unsecured creditors. *In re GTI Capital Holdings, LLC*, 373 B.R. 671, 677 (Bankr. D. Ariz. 2007).

Courts also seem to agree that there need not be a dollar-for-dollar exchange. *Weaver v. Kellogg*, 216 B.R. 563, 574 (S.D. Tex. 1997). Some courts have stated that a debtor receives reasonably equivalent value if it receives roughly the value it gave. *See, e.g., In re Phillips Group, Inc.*, 382 B.R. 876, 887 (Bankr. W.D. Pa. 2008); *In re Gonzalez*, 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006).

The Court now turns to the question of what it means, under Delaware law, for the value received to be reasonably equivalent to the value of the asset transferred. The United States Supreme Court has had one opportunity to discuss reasonably equivalent value. In *BFP v. Resolution Trust Co.*, the high court held that the price received at a foreclosure constitutes REV so long as the sale complies with the state's foreclosure laws. 511 U.S. 531, 545 (1994). The Court noted that outside of the foreclosure context, REV "will continue to have an independent meaning (ordinarily a meaning similar to fair market value). . . ." *Id.*[50] Discussing the meaning of REV in his dissent,

---

[50] The UFTA (and Delaware's version thereof) includes a special provision regarding the meaning of REV in the foreclosure context. The *BFP* case was decided in 1994, ten years after the UFTA was drafted; thus, one cannot make the argument that the UFTA intended to incorporate *BFP*. By this holding, however, the Supreme Court made a distinction between REV in foreclosure and non-foreclosure contexts. The UFTA, by providing a special test for REV in foreclosure, does the same.

Justice Souter states, "[a]lthough this formula makes no pretense to mathematical precision, an ordinary speaker of English would have no difficulty grasping its basic thrust: the bankruptcy court must compare the price received by the insolvent debtor and the worth of the item when sold and set aside the transfer if the former was substantially (unreasonably) less than the latter." *Id.* at 552. (Justice Souter dissenting) (internal quotation omitted).  Justice Souter called attention to the fact that the majority indicated that this is what the statute means in all contexts outside of foreclosure. It is up to the courts to decide what constitutes an amount substantially or unreasonably lower than an item's fair market value.

The tests courts use to determine whether the value received is reasonably equivalent to the value transferred varies among jurisdictions. A minority of courts look at the percentage of property value to determine whether the debtor received REV. The majority of courts, however, seem to use a totality of the circumstances approach.

The percentage approach may have begun with a Fifth Circuit case in which the court stated, in dicta, that a foreclosure sale conducted within one year of bankruptcy violated § 548 if the proceeds realized were less than seventy percent of the value of the foreclosed property. *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203 (5th Cir. 1980). A number of courts utilized this 70-percent rule, while the majority of Circuits flatly rejected the rule in favor of a less formulaic, totality of the circumstances approach. *Matter of Besing*, 981 F.2d 1488, 1496 n.14 (5th Cir. 1993) (citing cases adopting the totality of the circumstances from other Circuits).  The *BFP* case, discussed above, effectively overruled *Durrett* by holding that the price received at a foreclosure constitutes REV so long as the transaction complied with the state's foreclosure laws. *BFP*, 511 U.S. at 545. It is unclear whether this 70-percent rule retains any viability.

The more widely accepted approach is to look at the totality of the circumstances.[51]  In utilizing this approach, the factors most widely considered are: (1) the disparity between the fair value of the transferred property and what the debtor received; (2) the good faith of the parties; and

---

[51]  *See, e.g., In re Fruehauf Trailer Corp.*, 444 F. 3d 203, 213 (3d Cir. 2006); *In re Commercial Fin. Servs., Inc.*, 350 B.R. 559, 576-77 (Bankr. N.D. Okla. 2005); *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002); *see also In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (C.D. Ill. 2006); *In re Phillips Group, Inc.*, 382 B.R. 876, 887 (Bankr. W.D. Pa. 2008); *In re Sapp*, 364 B.R. 618, 632 (Bankr. N.D. W. Va. 2007); *In re Nelco, Ltd.*, 264 B.R. 790, 813-14 (Bankr. E.D.Va. 1999); COLLIER ON BANKRUPTCY ¶ 548.05 (15th ed. rev.).

(3) whether the transaction was at arm's length.  *Peltz v. Hatten*, 279 B.R. 710, 736-37 (D. Del. 2002); *see also In re Jumer's Castle Lodge*, 338 B.R. 344, 354 (C.D.Ill. 2006); *In re Sun Valley Prod., Inc.*, 328 B.R. 147, 156-57 (Bankr. D.N.D. 2005); *In re Nelco, Ltd.*, 264 B.R. 790, 814 (Bankr. E.D.Va. 1999).

