# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# –BROWNSVILLE DIVISION–

United States District Court
Southern District of Texas
ENTERED

APR - 1 2009

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| ASARCO LLC, SOUTHERN PERU HOLDINGS, LLC, | §<br>§<br>§ | |
| Plaintiffs, | § | |
| vs. | §<br>§ | CIVIL NO. 1:07-CV-00018 |
| AMERICAS MINING CORPORATION, | §<br>§ | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs ASARCO LLC (hereinafter "ASARCO") and Southern Peru Holdings, LLC (both of which are currently in bankruptcy) brought an adversary action in this Court, in their capacities as debtors in possession and on behalf of ASARCO's creditors, to recover from Defendant Americas Mining Corporation (hereinafter "AMC") stock representing 54.18% of the outstanding shares of Southern Peru Copper Company (hereinafter "SPCC") and damages resulting from having been wrongly deprived of this stock ownership.[1]  The Court held a four-week bench trial and has previously issued its findings of facts and conclusions of law on the issue of liability.  Specifically, the Court found AMC liable for actual fraudulent transfer, aiding and abetting a breach of fiduciary duty, and conspiracy.  The Court granted leave for each side to file additional briefing on the issue of damages and also heard oral argument.  Subsequently, the Court ordered the parties into a mediation, which was held on multiple occasions over a period of time, but which ultimately concluded unsuccessfully.  The Court now issues this Memorandum Opinion and Order to reach the issue of damages and dispose of all pending motions.

---

[1]Through a variety of business maneuvers, the stock is no longer the discrete 54.18% of SPCC that it was at the time of the transaction in question.  Nonetheless, it remains identifiable, and for the purposes of this Order, the Court will refer to the stock in the manner in which it existed at the time of the transfer.  The Court will refer to Southern Peru Copper Company as SPCC, although its name has been changed, as well.

## I.      Factual Background[2]

Plaintiff ASARCO LLC is the successor in interest to ASARCO Incorporated,[3] a company that had been involved in the domestic and international mining industries for over a century.   One of the primary products from its mining operations was, and still is, copper, and among its international assets was the controlling interest (54.18%) in SPCC, a publicly traded Peruvian copper company.  In late 1999, Grupo Mexico S.A.B. de C.V. (hereinafter "Grupo"), a Mexican corporation also involved in the mining industry, acquired ASARCO for a purchase price of over $2 billion, and ASARCO became a wholly owned subsidiary of Grupo.   For a variety of reasons, including debt from this acquisition, ASARCO carried a high debt load, which included a $450 million Revolving Credit Agreement (hereinafter "Revolver") financed by a consortium of 19 banks headed by Chase Manhattan Bank and Chase Securities Inc. (hereinafter referred to jointly as "Chase") and secured by, *inter alia*, the stock ASARCO held in SPCC.  Shortly after acquiring ASARCO, Grupo created the Southern Peru Holding Company (hereinafter "SPHC") as a wholly owned subsidiary of ASARCO and then had ASARCO transfer ownership of the stock to SPHC.  SPHC's sole function was to own and hold the SPCC stock.  In October of 2000, Grupo formed AMC as a wholly owned subsidiary whose function was to hold ASARCO's stock.

Thus, by these maneuvers a four-tier corporate family was established: Grupo wholly owned AMC, which wholly owned ASARCO, which wholly owned SPHC, which owned the majority of stock in SPCC.   The boards of each of these subsidiaries were stocked with various Grupo employees or loyal retainers, creating an integrated and overlapping hierarchy of control within the Grupo corporate family.

In addition to the debt from the 1999 acquisition, ASARCO was also beset with legal problems resulting from various environmental and asbestos claims.   By the fall of 2001, ASARCO's financial difficulties became critical.  In October 2001, ASARCO engaged the law firm

---

[2]The following is a brief summary of the facts giving rise to this suit.  For a fuller treatment, see *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008).  Except where specifically noted, the factual recitation contained herein is not meant to supplant or amend the actual findings of fact and conclusions of law contained in this Court's prior opinion on liability.  This summary is included in an effort to give context to the Court's present ruling on damages.

[3]Both entities may be referred to jointly as "ASARCO".

of Sidley Austin to provide bankruptcy and restructuring advice.  In late 2001, Grupo or one of its principals (through AMC) loaned $41.75 million to ASARCO to keep it afloat, however the financial problems continued to mount throughout 2002.  Toward the latter part of 2002, Chase began to apply increasing pressure on ASARCO for payment in full on the Revolver and threatened to foreclose on its security interests (including the SPCC stock) if the debt was not paid.  Moreover, $100 million worth of outstanding bonds–the so-called "Yankee Bonds"–were coming due on February 3, 2003.

Most AMC/Grupo/ASARCO insiders believed that ASARCO had only two feasible courses of action: bankruptcy or the sale of assets.  ASARCO's best and most valuable asset was ASARCO's stock in SPCC.  As early as 2001, AMC/Grupo concluded that the most viable option to alleviate ASARCO's financial situation was to sell the SPCC shares.  However, AMC/Grupo, being in the copper business themselves, did not want to relinquish control of this valuable asset.  Various legal and financial experts were hired to help effectuate a restructuring and, if possible, an inter-company sale of the SPCC stock, including the law firm of Squire, Sanders & Dempsey and the consulting firm of Ernst & Young Corporate Finance (hereinafter "EYCF").

While various permutations were proposed, Grupo ultimately decided to have ASARCO sell the SPCC shares to AMC, and the transaction was closed on March 31, 2003.  Testimony at trial suggested that various, but not all, of ASARCO's lending banks had indicated to AMC/Grupo that paying off the Yankee Bonds could make refinancing outstanding debt obligations significantly easier.  In addition, evidence was introduced suggesting that Inbursa, a Mexican bank that owned, or whose principals owned, a large number of the Yankee Bonds, was demanding full payment as a condition of its financing the AMC purchase of the SPCC stock.  Regardless of the reason, part of the transaction included the payment by ASARCO of $100 million plus interest to the Yankee Bond holders.

Despite some measure of relief from these debt obligations as a result of the sale of the stock to AMC, ASARCO continued to find itself in difficult financial straits.  Throughout the post-transaction years prior to its bankruptcy filing (i.e., 2003–2005), ASARCO continued to survive hand to mouth. Cash flow problems increased, and asbestos-related and environmental liabilities continued to mount.  ASARCO put a number of its subsidiaries into bankruptcy in early 2005, and ASARCO followed these subsidiaries into Chapter 11 on August 9, 2005.  SPHC filed a voluntary

petition for Chapter 11 protection the next year.  On February 2, 2007, Plaintiffs brought various claims against AMC in their capacities as debtors in possession and on behalf of ASARCO's unpaid creditors.

## II.    Summary of Liability

After a four-week bench trial, this Court issued its findings of fact and conclusions of law on the issue of liability.  *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008). Specifically, the Court found AMC liable for:

A.    actual-intent fraudulent transfer under Delaware's version of the Uniform Fraudulent Transfer Act, DEL. CODE ANN. tit. 6 § 1304(a)(1), *id.* at 394;

B.    aiding and abetting a breach of fiduciary duty under New Jersey law, *id.* at 394 n.133, 413; and

C.    civil conspiracy under Arizona law, *id.* at 416; *see id.* at 419–21.

## III.    Available Remedies

A.    <u>Actual-intent fraudulent transfer</u>

Plaintiffs brought their claim for actual-intent fraudulent transfer pursuant to 11 U.S.C. § 544(b), which provides that a "trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable [state] law by a creditor" holding an allowable unsecured claim. 11 U.S.C. § 544(b)(1).  Trustees and debtors in possession use § 544(b) as a conduit to assert state-law-based fraudulent-transfer claims in bankruptcy.  This Court held that Delaware's version of the Uniform Fraudulent Transfer Act was the applicable state law under the facts of this case.  *See ASARCO LLC*, 396 B.R. at 364–65; *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 64 (S.D. Tex. 2007).[4]

Section 550 of the Bankruptcy Code, however,  provides the remedies available if a plaintiff prevails on a § 544 cause of action.  Thus, "to the extent that a transfer is avoided under section 544

---

[4]Prior to trial, both parties conceded that Delaware law controlled the fraudulent-transfer claim; New Jersey law the fiduciary-duty claims; and Arizona law the conspiracy claim.  Therefore, while at issue in the initial stages of these proceedings, all choice-of-law matters were resolved by agreement by the time of trial.  For the court's complete choice-of-law analysis, see *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49 (S.D. Tex. 2007).

. . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . . ." 11 U.S.C. § 550(a).[5] Such recovery may be from, *inter alia*, "the initial transferee of such transfer or the entity for whose benefit such a transfer was made . . . ." 11 U.S.C. § 550(a)(1).

    B.    <u>Aiding and abetting breach of fiduciary duty</u>

    Under New Jersey law, a party found liable for aiding and abetting a tort, including breach of fiduciary duty, is liable "with another if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Judson v. Peoples Bank & Trust Co.*, 134 A.2d 761, 767 (N.J. 1957) (internal quotations omitted).

    There is no statutory scheme in New Jersey law prescribing remedies for breach of fiduciary duty (or aiding and abetting thereof), and the New Jersey courts permit a degree of flexibility. At least one court has described the measure of damages recoverable on breach of a fiduciary duty as a "choice between the amount of the [beneficiary's] loss and that of the [fiduciary's] gain." *Societa Operaia Di Mutuo Soccorso Villalba v. Di Maria*, 122 A.2d 897, 899 (N.J. Super. Ct. App. Div. 1956). As to specific remedies, New Jersey courts tend to tailor the available remedy to the specifics of the individual case. Thus, some courts have imposed a constructive trust on the property obtained by a fiduciary in breach of his fiduciary duty. *See Daloisio v. Peninsula Land Co.*, 127 A.2d 885, 890, 893 (N.J. Super. Ct. App. Div. 1956); *see also Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).[6] Other courts have accomplished similar results through rescission, disgorgement, award of "rescissory" damages, or a mixture of these. *See Hill Dredging Corp. v. Risley*, 114 A.2d 697, 718 (N.J. 1955) (rescission); *see also Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 752 (Del. Ch. 2007) (disgorgement); *Strassburger v. Earley*, 752 A.2d 557, 578–81 (Del. Ch. 2000) (discussing "rescissory" damages); *id.* at 582 (awarding a mix). In cases involving fiduciaries who acquire stock

---

[5]Although the statute says "trustee," for purposes of their fraudulent-transfer claims, Plaintiffs, as debtors in possession, have the same rights to sue and be sued as a trustee. 11 U.S.C. § 1107(a).

[6] The Court has found that where the law, such as the law of fiduciary duty, is undeveloped in New Jersey, its courts often find Delaware law to be instructive. *See ASARCO LLC*, 382 B.R. at 70. Consequently, this Court includes references to Delaware law in its discussion of available New Jersey remedies.

in breach of their duty, courts may require the return of the stock, as well as any post-acquisition dividends. *See Guth*, 5 A.2d at 508.