Despite the overwhelming acceptance of these factors, there seems to be some debate over the role "good faith" plays in a REV analysis.  The comments to the UFTA expressly state that good faith should not be a consideration in the REV inquiry, but, rather, it is an affirmative defense. UFTA § 4 cmt. 2.  Under the former fraudulent conveyance law, the UFCA, which used the term "fair consideration" instead of "reasonably equivalent value," courts considered the good faith of the parties involved in determining whether adequate consideration was received. UFTA prefatory note and § 4 cmt. 2.  Under the UFTA, however, the drafters elimated "good faith" from the inquiry in an effort to achieve a more objective test.  *See id.*  Collier, a leading authority on bankruptcy law, also notes that "reasonably equivalent value" does not contain a good faith component. COLLIER ON BANKRUPTCY ¶ 548.05 (15th ed. rev.).  Nevertheless, the majority of jurisdictions continue to consider good faith as a factor in the reasonably equivalent value determination.[52]

This Court finds that the high court of Delaware would adopt the totality of the circumstances approach, which is applied in most jurisdictions.  Although the Third Circuit includes "good faith" as a factor in its reasonably equivalent value analysis in cases brought under § 548, the comments to the UFTA make clear that "good faith" should not be a consideration in the REV inquiry. *Compare In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213-14 (3d Cir. 2006), *with* UFTA prefatory note and § 4 cmt. n.2.  For this reason, the Court finds that Delaware would look at all the facts surrounding the transaction, including whether the transaction was at arm's length, but would not include "good faith" as a factor in its REV assessment.

---

[52] At least one court used a totality of the circumstances approach without considering "good faith," but there was no indication by that court that the omission of that factor was intentional. *See In re Lindell*, 334 B.R. 249, 255-56 (Bankr. D. Minn. 2005)

### a. Value Of Consideration Received

Both parties agree that ASARCO/SPHC transferred its 54.18% stake in SPCC to AMC for an aggregate nominal amount of $765 million, which included: (1) $450 million in cash, used to pay the Chase Revolver debt; (2) $50 million in cash, earmarked to pay part of the Yankee Bonds; (3) AMC's execution and delivery of a promissory note to SPHC in the amount of $123.25 million (the "AMC Note"); (4) AMC's execution and delivery to SPHC of a promissory note in the amount of $100 million, which was dedicated to pay environmental claims, and which was guaranteed by Grupo (the "DOJ Trust Note"); and (5) AMC's and/or its affiliate's cancellation of the $41.75 million debt against ASARCO/SPHC ("Debt Forgiveness"). (PX 270; DX 467).

In order to resolve the constructive-fraudulent-transfer claim, the Court must determine the 2003 present value and net effect of the consideration received by ASARCO/SPHC. ASARCO's experts, Navigant, concluded that the present value of the consideration was between $660.21 million and $726.61 million. Navigant then subtracts from these numbers what it describes as the additional net economic effect on ASARCO of paying the Yankee Bonds. This reduced Navigant's conclusion to a range of $611.21 and $702.11. Dr. Pirrong, the valuation expert called by AMC, concluded that the present value of the consideration totaled $720.31 million. Dr. Pirrong did not reduce this number to account for the additional money ASARCO used to pay the Yankee Bonds.

### i. $450 Million

All parties agree, and the Court finds, that the present value of the $450 million paid in cash to retire the past-due Chase Revolver is $450 million.[53]

### ii. The AMC Note

The nominal value of the AMC Note was $123.25 million. (PX 0271). According to the terms of the note, AMC was required to pay SPHC the principal amount in seven consecutive installments, consisting of $17,607,143 each, in October of each year from 2003 to 2009. (PX 0271).

---

[53] While ASARCO has somewhat attacked the motivation for paying the overdue Revolver (since Grupo was a guarantor of the note and AMC received $50 million of this amount because of its participation in the Revolver), the Court finds that any secondary motivation that Grupo had for paying the note does not affect the amount that it represents toward the REV calculation.

Navigant concluded that the present value of the note was between $78.66 million and $105.68 million. EYCF performed a present-value analysis on this note using a discount rate of 12.5% to 25%. (PX 0187). EYCF determined that the value was between $77.1 million and $105.68 million. (PX 0187). Dr. Pirrong considered the applicable credit rating and the fact that Grupo did not guarantee this note. He used varying discount rates, ranging from 17.55% and 19.36%, based on a credit spread of 16.43%. Dr. Pirrong arrived at a value of $94.36 million. (DX 0611; Pirrong, June 4, 2008, 124:16-125:5).

The Court finds Dr. Pirrong's approach to be reasonable. His conclusion is based upon supportable assumptions and methodologies and is somewhat buoyed by the fact that it falls within the center of the ranges Navigant and EYCF found. For this reason, the Court finds that the present value of the AMC Note was $94.36 million.

### iii. DOJ Trust Note

The nominal value of the DOJ Trust Note was $100 million. Under the terms of this note, AMC was to pay SPHC the principal amount in eight consecutive annual installments of $12,500,000. (PX 0272). In turn, SPHC was to transfer these sums to the DOJ trust.

Unlike the AMC Note, this note was guaranteed by Grupo. For this reason, EYCF performed a present-value analysis using discount rates of 10% to 12.5% (rather than 12.5% to 25% as it used for the AMC Note), resulting in a value of $85.1 million to $91.4 million. (PX 0187). Navigant reviewed EYCF's analysis and did an independent present-value analysis, concluding that the DOJ Trust Note was worth $85.67 million to $91.68 million to ASARCO. (PX 1217). Dr. Pirrong examined Grupo's credit rating and the prevailing market yields. He used a credit spread of 4.55% and discount rates ranging from 5.68% to 7.99% to determine that the note was worth $99.83 million. (DX 0611).

The Court finds that Dr. Pirrong's discount rates were too low in calculating the present value of the DOJ Trust Note. The Court further finds that the high ends of EYCF and Navigant's analyses are most appropriate and concludes that the present value of the $100 million note was $91.68 million.