C.    Civil Conspiracy

Under Arizona law, "[w]hen a civil wrong occurs as the result of concerted action, the participants in the common plan are equally liable." *McElhanon v. Hing*, 728 P.2d 256, 262 (Ariz. Ct. App. 1985), *aff'd in part, vacated in part on other grounds*, 728 P.2d 273, 278 (Ariz. 1986). Thus, a defendant can be held liable for another's wrongful acts based upon "a conspiracy, agency or acting-in-concert theory . . . ." *Mohave Elec. Co-op., Inc. v. Byers*, 942 P.2d 451, 465 (Ariz. Ct. App. 1997).

In the instant case, this Court found AMC liable for conspiring with ASARCO's directors to effectuate a fraudulent transfer and to breach those directors' fiduciary duties to ASARCO and ASARCO's creditors by structuring and accomplishing the SPCC stock transfer. *ASARCO LLC*, 396 B.R. at 419–21. As both Plaintiffs and Defendant acknowledge, the remedies available under this claim duplicate those available for aiding and abetting the breach of fiduciary duty. (*See* ASARCO's Proposed Findings, ¶ 228 at p. 277; AMC's Memorandum of Law on Remedies at 30).  Under Arizona law, approved remedies for a breach of fiduciary duty include constructive trust, rescission, and restitution. *See, e.g.*, *Turley v. Ethington*, 146 P.3d 1282, 1285 (Ariz. Ct. App. 2006) (noting that Arizona "courts will impose constructive trusts if there has been a breach of fiduciary duty"); *Navajo Nation v. MacDonald*, 885 P.2d 1104, 1109, 1110, 1113 (Ariz. Ct. App. 1994) (affirming an award of rescission and restitution on a claim for breach of fiduciary duty).


IV.    **Discussion**

A.    Actual-intent fraudulent transfer

In its Memorandum Opinion and Order on the issue of liability, this Court found that ASARCO, but not SPHC, had standing to pursue fraudulent-transfer claims against AMC under Delaware law because ASARCO had at least one actual, unsecured creditor who existed at the time of the transfer of SPCC stock and who still had a claim against ASARCO. *ASARCO LLC*, 396 B.R. at 335.  Further, the Court found that ASARCO and SPHC were alter egos, thereby expanding

Plaintiff's estate such that ASARCO could claim an interest in the SPCC stock and have standing to pursue fraudulent-transfer causes of action against AMC. *Id.*

Turning to these causes of action, the Court first denied Plaintiff's claim based upon a theory of constructive fraudulent transfer because the Court found that AMC had paid ASARCO "reasonably equivalent value" for the SPCC shares. *Id.* at 364. The Court did, however, find that Plaintiff proved by a preponderance of the evidence its claim for actual fraudulent transfer because, despite having paid reasonably equivalent value for the stock, AMC nonetheless had caused the transfer "with the actual intent to hinder or delay some of ASARCO's creditors." *Id.* at 388. In support of this conclusion, the Court found, among other things, that: (1) the SPCC stock was ASARCO's "crown jewel", which AMC/Grupo intended to isolate from ASARCO's creditors, *id.* at 375; (2) almost all of the consideration for the SPCC stock was used to benefit AMC/Grupo and/or was used to satisfy "key creditors", i.e., those creditors who needed to be paid in order to close the transaction or who held a debt guaranteed by AMC/Grupo, *id.* at 375–77; (3) AMC/Grupo refused to expose the SPCC stock to outside bidders, *id.* at 379–80; (4) AMC/Grupo actively concealed relevant information concerning the transaction from ASARCO's independent directors, EYCF, and the Department of Justice, *id.* at 381; (5) AMC closed the transaction over the objection of the independent directors, *id.* at 382; (6) AMC paid the Yankee Bonds at par and with interest over the objections of many, including outside counsel, at a time when ASARCO was starved for cash, and with indifference to the impact this would have on ASARCO's other creditors, *id.* at 384; and (7) AMC/Grupo created separate bank accounts to hold the consideration received from the transfer for the sole purpose of avoiding garnishment by ASARCO's creditors, *id.* at 385–86.

In light of these holdings, the Court must now determine the appropriate remedy. As discussed above, § 550 provides that "to the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . . ." 11 U.S.C. § 550(a). In summary, ASARCO contends that pursuant to this language, as well as the purpose of fraudulent-transfer law, the Court should return to ASARCO the stock in SPCC, plus any post-transfer dividends and prejudgment interest on those dividends, and award damages for ASARCO's loss of control, through post-transfer dilution, of a majority of SPCC's outstanding stock. (ASARCO LLC's Post-Liability-Ruling Brief

on Remedies at 16, 23 n.36).  AMC contends that ASARCO is not entitled to any relief under 11
U.S.C. § 550(a) because it has failed to demonstrate that any recovery would result in a "benefit to
the estate."  (AMC's Memorandum of Law on Remedies at 6).  Alternatively, AMC asks that any
recovery be limited to the amount necessary to make ASARCO's creditors whole.  (*Id.* at 12).

1.    *ASARCO's Position*

ASARCO frames its argument by emphasizing that "[t]he purpose and thrust of [§ 550(a)]
is to restore the debtor's financial condition to the state it would have been had the transfer not
occurred."  (ASARCO LLC's Post-Liability-Ruling Brief on Remedies at 17 (quoting *In re Baker*,
17 B.R. 392, 395 (Bankr. W.D.N.Y. 1982))).  This purpose, according to ASARCO, can best be
achieved by returning the fraudulently transferred property.  (*See id.* at 17–18 (citing cases for
variations on the proposition that courts favor a return of the property itself and award the value of
the property only under limited circumstances)).  ASARCO contends that in this case, it would be
inequitable not to award return of the stock because the stock is readily available and identifiable for
return and AMC "did not enter into the challenged transaction in good faith."  (*Id.* at 19).

ASARCO also contends that it is entitled to all dividends paid on the stock after March 31,
2003, that would have been paid to ASARCO but for the transfer, citing language from the
Bankruptcy Code providing that even a *good-faith* transferee of avoided fraudulent transfers is only
entitled to a lien on the recovered property securing the lesser of "the cost, to such transferee, of any
improvement made after the transfer, *less the amount of any profit realized by or accruing to such
transferee from such property*; and any increase in the value of such property as a result of such
improvement, of the property transferred."  (*Id.* at 21–22 (quoting 11 U.S.C. § 550(e)(1)(A) & (B))
(emphasis added)).  Thus, according to ASARCO, a transferee found to have acted in *bad* faith, as
here, should certainly return any profits realized from the transferred property, such as dividends paid
to stockholders.  (*Id.* at 22).  To rule otherwise, ASARCO concludes, would confer a multi-billion
dollar windfall on the "perpetrator and beneficiary of the fraudulent transfer."  (*Id.*).

Additionally, ASARCO argues that it is entitled to prejudgment interest on lost dividends.
(*Id.* at 23).  Since no federal statute sets the proper rate of prejudgment interest, ASARCO asks the
Court to look to Delaware law, which provides the state-law claim through which Plaintiffs invoke
§ 544.  (*Id.*).  Under Delaware law, the rate of interest is calculated by adding 5% to the Federal

Reserve Discount Rate, computed from the date liability accrued. (*Id.* (citing DEL. CODE. ANN. tit. 6 § 2301(a); *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988))).

Finally, ASARCO asks the Court to award ASARCO damages for its loss of control of SPCC. (*Id.* at 13; 23 n.36). AMC presently has 260,093,694 shares of SPCC common stock, which represents roughly 29.4% of outstanding stock, as opposed to the 54.18% interest ASARCO held at the time of the transfer. (*Id.*). Thus, ASARCO's argument is that before the transaction it had a majority ownership, but now, even if the Court grants the relief it has requested, ASARCO will no longer have control of SPCC. To calculate ASARCO's damages for loss of control, ASARCO suggests that the Court multiply the present public market value of the SPCC stock returned to ASARCO by 20%, which the Court previously found was an appropriate control premium to apply to the stock price of SPCC. (*Id.*).

2.    *AMC's Position*

AMC contends that ASARCO is entitled to no relief under 11 U.S.C. § 550 because ASARCO has failed to prove that a recovery would "benefit the estate," as required by the statute. (AMC's Memorandum of Law on Remedies at 7). In the context of avoidance actions, AMC argues, "benefit to the estate" requires a showing that "any award increases distributions to creditors." (*Id.* at 9 (citing Fifth Circuit authority)). "Despite a lengthy discovery period and a full trial on the merits, ASARCO failed to provide any evidence demonstrating that its creditors will benefit–in any manner–from any judgment entered by this Court." (*Id.* at 10).

AMC further contends (or at least contended) that to the extent AMC has proposed "a plan of reorganization in ASARCO's bankruptcy case that would satisfy all allowed claims in full *without* the proceeds of any recovery in this litigation," ASARCO lacks standing to pursue any remedy under § 550. (*Id.* at 10, 11). Indeed, given AMC's alleged offer of its "Full Payment Plan," an award consistent with ASARCO's requests could, according to AMC, potentially amount to a windfall to ASARCO's creditors, in violation of the Bankruptcy Code's strict priority scheme. (*See id.* at 11–12).

In the event that the Court decides to award ASARCO relief under § 550, AMC argues that any award should be limited to the amount necessary to make ASARCO's creditors whole. (*Id.* at 12). In this situation, AMC requests that this Court "establish a protocol with the Bankruptcy Court

to determine the amount of damages–if any–that are permitted under Section 550." (*Id.*). The most appropriate procedure, according to AMC, "would be for this Court to direct the Bankruptcy Court to issue a report and recommendation to this Court detailing the amount necessary to satisfy all allowed claims in ASARCO's bankruptcy case . . . ." (*Id.* at 13). Then, "[u]pon reviewing the Bankruptcy Court's report and recommendation, this Court will be in a position either to enter a monetary judgment sufficient to satisfy creditors' claims in full . . . or to take whatever additional evidence the Court deems appropriate to make a final determination of the proper damage award." (*Id.*).

If the Court decides to avoid the transfer of the SPCC stock, AMC urges that the transfer only be avoided to the extent creditors were harmed. (*Id.* at 14). Similarly, AMC contends, principles of equity require that any money judgment be limited to the amount necessary to satisfy allowed claims. (*Id.* at 16). AMC urges that as a general principle, "[i]n fashioning an appropriate remedy, the Court should examine the harm that flowed from the actual wrongdoing." (*Id.* at 17). In this case, "the only possible harm that flowed from the hindrance or delay of certain creditors is the delay in the payment of their debts." (*Id.*). Thus, "the only logical remedy that compensates those creditors is full payment of their debt with interest," and any award should be so limited. (*Id.*).

AMC finally contends that whether under Delaware or federal law, the Court should deny ASARCO any award of prejudgment interest. (*Id.* at 33). Delaware law, AMC argues, does not include prejudgment interest as a remedy in fraudulent-transfer cases. (*Id.* (citing DEL. CODE ANN. tit. 6 §§ 1307(a), 2301(d))). According to AMC, the general federal rule is that in the absence of a statutory provision, the award of prejudgment interest is within the discretion of the court, but is not required. (*Id.* at 34). Since neither § 544 nor § 550 of the Bankruptcy Code provide for recovery of prejudgment interest, the matter is in this case left to the Court's discretion. AMC urges the Court to deny such an award, arguing that since the primary purpose for awarding prejudgment interest is "to compensate claimants for the use of cash," such an award here would create a windfall "[b]ecause the competing [bankruptcy] plans will fully compensate ASARCO's creditors, and

available remedies will otherwise fully satisfy (or overcompensate) any outstanding creditor claims." (*Id.*).[7]

3.      *Analysis*

The Court notes at the outset that this Court's decision on damages comes in the midst of ASARCO's still-pending bankruptcy proceeding. As of the writing of this opinion, the Bankruptcy Court has neither confirmed a reorganization plan nor resolved a number of outstanding issues, including the extent of any remaining asbestos-related and environmental liabilities. Despite the fact that this Court knows its decision herein will necessarily have some effect on the bankruptcy proceeding, the Court finds it must decide this case based solely upon the evidence presented at trial and the applicable law in this case. It will then be incumbent on the judge who is ably presiding over the bankruptcy to decide how this decision ultimately affects, if at all, those proceedings.

The Court agrees with AMC that the ultimate purpose of most fraudulent-transfer laws, and in particular § 550, is to protect unsecured creditors and, as far as possible, to make them whole. *See In re Texas Gen. Petroleum Corp.*, 52 F.3d 1330, 1336 (5th Cir. 1995) ("The proceeds recovered in avoidance actions should not benefit the reorganized debtor; rather, the proceeds should benefit the unsecured creditors."); *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("Fraudulent transfer laws are intended to promote payment to creditors; that is, the statutes are remedial, rather than punitive."). Nonetheless, in this instance, these goals will be best effectuated by the bankruptcy judge in the context of the bankruptcy proceedings. Neither party contests, and certainly the record supports, the fact that there are many unpaid creditors that are in need of compensation. AMC's arguments largely depend on the assumption that its "Full Payment Plan", or something essentially similar, will be confirmed, and as a result, ASARCO's creditors will be paid in full without having to dip into the proceeds of any damages awarded in the instant action. ASARCO has always maintained that this characterization by AMC of AMC's "plan" is not accurate. Further, ASARCO has recently filed transcripts indicating that AMC, at least in the Bankruptcy Court, has conceded that its plan, if even offered, would not, in effect, be a full-payment plan. (*See* Transcript of Status

---

[7]AMC did not address the issue of whether ASARCO is entitled to damages for loss of control over the SPCC stock in its initial briefing; however, it opposed these awards in oral argument, and the Court will discuss its arguments against such an award in detail below.

Conference held on 12/16/08, at 40:11–14). In fact, at that hearing, counsel for AMC conceded that it did not have a full-payment plan and that it did not ultimately expect to have an equity position, despite its 100% stock ownership in ASARCO. Putting aside whether or not AMC's plan–or any other reorganization plan for that matter–would, or could, actually accomplish full payment, what matters for this Court's purposes is that neither the AMC plan, nor any other, has actually been confirmed. Nor has the full extent of ASARCO's asbestos-related and environmental liabilities been determined. Under these circumstances, for this Court to limit its award "to the amount necessary to make ASARCO's creditors whole," as AMC urges, would require predictions about the future that this Court is in no position to make. Further, since neither party has actually introduced evidence on this point, this Court would have to abandon the basic tenet that a judgment must be based on evidence and grounded in law, and instead base its decision upon speculation. That would be a disservice not only to the parties here and in the Bankruptcy Court, but also to the judicial process as a whole. This being said, the basic premise of AMC's argument is not frivolous. Indeed, the extent of the ASARCO debts and contingent liabilities may very well have to be ascertained, and AMC as the sole ASARCO equity owner may ultimately be able to recover some portions of the judgment in this case. Nevertheless, this proceeding, which concerns one transaction, is not the most appropriate arena for such a determination.

Section 550 allows the trustee to recover the subject property or its value "if the court so orders." 11 U.S.C. § 550(a). "The recovery to be allowed is wholly within the discretion of the court. Courts will generally allow the trustee to recover the value of the property where the subject of the property is itself unrecoverable." *In re Vedaa*, 49 B.R. 409, 411 (Bankr. D.N.D. 1985). Nonetheless, "it is clear that courts favor a return of the property itself if at all possible so as to avoid speculation over its value." *Id.* Thus, "[i]n a normal preference, the transfer is avoided, the creditor's claim is restored as it existed before the transfer, and if money or property were transferred, they are returned to the estate, or the debtor-in-possession." *In re Am. Props., Inc.*, 14 B.R. 637, 643 (Bankr. D. Kan. 1981). This is true even in situations where the transferee paid reasonably equivalent value, but was found to have had an actual intent to hinder, delay, or defraud creditors. *See In re Sherman*, 67 F.3d 1348, 1354–55 (8th Cir. 1995). Put another way, "a transferee should return the property transferred unless to do so would be inequitable, in which event he must

pay the property's value." *In re Gen. Indus., Inc.*, 79 B.R. 124, 135 (Bankr. D. Mass. 1987), *superseded by statute on other grounds*, MASS. GEN. LAWS ANN. ch. 109A, § 3 (West 1992); *see also In re Brown*, 118 B.R. 57, 60 (Bankr. N.D. Tex. 1990) ("'Based on the language of section 550(a), this Court finds a congressional intent to return the property transferred unless to do so would be inequitable.'") (quoting *In re Morris Commc'ns NC Inc.*, 75 B.R. 619, 629 (Bankr. W.D.N.C. 1987)).

Despite the alleged current value of the stock, the Court finds no reason to depart from the usual practice in cases of fraudulent transfer of returning the transferred property to the estate or debtor in possession. The stock is available for return to ASARCO. Doing so would not, at this stage, be inequitable to any party, whereas not to do so may be inequitable to the plaintiffs. Furthermore, this Court presided over a month-long trial in which a major dispute concerned the valuation of copper and copper reserves. The only constant in the evidence given by the various witnesses was that the valuation of copper (and stocks based upon copper operations) is full of pitfalls and is an inherently difficult process. To value the stock now would necessarily entail a more detailed but less accurate examination—one that can be avoided if the stock is returned.[8] The Court, therefore, in its discretion as a court sitting in equity, finds it most appropriate to avoid the fraudulent transfer by ordering AMC to return the stock to ASARCO as debtor in possession, to be added to the estate and distributed as appropriate according to a plan the Bankruptcy Court determines is in accord with the statutory requirements.

The Court also awards ASARCO damages equal to the amount of dividends that AMC has received by virtue of its possession of the SPCC stock since March 31, 2003, the date of the transfer, as well as prejudgment interest on those dividends. "Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute." *In re Texas Gen. Petroleum Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1995) (citing *Carpenters Dist. Council v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994)). The Fifth Circuit applies a two-step analysis to determine whether an award of prejudgment interest is within a court's discretion: (1) whether the

---

[8]The Court notes that although in its prior opinion it was able to value the stock at the time of the transaction, this was only after hearing weeks of testimony. For the Court to make such a valuation now, as AMC suggests, would be much more difficult since it has no evidence to guide it other than the market price in a highly volatile marketplace.

federal act that creates the cause of action precludes such an award; and (2) whether such an award furthers the congressional policies of the federal act. *Id.* Applying this analysis to Bankruptcy Code § 548, the Fifth Circuit has held that

> The Bankruptcy Code and particularly § 548 are silent with regard to prejudgment interest. . . . Furthermore, an award of prejudgment interest furthers the congressional policies of the Bankruptcy Code. . . . The purpose of [Section 548] is to make the estate whole. Prejudgment interest compensates the estate for the time it was without use of the transferred funds.

*Id.* at 1339–40. ASARCO brings its fraudulent transfer claim under § 544 of the Bankruptcy Code, and the Court finds that this analysis applies to this section, as well.

Federal law also governs the determination of the proper rate of prejudgment interest, but no federal statute sets such a rate. *In re Mega Systems, L.L.C.*, Bankr. No. 03-30190, 2007 WL 1643182, at *10 (Bankr. E.D. Tex. June 4, 2007) (citing *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991)). Absent a federal statute on the matter, state law is an appropriate source of guidance on the proper prejudgment interest rate. *Id.* (citing *Dramse v. Delta Family-Care Disability and Survivorship Plan*, No. 3:05-CV-524-M, 2007 WL 60907, at *2 (N.D. Tex. Jan. 9, 2007)). In fraudulent-transfer actions brought under the Bankruptcy Code, courts may look to the laws of the state under which a similar fraudulent-transfer action could have been brought for such guidance. *See id.* at *11. Under Delaware law, the rate of interest is calculated by adding 5% to the Federal Reserve Discount Rate.[9] DEL. CODE ANN. tit. 6 § 2301(a). Accordingly, the Court finds that prejudgment interest should be calculated on this claim pursuant to Title 6, section 2301(a) of the Delaware Code.

B.    Aiding and abetting breach of fiduciary duty

In its prior Memorandum Opinion and Order, the Court found that: (1) at the time of the SPCC transaction, ASARCO was "insolvent" under the tests articulated under applicable state law; (2) ASARCO's directors therefore owed a fiduciary duty to ASARCO's creditors; (3) ASARCO's

---

[9]AMC contends that since § 2301 provides for prejudgment interest in tort actions only when the plaintiff is "seeking monetary relief for bodily injuries, death or property damage," Delaware law precludes an award of prejudgment interest in this case. (AMC's Memorandum of Law on Remedies at 33). This argument is misplaced, however, to the extent that the applicable Fifth Circuit authority calls for a court to consult state law for guidance on the proper *rate* of prejudgment interest, not its *availability* as a remedy, which is determined by the two-step analysis outlined above. *See Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 983–84 (5th Cir. 1991).

directors breached their fiduciary duties by entering into the SPCC transaction; and (4) AMC knew that the conduct of ASARCO's directors constituted a breach and provided substantial assistance, aid, and encouragement to the directors to perform this breach. *ASARCO LLC*, 396 B.R. at 413. The Court determined that ASARCO's creditors suffered harm as a result because the corporation was deprived of assets needed to continue operations and cash to pay its creditors. Accordingly, the Court found that ASARCO prevailed on its claim against AMC for aiding and abetting the breach of fiduciary duty by ASARCO's directors. *Id.* at 414. The Court must now determine the appropriate remedy.

1.    *ASARCO's Position*

ASARCO contends that the applicable law of fiduciary duty requires that AMC return the stock, plus dividends and interest, as well as compensate ASARCO for loss of control. (ASARCO LLC's Post-Liability-Ruling Brief on Remedies at 4). ASARCO frames its argument by emphasizing that the Court's guiding principle in fashioning a remedy on this claim should be that "[e]quity does not allow a fiduciary to benefit from breaching its duties." (*Id.* at 5). ASARCO notes that under Delaware law, to which New Jersey courts give great deference, "[o]nce disloyalty has been established, the standards evolved in [prior cases] require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct." (*Id.* (quoting *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996))). Further, "strict imposition of penalties for disloyalty [is] designed to encourage loyalty and eliminate the possibility of profit flowing to defendants from the breach of a fiduciary relationship." (*Id.*).

Similarly, under New Jersey law, when a fiduciary improperly deprives its beneficiary of property, the beneficiary may recover the better of its own losses or the fiduciary's gains. *Societa Operaia Di Mutuo Soccorso Villalba v. Di Maria*, 122 A.2d 897, 899 (N.J. Super. Ct. App. Div. 1956). ASARCO cites New Jersey case law in which courts employ various remedies, e.g., constructive trust, rescission, and restitution, to prevent unjust enrichment. (*See* ASARCO LLC's Post-Liability-Ruling Brief on Remedies at 5–7 (citing *Daloisio v. Peninsula Land Co.*, 127 A.2d 885 (N.J. Super. Ct. App. Div. 1956); *Packard-Bamberger & Co., Inc. v. Collier*, 771 A.2d 1194, 1200–02 (N.J. 2001); *Hill Dredging Corp. v. Risley*, 114 A.2d 697, 714 (N.J. 1955))).

15

ASARCO contends that to remedy the harm AMC inflicted upon ASARCO and its creditors through the SPCC transaction, "AMC must undo the self-dealing transaction by returning the SPCC shares to ASARCO, disgorging all dividends received on the shares plus interest, and compensating ASARCO for its loss of control of SPCC." (ASARCO LLC's Post-Liability-Ruling Brief on Remedies at 9). According to ASARCO, rescission of the SPCC transaction is preferable to "rescissory" damages because "rescissory" damages are generally awarded only when rescission is appropriate, but not feasible. (*Id.* (citing *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 502 (Del. 1981))). In this case, ASARCO maintains, rescission is "simple" because the transaction at issue concerned an "identifiable *res*–the SPCC shares," which AMC continues to hold subject to a Court order enjoining transfer. (*Id.*). ASARCO also urges that an award of the value of SPCC shares at the time of the transfer, or any other remedy supposedly based on "harm" to the creditors rather than simple rescission of the transaction, risks encouraging future wrongdoers to commit "efficient breach" when there is expectation that the price of the property in question will increase in value over time. (*Id.* at 12).

2.    *AMC's Position*

AMC contends that ASARCO is not entitled to any remedy on its aiding and abetting claim. As an initial matter, AMC argues that ASARCO is not entitled to equitable remedies of any kind, including rescission, because compensatory damages would be an adequate remedy at law. (AMC's Memorandum of Law on Remedies at 21 (citing New Jersey case law for the proposition that equitable jurisdiction cannot be exercised when there is an adequate remedy at law)). AMC contends that rescission is inappropriate because compensatory damages are an adequate remedy at law, and that any compensatory damages should be limited to ASARCO's creditors' "out-of-pocket" actual losses calculated under AMC's full-payment plan. (*Id.* at 21, 22). To the extent that AMC's plan offers to pay all allowed creditors in full, AMC argues that the Court should deny ASARCO any remedy at all. (*Id.*). AMC then argues that any award of compensatory damages must be limited to ASARCO's creditors' actual losses proximately caused by the defendant's wrongful conduct. (*Id.*). These actual harms, AMC urges, consist only of the overpayment on the Yankee Bonds, the forgiveness of the inter-company loan by AMC to ASARCO, and the discrepancy between the value of the SPCC shares and the value of the consideration paid for those shares. (*Id.* at 22). To the

extent that "each of these harms would be fully remedied under AMC's Full Payment Plan," AMC concludes that no further remedy is necessary. (*Id.*).

AMC also specifically opposes ASARCO's request for rescission, again arguing that ASARCO has an adequate remedy at law in the form of compensatory damages, and also that the parties cannot be restored to the *status quo ante*. (*Id.* at 23). According to AMC, rescission is generally only available when the party seeking rescission can restore the other party to the position that it occupied before the challenged transaction, i.e., the *status quo ante*, and the *status quo ante* cannot be restored in this case. (*Id.* (citing, e.g., *Walter v. Holiday Inns, Inc.*, 784 F. Supp. 1159, 1166 (D.N.J. 1992))). The cash consideration AMC paid for the SPCC stock has been transferred to third-party creditors who are not parties to this litigation and from whom this consideration cannot be recovered in any action to rescind the sale. Similarly, it argues the Court cannot unwind either of the two promissory notes still in existence that AMC executed and delivered to SPHC as consideration for the stock sale because the interest in these notes has also been pledged to outside parties. (*Id.* at 24–26).

AMC contends that rescission is inappropriate in this case on at least two other grounds, as well. First, AMC argues that the Court cannot properly award the SPCC stock to ASARCO because it was SPHC, ASARCO's subsidiary, and not ASARCO itself that owned the shares at the time of the transaction. (*Id.* at 24). AMC also argues that rescission would be inequitable under the circumstances of this case. According to AMC, since this Court found that AMC had paid reasonably equivalent value for the SPCC shares, and that it was reasonable for AMC to have believed that ASARCO was receiving reasonably equivalent value, "it would be inequitable for the Court to now unwind the SPCC Share Transaction under these facts, particularly when AMC stands ready, willing and able to make all creditors whole." (*Id.* at 27). This is especially so, according to AMC, to the extent that rescission would award the post-sale appreciation in value of the SPCC shares to ASARCO, despite the fact that this appreciation in value was not a loss to ASARCO proximately caused by AMC's aiding and abetting conduct. (*Id.* at 28).

3.    *Analysis*

As with the cause of action of actual fraudulent transfer, the Court finds that under the facts of this case and in the light of the relevant case law, the most appropriate remedy for AMC's aiding

17

and abetting of ASARCO's directors' breach of fiduciary duty is a return of the SPCC shares to ASARCO, plus dividends and prejudgment interest on those dividends. As a preliminary matter, the Court notes the seriousness with which American law has long viewed the duties owed by fiduciaries, duties perhaps most famously described by Justice Cardozo as entailing "[n]ot honesty alone, but the punctilio of an honor the most sensitive." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). Accordingly, courts encourage remedies commensurate with this exacting standard. New Jersey law, which governs this specific claim, also emphasizes the strict loyalty owed by fiduciaries, as well as the "'[u]ncompromising rigidity [that] has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions.'" *Di Maria*, 122 A.2d at 899 (quoting *Meinhard*, 249 N.Y. at 464). In the context of these principles, courts often describe a breaching fiduciary as holding the interest in question upon a "constructive trust" for the injured party. *See, e.g., Daloisio*, 127 A.2d at 889; *Guth*, 5 A.2d at 510; *see also* RESTATEMENT OF RESTITUTION § 190 (1937) ("Where a person in a fiduciary relation to another acquires property, and the acquisition or retention of the property is in violation of his duty as fiduciary, he holds it upon a constructive trust for the other."). Ultimately, New Jersey courts have held that the appropriate remedy in such circumstances is for the liable party to re-convey the property taken. *See Packard-Bamberger & Co., Inc.*, 771 A.2d at 1200–01; *Daloisio*, 127 A.2d at 889, 893; *see also Hill Dredging Corp.*, 114 A.2d at 718.[10]

Along similar lines, the Supreme Court of Delaware has emphasized that regarding any interest acquired by a fiduciary in violation of his duty, "the law denies to the betrayer all benefit and profit," and notes that this

> rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

---

[10]These authorities sometimes hold the transaction "void ab initio," *Hill Dredging Corp.*, 114 A.2d at 714, or suggest a constructive trust, *Daloisio*, 127 A.2d at 889. Whatever label is used, the ultimate result is the return of the property.

*Guth*, 5 A.2d at 510.  Accordingly, Delaware courts, to which New Jersey courts look with favor, frequently adopt rescission and similar remedies as those most appropriate to breaches of fiduciary duty.  *See, e.g.*, *Guth*, 5 A.2d at 508, 515 (awarding rescission of stock transfer); *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 752 (Del. Ch. 2007) (disgorgement); *Strassburger v. Earley*, 752 A.2d 557, 578 (Del. Ch. 2000) (discussing "rescissory" damages); *id.* at 582 (awarding a mix).

The Court is unpersuaded by the various arguments AMC advances suggesting that rescission is somehow inappropriate under the facts of this case.  First, the Court rejects AMC's contention that rescission, an equitable remedy, is inappropriate because compensatory damages (in an amount that would match the payment of the Yankee Bonds and the internal repayment of the loan) would constitute an adequate remedy at law.  In this case, compensatory damages based upon the payment of the Yankee Bonds and the payment of AMC's own debt (to the exclusion of other creditors) would not be an adequate remedy because the resulting damages to ASARCO and its creditors from the underpayment for the stock are far greater than the amount of the Yankee Bonds and the other approximately $41.75 million AMC paid to itself.  As a result of the SPCC stock sale, not only have creditors been delayed and hindered, but  ASARCO and SPHC were left with virtually no cash and were ultimately forced to file bankruptcy.  Simply put, the sums suggested by AMC would not and could not make the estate or its creditors whole.  Furthermore, the inherent difficulties in awarding money damages based upon the total value of stock would be virtually impossible to overcome, especially given the post-transaction machinations the stock has undergone and the fluctuations in the price of copper.

Second, AMC's contention that rescission is inappropriate because the parties cannot be returned to the *status quo ante* is equally misplaced, since the Court is fashioning its judgment to ensure that AMC is fully compensated for the consideration it paid in the stock sale.

Regarding AMC's claim that an award of the stock to ASARCO is inappropriate to the extent that SPHC, not ASARCO, owned the stock at the time of the transfer, the Court relies on its finding that ASARCO and SPHC were alter egos.  Since the Court found no distinction between the two entities for the purposes of standing, the same holds for awarding a remedy.  *See ASARCO LLC*, 396 B.R. at 335.

19

Finally, the Court finds that rescission would not be inequitable under the facts of this case. While it is true that the Court found that AMC paid reasonably equivalent value for the SPCC stock, this is not the decisive issue. Of utmost importance for the purposes of fashioning a remedy on an aiding and abetting a breach of fiduciary duty claim is the inequity inherent to any breach of fiduciary duty and the strong role the courts must play in deterring such breaches in the future. In the instant case, this Court found, and it reiterates that finding here, that AMC knew ASARCO's directors' conduct in the SPCC stock sale constituted a breach of fiduciary duty, but encouraged and facilitated the sale anyway. *Id.* at 412–13. Key AMC directors were repeatedly warned that ASARCO's directors owed a fiduciary duty to ASARCO's creditors, and that if the sale went through as it was structured, the transaction would be subject to legitimate attacks for breach of fiduciary duty, yet they purposely ignored this advice, pushed through the transaction, and then later in 2003 resigned to avoid personal liability. *Id.* at 412. This conduct is precisely what the law governing fiduciary duties is meant to deter. For all of these reasons, the Court finds that the most appropriate remedy under the facts of this case is return of the stock and dividends, plus prejudgment interest on those dividends.[11]

C.    Civil Conspiracy

Finally, the Court found AMC liable for conspiracy between AMC and ASARCO's directors to commit the fraudulent transfer of the SPCC stock and to breach ASARCO's directors' fiduciary duties to ASARCO's creditors. *Id.* at 417–21. Specifically, the Court found that: (1) AMC and ASARCO's directors were two or more persons for the purposes of conspiracy liability because ASARCO's directors, who were also AMC's directors, owed duties to ASARCO's creditors once ASARCO entered the zone of insolvency and therefore inhabited a role sufficiently independent from their role as AMC's directors to conspire with AMC to effect the stock transfer; (2) AMC and ASARCO's directors agreed to accomplish the underlying torts on which Plaintiff's conspiracy claim

---

[11]State law governs the award of prejudgment interest where state law provides for prejudgment interest as a substantive right. *See Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 330–31 (5th Cir. 1987). New Jersey law requires the inclusion of prejudgment interest in all judgments arising out of tort claims, except in unusual cases. Since ASARCO's aiding and abetting breach of fiduciary duty claim arises under New Jersey law, the Court finds that prejudgment interest on lost dividends would be calculated on this claim pursuant to the applicable New Jersey statute, Rule 4.42-11 of the New Jersey Rules of Court. AMC does not specifically address the issue of prejudgment interest in the context of either the aiding and abetting a breach of fiduciary duty claim or the conspiracy claim.

is based; (3) the underlying torts were accomplished; and (4) Plaintiff's damages were directly caused by the conspiracy. *Id.*

Except in the context of prejudgment interest, ASARCO does not address the conspiracy claim in its brief on remedies.  AMC contends that the Court's liability finding on this claim "does not provide a basis for awarding any additional damages" because "[e]stablishing a conspiracy does not alter the measure or type of damages recoverable, but merely makes all persons involved in the conspiracy equally liable." (AMC's Memorandum of Law on Remedies at 30 (citing Arizona law)). AMC notes further that ASARCO concedes in its Proposed Findings that "[d]amages for conspiracy to breach fiduciary duties are identical to those available for aiding and abetting the breach of fiduciary duties." (*Id.*).

The Court has previously determined (and the parties have agreed) that Arizona law applies to Plaintiff's conspiracy claim. *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 75 (S.D. Tex. 2007).  Thus, the remedies available to ASARCO on conspiracy are, as the parties concede, "identical to those available for aiding and abetting the breach of fiduciary duties" under Arizona law.  Under Arizona law, approved remedies for a breach of fiduciary duty[12] include constructive trust, rescission, and restitution. *See, e.g., Turley v. Ethington*, 146 P.3d 1282, 1285 (Ariz. Ct. App. 2006) (noting that Arizona "courts will impose constructive trusts if there has been a breach of fiduciary duty"); *Navajo Nation v. MacDonald*, 885 P.2d 1104, 1109, 1110, 1113 (Ariz. Ct. App. 1994) (affirming an award of rescission and restitution on a claim for breach of fiduciary duty). Accordingly, the Court awards to ASARCO on its conspiracy claim the same remedies awarded on the claim for aiding and abetting breach of fiduciary duty, i.e., return of the stock and dividends, plus prejudgment interest on the dividends.[13]

---

[12]The Court notes in passing that Arizona courts recognize aiding and abetting "as embodied in Restatement § 876(b), that a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person." *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 23 (Ariz. 2002).  This concept applies to aiding and abetting breach of fiduciary duty in particular. *Chalpin v. Snyder*, No. 1 CA-CV 06-0371, 2008 WL 4659438, at *11 (Ariz. Ct. App. Oct. 21, 2008).

[13]Under Arizona law, prejudgment interest is awarded as a matter of right on a liquidated claim, whether based on contract or tort. *Alta Vista Plaza, Ltd. v. Insulation Specialists Co., Inc.*, 919 P.2d 176, 177 (Ariz. Ct. App. 1995). A claim is liquidated when it is possible "to compute the amount of damages with exactness, without relying upon opinion or discretion." *Banner Realty, Inc. v. Turek*, 546 P.2d 798, 801 (Ariz. 1976). Arizona law sets interest on a judgment, including prejudgment interest, at 10% per year. ARIZ. REV. STAT. ANN. § 44-1201 (2007); *see Dawson v.*

V.      **ASARCO's Claim for Damages From Loss of Control (Control Premium)**

Perhaps the claim for relief that presents the Court with the most perplexing problem is the plaintiffs' claim that they should be awarded a "control premium" as part of their damages. Their argument, in reality, is a very simple one. Prior to the March 2003 sale, ASARCO through its wholly owned and totally controlled subsidiary, SPHC, owned a 54.18% interest in SPCC. While it did not own SPCC's Founder's Shares in their entirety, as it shared some Founder's Share ownership with Phelps Dodge and Cerro Trading Co., Inc., its block of stock was such that it could elect 13 of the 15 Board members as well as its president and could effectively control SPCC's destiny. That was one of the reasons that this block of stock had as high a value as it did in an otherwise down copper market.

This Court recognized the value of this right of control in its opinion on liability. *See ASARCO LLC*, 396 B.R. at 346–52. The Court reviewed (and detailed in its prior opinion) the evidence presented by multiple witnesses, as well as those opinions that had been offered by a variety of experts prior to the transaction. It found 20% to be the premium best supported by the evidence, common sense, and reason. That premium had been previously suggested by at least one consultant in 2002, and it was also the premium used by AMC/Grupo in various analyses performed prior to the closing of the stock sale. In addition to being supported by the evidence, this figure also had two inherent advantages that the Court did not stress in its prior opinion. First, 20% was a figure that was being used prospectively (i.e., prior to the transaction) and, consequently, included the current thinking of some of those intimately involved in the relevant time period as to the copper market and future prices. Further, this figure was not colored by the fact that copper prices soon thereafter rose exponentially. Second, unlike the various retrospective opinions offered at trial by a variety of sources and put forth by both sides to this lawsuit, this figure was not biased by the lawsuit or by those advocating a certain position.

---

*Withycombe*, 163 P.3d 1034, 1045, 1063 (Ariz. Ct. App. 2007); *Envtl. Liners, Inc. v. Ryley, Carlock & Appelwhite*, 930 P.2d 456, 462 (Ariz. Ct. App. 1996). The dividends on the SPCC stock transfer were paid in finite amounts at a time certain, making them capable of being computed with exactness, and thus, liquidated. Since this Court awards ASARCO prejudgment interest on the lost dividends under each of the claims for which it found AMC liable, the Court directs that calculation of this interest shall be made by applying the highest rate, i.e., 10% under Arizona law.

22

Plaintiffs, not surprisingly, are now suggesting to this Court that it award them either the value of the stock, or the stock itself, plus the 20% control premium that it "lost" in the transaction. Since various corporate machinations involving the SPCC stock have occurred since March of 2003, this Court cannot restore to ASARCO the all-but-total right of control it held prior to March 31, 2003. Plaintiffs' argument, put simplistically, is: we had control before, we do not have it now, therefore, we should be compensated for its loss. This is not an illogical argument. In fraudulent conveyance/breach of fiduciary duty situations, courts have long endeavored to put the prevailing plaintiff back in the same position it occupied before the fraudulent transfer took place. AMC, of course, opposes such an award.

Like most subjects in law (or in life for that matter), and certainly in most aspects of this case, nothing is as simple or clear-cut as it seems or as anyone would wish it to be.[14] There are two major factors that complicate this Court's simply "reversing the deal", as is being urged by ASARCO: (1) all parties concede that during this time period the SPCC stock would have to have been sold to someone at some price; and (2) AMC/Grupo paid (as per this Court's finding) reasonably equivalent value for the stock. The Court will address both factors.

One of the key facts in this Court's prior liability decision was the insolvency ASARCO faced from the fall of 2002 through the date of the transaction. The Court has detailed this evidence previously and finds no reason to recount it here. Further, both sides, to varying degrees, have either introduced evidence in support of these findings or have at least conceded that the financial situation was far less than desirable. This financial crisis led to ASARCO facing three possible scenarios with respect to the SPCC stock. The first possible course of action was that of inaction. It could have done nothing—in which case Chase would have foreclosed on the stock, as it was pledged as collateral for the overdue payment of the Revolver. Second, it could have gone into bankruptcy, and the stock could then have been sold.[15] Finally, the stock could have been sold outside of bankruptcy and the proceeds used to retire the outstanding debt owed to Chase.

---

[14]Oscar Wilde once opined that, "The truth is rarely pure and never simple."

[15]A dispute remains as to whether the stock sale in a bankruptcy context would have been with or without the restrictions on Founder's Shares that would trigger provisions causing the buyer to lose the controlling interest. While the Court does not believe it is necessary to rule specifically on this course of action, it does find most of the testimony supporting the striking of these restrictions to be little more than speculation.

Suffice it to say that according to the evidence produced at the trial, no one in 2003 (nor anyone by the 2008 trial for that matter) suggested a feasible plan that did not include some version of these three options. The stock in question was ASARCO's most discrete and salable asset. That being the case, in view of the dire financial situation throughout 2002–2003 and the immediate need for funds to pay Chase, ASARCO faced the inevitable prospect of having to part with the stock, whether voluntarily or not. Given this evidence, AMC strongly argues that no control premium is due to ASARCO, because under any scenario ASARCO was going to lose control over SPCC.

The second factor complicating the simple claim for an award of damages representing the loss of a control premium is the fact that this Court found that AMC/Grupo had paid "reasonably equivalent value" ("REV") for the stock. To summarize, the Court found that given many factors, such as the depressed price of copper, the number of variables involved in calculating REV at the time, and the unpredictability of future copper prices, the $727.79 million (the 2003 present value) paid by Grupo/AMC was sufficient to qualify as reasonably equivalent value.[16] AMC's argument then follows that since the Court found that REV had been paid, the most this Court can award is the difference between the fair market value and the amount of consideration that was actually paid.

The Court will address these arguments in reverse order.

A.   Reasonably Equivalent Value

AMC's argument that the payment of REV negates the award of damages representing the loss of a control premium (and in fact AMC argues that this fact precludes the return of the stock, as well) fails for two reasons. The first is based in the law that controls the case; the second is more practical, as it turns on the evidence presented and the situation in which ASARCO found itself at the relevant time.

The concept of REV is an integral part of Plaintiffs' constructive fraud claim. This Court's finding that REV was paid in March of 2003 was fatal to this claim since to prevail Plaintiffs had to prove: (1) insolvency and (2) failure to pay REV. DEL. CODE. ANN. tit. 6 §§1304(a)(2), 1305(a). Yet this finding did not prevent the finding of liability on the three causes of action on which this

---

[16]The Court recognizes now, as it did in its liability opinion, that while qualifying as REV, the amount paid did not represent the fair market value of the SPCC shares involved in the transaction, since the Court found that this value fell somewhere between $811.4 million and $853 million. ASARCO suggests that this gap negates any argument that AMC/Grupo has in this regard.

Court found Plaintiffs to have prevailed. While the concept of a control premium was one of the issues on which much evidence was presented, and while it was one of the issues that this Court had to resolve to reach its decision regarding REV, the two do not necessarily rise and fall together. This Court has not found any authority, and AMC has not provided any, to support the argument that the finding of REV would affect an available measure of damages.

Second, the evidence does not support the argument made by the defendant. This Court found that the fair market value of the stock was between $811.4 million and $853 million. It found the present value paid to be $727.79 million. Thus, ASARCO was left with a gap between fair market value and value received of between $83 million and just over $125 million. While the Court found that, given the number of variables, the uncertainty of the copper market, the inability to precisely value all of the assets of SPCC, and the inherent difficulty—indeed, virtual impossibility—of predicting with certainty the future of the copper market, the amount AMC paid for the stock reached the level of REV, the Court nonetheless did not find the amount paid to equal the actual fair market value given up. This is an important distinction, especially given ASARCO's precarious financial situation at the time. This Circuit has recognized for some time that a debtor need not receive a dollar-for-dollar equivalent to receive reasonably equivalent value. *Butner Aviation Int'l Inc. v. Whyte*, 6 F.3d 1119, 1125–26 (5th Cir. 1993); *see In re Besing*, 981 F.2d 1488, 1495–96 (5th Cir. 1993); *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203 (5th Cir. 1980). Stated differently, the courts look to see if what the debtor received was "in the range of a reasonable measure of the value of what the debtor transferred." *In re Viscount Air Servs., Inc.*, 232 B.R. 416, 434 (D. Ariz. 1998) (citing numerous authorities). REV is "not a fixed point. Rather it is a continuum starting at market value and stopping just short of an amount or price sufficiently below market value to be less than reasonably equivalent value." *In re Perry Country Foods, Inc.*, 313 B.R. 875, 895 (Bankr. N.D. Ala. 2004).[17] This difference between reasonably equivalent and fair market value may very well have been the pivotal difference (given the evidence adduced at trial) between ASARCO's continued viability and ASARCO being forced to find shelter in bankruptcy court. It

---

[17]In *Durrett*, the Fifth Circuit held that 57.7% of market value could not be REV, but suggested that 70% might be. 621 F.2d at 203. This led many courts to suggest that a mechanical analysis was called for and that if 70% was paid, REV was received. The Fifth Circuit has described this type of analysis as being clearly incorrect and has suggested that a totality of circumstances approach is more appropriate. *In re Besing*, 981 F.2d at 1495 n.14.

certainly affected the ability of ASARCO to survive without cannibalizing its assets and insurance policies. These actions directly affected, and still affect, the ability of ASARCO's creditors, including the environmental and asbestos claimants, to be made whole. Further, this Court found that while AMC paid REV, it then dictated how the funds ASARCO received would be spent. That being the case, this Court can find no legal, equitable, or factual reason, based upon the evidence presented at trial, to hold that its finding of REV precludes an award of damages representing the loss of a control premium.

B.    Inevitable Sale of Stock

AMC's first attack on an award of damages based upon a control premium, however, is much more compelling. It asks why the Court should award ASARCO damages in the category of a control premium when the testimony established that regardless of whether ASARCO sold the stock to AMC or followed one of the other possible scenarios, the ultimate result in any case would have ASARCO losing control over SPCC. As stated numerous times, the evidence presented at trial clearly established that ASARCO was in such dire financial circumstances that it had to follow one of three plans of action: (1) sell the SPCC stock to AMC or a third party in a business-sale situation; (2) file bankruptcy and sell the stock under judicial oversight; or (3) do nothing, which would ultimately result in Chase foreclosing upon the stock, as it was the security for the soon-to-be-delinquent Revolver. ASARCO had no funds to repay this loan, and thus foreclosure was a very real possibility, if not a certainty, if no action was taken. Indeed, at trial ASARCO, while suggesting several scenarios, actually argued, and put on evidence to the effect, not that the stock should not have been sold, but that ASARCO should have declared bankruptcy and attempted to get the bankruptcy court to void the restrictions on the sale of the stock, thereby increasing the likelihood of a more profitable sale to a third party. The evidence was conclusive that under any realistic scenario, ASARCO could not have escaped its 2002–2003 financial bind still possessing the SPCC stock.

There is another way of viewing this issue, but both views lead to the same result. In fashioning a remedy in a fraudulent-transfer scheme, courts endeavor to give back to the estate (i.e., the creditors) what it could have had at the time. The creditors in this case might have had the legal means to gain access to the stock, but given the restrictions placed upon the transfer of the stock and,

more importantly, the fact it was pledged to Chase, the creditors could not have gained or sold "control."

As this Court has noted in more than a few instances, the law that governs this area of inquiry is scarce and the case law that does exist provides few specifics and even less firm direction. Nevertheless, one tenet seems consistent regardless of the jurisdiction from which it emanates: the court should award the amount of damages necessary to make the debtor's estate/creditors whole and any damages awarded should put the estate back in the financial condition in which it would have been at the time. Put another way, "only net amounts diverted from, that is damages consequently suffered by the creditor body of, a debtor may be recovered via a fraudulent conveyance action." *Foxmeyer Dry Co. v. Gen. Elec. Capital Corp.*, 296 B.R. 327, 342 (Bankr. D. Del. 2003).

The evidence in this case establishes that ASARCO would not have kept control of SPCC because it was going to have to part with the stock.[18] That being the case, a control premium (or an amount representing that premium) would not have been available to ASARCO's creditors. Therefore, the Court finds that the estate is not entitled to damages representing a control premium. While this Court does not hold that the expectations of the creditors at the time are necessarily critical to the analysis, it is certainly worth noting that (save for Chase, to whom the stock was pledged as security) the evidence supports the conclusion that no creditor could have reasonably expected to have had its debt protected by the fact that ASARCO owned the controlling block of SPCC stock. Obviously, creditors might have gained some comfort from ASARCO's ownership of the stock, as they would the ownership of any other asset, but that comfort would have or should

---

[18]The Court acknowledges that AMC could make, and to a certain extent is making, a similar argument to bolster its claim that the stock itself should not be returned. This claim, however, ignores an extremely pertinent fact. The necessity of such a sale (i.e., needing cash) does not give a green light to fraudulently transfer the asset. If that were true, almost every fraudulent transfer could be justified by the insolvency of the debtor, and, consequently, creditors would never have any meaningful recourse. Further, while not having access to control of SPCC, the creditors would have had access to the stock or funds from the sale of the stock. A simple example, utilizing the worst-case scenario (i.e., foreclosure), illustrates this reasoning. Hypothetically, had decision makers at AMC/Grupo/ASARCO decided not to take any action toward selling the stock in late 2002 - early 2003, Chase by all accounts would have foreclosed upon the stock and no doubt would have sold the stock to satisfy the Revolver debt. Under most scenarios, any excess monies received over the debt, fees, and costs would have been due back to the debtor, i.e., ASARCO. If one assumes a sale for an amount that equals at least reasonably equivalent value (for example, the $727.79 million paid by AMC), the excess over the Chase debt would have been returned to the debtor. Hypothetically, in this case, that sum would have been $277.79 million. In this scenario, ASARCO would then have had almost $300 million with which to deal with its remaining creditors, while in actuality it was left with no cash. Further, it would not have had to favor certain creditors while hindering others—the situation that was forced upon it by AMC.

have been tempered by the fact that the stock was completely encumbered by the pledge to Chase and that these Founder's Shares carried certain restrictions. The Court finds that ASARCO and its creditors are not entitled to recover a "control premium" as an element of damages. Control of SPCC would never have been an asset available to the debtor's estate and would never have inured to the benefit of the creditors.

## VI.    Benefit of the Estate

AMC's primary response to the Court's solicitation for briefing on the topic of possible remedies and/or damages has been to argue that no damages should be awarded because the Court is limited to awarding damages that make the estate whole and the estate is, in fact, basically already whole. Although the Court has to some extent already addressed this argument, see *supra* at 11–12, because so much of AMC's brief turns on this argument, the Court considers it worthwhile to reiterate and expand on some of the points made above. Regarding benefit to the estate, AMC's brief argues as follows:

> Because the very purpose of fraudulent transfer statutes is to ensure that creditors are not harmed by a debtor's transfer of assets for less than REV, this Court's unique holding calls for a remedy carefully tailored to the creditors' actual injuries. Further, unlike the vast majority of bankruptcy cases in which fraudulent transfer remedies are considered, a proposed plan of reorganization has been filed in ASARCO's bankruptcy that would result in all creditors being paid in full. AMC's proposed plan guarantees that all of ASARCO's creditors would be paid in full, in cash, plus interest and AMC has committed to paying $2.7 billion to back up its guarantee. Even if AMC's full payment plan is not approved and ASARCO's creditors receive less than full payment, under any set of circumstances, any deficit will be substantially less than the value of the SPCC Shares. Under these unique circumstances, ASARCO's request for the shares plus dividends—an award in excess of $8.6 billion—should be rejected.

*   *   *

## II.   SUMMARY OF THE ARGUMENT

**Fraudulent Transfer Remedy.**  While this Court found the SPCC Share Transaction avoidable under Section 544 of the Bankruptcy Code, ASARCO still had the burden of proving that any recovery would be "for the benefit of the estate" (i.e., the creditors) under Section 550(a) of the Bankruptcy Code.  The Fifth Circuit instructs that this requirement is met when an award *increases distributions* to creditors in a bankruptcy case.  ASARCO did not meet is burden of showing a "benefit to the estate," and its argument that simply "increasing the assets of the estate" satisfies this requirement would render the statutory language superfluous.

The proceedings in the Bankruptcy Court confirm that ASARCO cannot satisfy the "benefit to the estate" requirement.  AMC has filed a plan of reorganization that would pay all of ASARCO's creditors *in cash and in full* without any award from this Court.  ASARCO has filed its own plan of reorganization that also may satisfy all creditors in full without a recovery in this case (depending on how certain contingent liabilities are estimated by the Bankruptcy Court).  Indeed, under ASARCO's plan, after the claims of the Asbestos Creditors (defined below) are paid, any remaining funds will be paid—not to the junior classes of claims and equity interests—but to a charity engaged in the treatment of, research regarding, or payment of, claims related to asbestos-caused disorders.  It is beyond question that these charitable contributions, which would be funded with any recovery from this case, are not for the "benefit of the estate" as required by Section 550.

Even if ASARCO were able to demonstrate a benefit to the estate under its plan (which it has not and cannot), this Court should limit any relief to the monetary amount necessary to satisfy all allowed creditor claims in ASARCO's bankruptcy case.  Such a limitation is consistent with the remedial purpose of fraudulent transfer law, the "benefit to the estate" requirement, and the facts and circumstances of this case . . . .  Under these circumstances, to the extent that any award is entered under Section 550, it should be limited to the amount necessary to make ASARCO's creditors whole.

(AMC's Memorandum of Law on Remedies at 1–3).  Initially, this Court must note three important factors:

1.   AMC has conceded in the Bankruptcy Court that its so-called "Full Payment Plan" is not feasible.  Consequently, its entire argument is based upon a faulty assumption;

2.   While this Court has heard counsel trade arguments concerning the status of the bankruptcy case and of various plans and amounts due to creditors, this Court has little to no evidence before it on which to base a reasoned opinion concerning any of the actual bankruptcy issues; and

3.   While this Court has evidence concerning the gross amounts being claimed by the asbestos and environmental claimants, it has no evidence concerning the relative merits of any specific claim.  Therefore, it is in no position to estimate the liability in that regard.

Arguably, the demise of AMC's Full Payment Plan moots this entire argument, but, out of an overabundance of caution, the Court turns to this issue.[19]

As a general matter, this Court agrees with the two broad legal propositions upon which AMC rests its argument.  The first proposition is that the trustee brings an avoidance action for the benefit of the estate.  11 U.S.C. § 550(a).  AMC's second proposition is that creditors cannot receive more than what they are owed.  *See* 11 U.S.C. §§ 726, 1129(b).  While it may disagree as to what constitutes "benefit" to the estate, ASARCO has not seriously disputed either proposition—nor could it.

The crux of the problem, at least prior to the latest concession in the Bankruptcy Court, is that AMC's "Full Payment Plan" puts little or no value on the asbestos and environmental claims.  AMC has asked this Court to order the Bankruptcy Court to issue a report and recommendation in conjunction with hearings on its Estimation Motion and then issue a judgment.  AMC may be correct that ultimately some court may have to estimate the value of these claims, but it is mistaken in its argument that this should prevent this Court from moving forward to a judgment on this discrete adversary matter.

AMC is also mistaken in its position that this Court must determine the extent of all of the bankruptcy liabilities before it renders a judgment in this case.  If it turns out that the debtor is

---

[19]Counsel for AMC told the Bankruptcy Court on December 16, 2008, that it did not have a plan, "full payment" or otherwise, due to changed economic circumstances.  They also stated as a parent that they were no longer looking at themselves as equity holders.

solvent (e.g., because of an upturn in the price of copper, because of this judgment, or because of some other event), then AMC can address these issues in the Bankruptcy Court when addressing the confirmation of any proposed plan.  Should a plan give creditors more than the law allows, the plan cannot be confirmed.  As it stands now, this Court will decide this fraudulent-transfer action and leave the arguments over the judgment's effects on the bankruptcy action to the Bankruptcy Court and those parties involved in that action.  This Court found that the transaction in question was the result of three different tortious activities and hereby finds that under the controlling precedent, the fraudulently transferred property should be returned to the estate.  This Court finds that the return of this property plus the money damages will benefit the estate.

## VII.    Offset

While not conceding that any damages are due and owing, AMC has argued to this Court that any money damages awarded must be reduced by the amount of the consideration received by ASARCO.  ASARCO has conceded (in oral argument before this Court) that AMC is due the return of the consideration that it paid in the transaction.  This concession was no doubt motivated by the almost universal interpretation that the intention behind Section 550(a) is to restore the estate to the financial condition it would have enjoyed absent the (fraudulent) transfer.  In "undoing" the transfer, the restoration of the property to the trustee indirectly contemplates the return of the consideration to the transferee.  *See, e.g.*, *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1266–68 (10th Cir. 2004); *In re Colonial Realty Co.*, 226 B.R. 513, 525 (Bankr. D. Conn. 1998) (finding that courts award the "market value of the property at the time of transfer, *less the consideration received . . .*").  Courts generally hold that the trustee can either recover the property or the value of the property minus the consideration received.  *See* 11 U.S.C. § 550(a).

While making this concession, ASARCO has not admitted to owing a sum certain.  Most cases present little problem in determining the value of the consideration; however, this was one of the hotly disputed issues in this case.  At trial, AMC maintained that the value it paid was the $765 million gross value minus a slight discount for the two notes it had executed as part of its consideration ($100 million to the United States and $123.25 million to SPHC).  ASARCO argued for a much lesser figure, both in terms of gross value and in terms of the discounted value of the two

notes.  Ultimately, this Court ruled that on March 31, 2003, the date of the transaction, the present value of the consideration was $727.79 million.

The SPHC note was to be funded by seven payments of $17,607,143—the last of which is due in October of 2009.  The parties, while disputing whether there is default interest due on a prior payment, have confirmed to the Court that AMC has one payment left.  The note to the United States was to be paid by eight payments of $12,500,000.[20]  While there was some ambiguity in the evidence as to the date of the first payment, the parties have confirmed to the Court that there are two payments due, the last of which is due in May of 2010.  This note is guaranteed by Grupo.  Again, there is no evidence that AMC is in default on its obligations to the United States.

Given the context of ASARCO's concession, it seems likely that it contemplated that the Court would use the $729.79 million as the offset figure.  AMC, no doubt, contemplates the use of the $765 million gross consideration as the appropriate measure of offset.  Arguments can be made in favor of either figure, however the Court finds the $765 million gross figure to be the correct starting point to determine the appropriate measure for offset purposes, despite the fact that it is quite comfortable that the evidence clearly supports $729 million as the present value as of March 31, 2003.  The problem with using that six-year-old present-value figure as the offset value is that for six years AMC has made payments on both notes.  If the Court used the 2003 present-value figure, AMC would be getting no credit for the value of the past six years of note(s) payments.[21]  This would be inequitable.  This Court hereby holds that AMC should, with one exception, be given full credit for these payments regardless of the fact that they were not fully consummated on March 31, 2003.

---

[20]This note is often referred to by the parties and the Court as the note due to the United States.  This is not technically correct.  The actual payee is SPHC; the payments, however, have been assigned irrevocably to the Environmental Trust set up as a result of the settlement of the Arizona lawsuit between the United States and ASARCO, the details of which are contained in the Arizona court's Consent Decree.

[21]One important feature of the discount rate is the risk that a specific note will not be paid.  Hence, the experts who testified found the note to the United States to be due a lower discount rate because it had the additional guarantee of Grupo.  Since payments have been made in the intervening years, the risk of non-payment of either note is greatly reduced.  While AMC has argued that the existence of these two notes is somehow a reason not to return the stock or even award damages, this argument has no support in law or common sense.  Practically, the only difficulty presented by the two notes is in how the Court gives AMC an offset credit for them.  The notes have little or no effect at all with respect to the estate's damages.

The Court has considered various means of establishing a present 2009 value of the payments left outstanding to the United States and, in fact, has considered different ways to accelerate the outstanding payments to make a judgment in this case more certain. Despite this desire to resolve as many outstanding issues as possible, the Court finds that it would be inappropriate to attempt to change or abrogate the contract between AMC, Grupo, ASARCO, SPHC, the Environmental Trust and the United States, as it is outside the purview of this litigation, it concerns several entities not before this court, and it is the subject of the Consent Decree entered by a sister District Court in Arizona on February 2, 2003.

Paragraph 46 of this Decree provides that the "Consent Decree shall become null and void" should "the transfer of ASARCO/SPHC's ownership in SPCC stock be subsequently completely unwound, invalidated, or nullified pursuant to a judgment issued by a court of competent jurisdiction . . . ." The Court specifically notes that its judgment described herein will preserve the $100 million note in its entirety, including any outstanding obligations by any party to this note, and with respect to any of its terms. To this extent, the transfer of the SPCC stock to AMC is not "*completely unwound, invalidated, or nullified*" pursuant to this or any other judgment of this Court, and Paragraph 46 of the Consent Decree may not thereby implicated.[22]

More broadly, by calibrating its rescission of the stock transfer to exclude the $100 million note, the Court exercises its authority in accord with its broad equitable powers to fashion an

----

[22]While this Court would not presume to invade the jurisdiction of the court in Arizona, it certainly intends that this result accord with the understanding of the Arizona District Court. That court in its Order of November 15, 2002, denied tort claimants with unliquidated claims against ASARCO the right to intervene in a suit between the United States and ASARCO. In the Arizona suit, the government was attempting to halt the transfer of the SPCC stock to preserve the collectibility of certain of ASARCO's environmental liabilities. The putative intervenors argued that their claims could be prejudiced by a resolution between ASARCO and the United States that did not include their participation. The Court, while denying that the intervenors met the requirements of Rule 24(a) for intervention of right, nonetheless acknowledged the possibility, which ultimately materialized, of a discrete arrangement between ASARCO and the United States that was independent of any other parties' interests. *See* PX 174 at 2. Paragraph 46 of the Consent Decree seems to contemplate that individuals (such as these putative intervenors) might seek to set aside the transaction in the immediate post-transaction period, not that they would do so long after the performance of the contract was almost completed. To this Court's knowledge, the United States has already performed its part of the bargain, and the only remaining executory acts contemplated are the final AMC payments. Since the Court is ordering the offset in this case to include these two remaining payments to the United States, the Court, as part of this opinion, hereby orders AMC and Plaintiffs to comply with their respective obligations under the Consent Decree. Consequently, if these payments are not made, the parties will have to explain that deficiency not only to the United States, but also to two separate federal district courts.

appropriate judgment. *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *In re Mendoza*, 111 F.3d 1264, 1270 (5th Cir. 1997) ("Because of the equitable nature of bankruptcy in seeking a balance between debtors and creditors, bankruptcy courts should be afforded the latitude to fashion remedies they consider appropriate under the circumstances . . . as long as the bankruptcy court follows the Bankruptcy Code's statutory mandate.").

The same, however, is not necessarily true for the last payment due to SPHC. The Court, having found the transaction to be fraudulent, has the power to put the parties back where they were before the transaction. Yet the executory nature of this last payment still leaves some room for discussion. If the Court allows AMC an offset in the amount of the last payment and, subsequently, AMC does not make the last payment as scheduled, then AMC will have received an offset that it does not deserve and ASARCO could be left without a remedy. On the other hand, if the Court does not give AMC credit for its last payment and it complies with the terms of the note in question, then AMC will not be given full credit for all it will have paid. Thus, the Court is caught in a quandary. To resolve this problem, the Court hereby holds, based upon the fact that it has held the transaction to be fraudulent and, therefore, avoidable, that AMC is not to be given offset credit for the last payment to ASARCO that it has yet to make, while at the same time the Court hereby abrogates the need for AMC to make this last payment.[23]

Therefore, this Court finds that AMC is entitled to an offset representing the amount of consideration it paid ASARCO/SPHC in the amount of $747,392,857 (which represents the gross consideration of $765,000,000 minus $17,607,143, the amount that would have been due to ASARCO in October of 2009). The Court, having held that the transaction in question was based upon fraud, conspiracy, and breach of fiduciary duty, hereby sets it aside and returns the parties to the positions in which they would have been on March 30, 2003. In doing so, the Court hereby declares the note between AMC and SPHC in the amount of $123.25 million to be void. The payment due in October of 2009, plus any disputed interest, is, therefore, no longer due and owing.

---

[23]The same is hereby true for any amount of disputed default interest. This Court need not know which party is correct as to this dispute or the correct amount involved, as whatever amount might be due ASARCO would then be given to AMC as an offset–thus mooting the argument.

The Court orders AMC/Grupo and Plaintiffs to continue to comply with their contractual obligations on the United States note, and in contemplation of these last payments has awarded an offset to AMC.

## VIII.   AMC's Rule 15(b) Motion for Post-Trial Amendment of Pleadings to Conform to Evidence Presented at Trial

After this Court issued its opinion on liability, and after the parties failed to reach a voluntary agreement in the court-ordered mediation, AMC filed a motion asking the Court to amend ASARCO's pleadings to reflect the evidence presented at trial and to enter any judgment on damages on these amended pleadings.  (Doc. No. 485 at 1).  AMC contends that this Court should exercise its authority under Federal Rule of Civil Procedure 15(b) to amend or supplement ASARCO's actual fraudulent transfer and conspiracy to commit actual fraudulent transfer claims to conform to the "evidence presented at trial–and this Court's liability opinion" and to "reflect a claim that the various transfers occurring after the SPCC Share Transaction–specifically the payment of the Yankee Bonds and the cancellation of the AMC loan–constituted separate fraudulent transfers independent of the SPCC Share Transaction." (*Id.* at 2, 3).  Such an amendment would, in AMC's view, reflect not only the evidence ASARCO actually presented at trial, but also this Court's liability opinion, which, according to AMC, found fault not with the SPCC share transaction itself, but with "AMC's decision to transfer the proceeds from that transaction to certain ASARCO creditors, while delaying payment to others." (*Id.* at 2).  AMC argues that to this extent, the "Court's judgment should conclude (consistent with its factual findings) that the SPCC Share Transaction was not a fraudulent transfer and that the SPCC Share Transaction should not be unwound." (*Id.* at 3).  Instead, "if this Court determines that damages are appropriate, AMC urges that at the very most, fraudulent transfer damages must be tied to the harms found by this Court based on . . . the damages allegedly suffered by creditors as a result of the payment of the Yankee Bonds and the cancellation of the AMC inter-company debt." (*Id.* at 9).

ASARCO responds by urging the Court to deny AMC's motion to amend ASARCO's pleadings, arguing that: (1) ASARCO, in fact, challenged "the entire SPCC transaction as an intentional fraudulent transfer, and the Court's Liability Order found that ASARCO proved its case"

(Doc. No. 486 at 3); (2) AMC's attempt to use Rule 15(b) to amend and contract an *opposing* party's pleadings to limit that party's recovery is "unprecedented and unjustified," especially as the issue in question "was not tried by the parties' express or implied consent" (*id.* at 11–13); and (3) AMC only raises these arguments now "because events since September 2008 have greatly undermined the arguments it did assert in its remedies brief" (*id.* at 17). Specifically, according to ASARCO, the recent economic downturn has forced AMC to abandon its "full-payment plan" in the bankruptcy proceeding, on which AMC "principally" relies in its remedies brief, and so AMC seeks in its Rule 15(b) motion to supply alternative grounds for the Court to limit AMC's liability. (*Id.* at 17).

Rule 15(b) of the Federal Rules of Civil Procedure provides in relevant part:

> **(b)     Amendments During and After Trial**
>
>           * * *
>
> (2)     ***For Issues Tried by Consent.***   When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move–at any time, even after judgment–to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But the failure to amend does not affect the result of the trial of that issue.

FED. R. CIV. P. 15(b)(2).

The Court need not address the issue of whether Rule 15(b) can be appropriately used in the manner AMC urges, nor does it address whether or not the issues AMC raises were in fact "tried by the parties' implied consent."[24] Instead, the Court emphasizes that it has *already found* that the acts AMC highlights were all part and parcel of the single SPCC transaction. This includes the decision to sell, the choice of buyer, the price, and the choice of to whom the proceeds would be paid, including payment of the Yankee Bonds, the inter-company debt to AMC, and all other related payments. These were merely different aspects of a single transaction, ultimately tied together by AMC's intent to keep ASARCO's "crown jewel"–the SPCC stock–out of the hands of its creditors. The evidence in this regard was overwhelming, and there was very little by way of credible evidence adduced at trial to suggest otherwise. The Court found in its Liability Opinion that "AMC closed the *SPCC transfer* with the actual intent to hinder or delay some of ASARCO's creditors." *ASARCO*

---

[24]Neither party alleges that these issues were tried by the parties' explicit agreement.

*LLC*, 396 B.R. at 388 (emphasis added).  Further, the Court found that "[a]ll of the transfers described [including that of the Yankee Bonds] were interrelated and each was an integral part of the transaction and had to go forward in order to close the transfer" of the SPCC stock to AMC. *Id.* at 383 n.118.  The Court also found "based on overwhelming evidence, that the SPCC stock sale and the payment of the Yankee Bond[s] were part and parcel of the same transaction . . . ." *Id.* at 341 n.54.  Finally, "AMC/Grupo was aware that the SPCC transaction, which included payment of the Yankee Bonds as a necessary element, would hinder and delay some of ASARCO's other creditors from collecting overdue payments from ASARCO." *Id.* at 386.

While there is no doubt that counsel for ASARCO emphasized these questionable payments in the presentation of the evidence, they were not by any means the only problem areas raised by the evidence or argued by ASARCO, or for that matter found by this Court.  The Court presumes that one reason for this emphasis by ASARCO was the uncontroverted evidence that some of the professional advisors in place counseled against that course of action, and counsel for ASARCO felt that this highlighted AMC's ill-advised strategy.  Regardless of the reason for this strategy at trial, this Court cannot adopt the position being urged by AMC.  The Rule 15 Motion is denied.

## IX.    Conclusion

This Court found in its opinion on liability that AMC committed tortious acts in three different ways.  It found the March 31, 2003, sale of the SPCC stock to be a fraudulent transfer.  It also found that AMC conspired with directors of ASARCO to breach their fiduciary duties and found that AMC aided and abetted the breach of fiduciary duty committed by ASARCO's directors.  Its post-trial review of the evidence in conjunction with this opinion on damages reaffirmed these findings in the mind of the Court.

On review of the pleadings and briefs and oral argument of the parties, this Court finds that the return of the fraudulently transferred stock is warranted under all three liability findings.  Further, it finds that the return of the stock is the remedy most likely to put the estate back in the position in which it would have been prior to the transaction.  While this Court could certainly ascertain the price of the stock on the open market (and hence calculate the "value" of the stock on any given day merely by multiplying the number of shares by that day's price), there was credible evidence adduced

at trial that this approach would not lead to a fair determination of the real value of the stock. Further, there was more than a little conflicting evidence over the accuracy of picking the stock price on a day certain versus a trailing average. If one used the former method, how would one pick the date? Would the Court use the date of the transaction, the date this action was filed, the date of the highest value in the intervening time period, the date of the liability opinion, the date of this opinion, or the ultimate date of the judgment? If one used a trailing average, what time period should be used? All of these variables could lead to an imprecise or perhaps even an inaccurate result. The Court finds that to use such a questionable valuation in this case makes no sense, when by ordering the return of the stock, the Court is ensured of a fairer and more accurate result. The stock to be returned shall be all of the stock in any form (including any stock splits or other reformulations) that is traceable to the 54.18% of SPCC shares owned by SPHC (and/or ASARCO) on March 30, 2003. Further, the Court orders that AMC not only return the stock, but also that AMC execute any and all documents needed to effectuate the transfer of such stock to Plaintiffs.

The Court also orders AMC to pay money damages in the amount of the dividends awarded from March 31, 2003, through the date on which it returns the stock. As of oral argument, these dividends totaled $1,851,286,225.36. Each of the three liability theories upon which this ruling rests contemplates the return of these dividends. Consequently, as with the return of stock, damages representing the amount of dividends are due and owing as long as any one of the causes of action remains intact.

AMC is due an offset from the amount of dividends of $747,392,857.00, representing the amount of consideration it ultimately paid for the stock. Included in this offset amount is credit for the payment in full of the note to the United States, which for the reasons stated above, this Court finds to be inviolate. With the exception of this note (which was incorporated in a consent decree), the Court sets aside and avoids all of the remainder of the transaction documents between AMC, ASARCO, and SPHC. Included among these now void transactions is the last payment of the

$123.25 million note, plus any disputed amounts. That being the case, AMC is hereby relieved of the obligation of making these payments.[25]

With regard to the amount of dividends and the amount of offset, the Court finds that both amounts are due prejudgment interest from February 2, 2007, the date Plaintiffs filed suit[26], to April 15, 2009, at the rate of 10% per annum, the highest rate available under the laws of the three controlling jurisdictions. If the Court's finding with respect to the conspiracy conviction is ever reversed, then the rate of prejudgment interest is to be changed to equal 2% plus the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year of the State of New Jersey Cash Management Fund, computed from February 2, 2007 (the date of institution of the action[27]), the rate of interest under New Jersey law, which controls the aiding and abetting cause of action. If both the causes of action of aiding and abetting and conspiracy are ever reversed, then the prevailing prejudgment interest rate shall be equal to the Federal Discount Rate plus 5%, the prevailing rate under Delaware law, which the Court looks to on the actual fraudulent transfer cause of action, computed from February 2, 2007.[28] As a consequence, the judgment shall

---

[25]Obviously, if either side appeals this judgment in a manner that suspends the judgment (e.g., by a bond pending appeal), AMC's obligations to make its last payment would remain intact and the dispute over past due interest would remain a live dispute. This also cures the alleged problem raised by AMC based upon its suggestion that the payments on this note were apparently used by ASARCO as collateral to guarantee a settlement between ASARCO and the Coeur d'Alene Tribe. If the judgment is not suspended, ASARCO can use the funds received to satisfy that guarantee if needed. If the judgment is suspended, the loan payments are still due and owing and the Tribe's collateral remains undisturbed. One way, the Tribe is protected by cash; the other, by the original note. Furthermore, whatever rights the Tribe may have (AMC provides no citation to the record in this regard), these do not supersede the rights being asserted here. If the Tribe indeed loses the back-up to its note, its remedies lie elsewhere.

[26]Arizona law, which governs the rate and calculation of prejudgment interest for the conspiracy cause of action, provides that "prejudgment interest is not awarded until after the plaintiff makes a demand for a sum certain from the debtor." *Potthast v. Cordon*, No. 1 CA-CV 07-0007, 2008 WL 4093701, at *8 (Ariz. Ct. App. Jan. 8, 2008) (citing *Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 38 P.2d 513, 535–36 (Ariz. Ct. App. 1979); *see also Alta Vista Plaza, Ltd. v. Insulation Specialists Co., Inc.*, 919 P.2d 176, 178 (Ariz. Ct. App. 1995) ("[P]rejudgment interest generally accrues from the date of demand, not from the date of loss . . . ."). The Court finds that Plaintiffs' date of demand in this case is the date they filed the instant suit.

[27]The controlling New Jersey statute makes prejudgment interest available from "the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later . . . ." N.J. RULES OF COURT R. 4:42-11(b). In this case, the date of the institution of the action is the later date.

[28]The applicable Delaware statute, Del. Code Ann. tit. 6 § 2301(d), provides that prejudgment interest shall be calculated "commencing from the date of injury," which in this case would be March 31, 2003, the date of the transfer. Nonetheless, the Court, in its discretion to select an equitable rate of prejudgment interest when the relevant cause of

reflect the following equation: Return of the stock, as well as damages in the amount of all SPCC dividends paid, with 10% prejudgment interest on such dividends and interest accruing from February 2, 2007, to April 15, 2009, minus the sum of $747,392,857 and prejudgment interest on this amount from February 2, 2007, to April 15, 2009.

For the reasons detailed above, this Court finds that damages representing a control premium are not due and owing. The debtor/estate would never have retained control over SPCC. Consequently, to award the estate damages based upon this loss of control in 2009 would be to order AMC to return to the estate something it never would have possessed.

Finally, this Court notes that ASARCO has specifically disclaimed any intent to seek recompense for its attorneys' fees and costs.[29] Therefore, this Court will not award such.

Signed this 1st day of April, 2009.

_____
Andrew S. Hanen
United States District Judge

---

action arises under federal law, directs that prejudgment interest in this case be calculated from the instigation of the instant suit. *See Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991) ("This Court has previously held that, because state law is not binding but merely provides guidance, it is within the discretion of the district court to select an equitable rate of prejudgment interest.").

[29] (*See* ASARCO LLC's Post-Liability-Ruling Brief on Remedies at 33 ("ASARCO does not seek an award of attorneys fees or costs.")).