United States District Court
Southern District of Texas
ENTERED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**–BROWNSVILLE DIVISION–**

JUL **2 0** 2009

Clerk of Court

| | | |
|---|---|---|
| ASARCO LLC, SOUTHERN PERU HOLDINGS, LLC, Plaintiffs, | § § § § | |
| vs. | § § | CIVIL NO. 1:07-CV-00018 |
| AMERICAS MINING CORPORATION, Defendant. | § § § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs ASARCO LLC (hereinafter "ASARCO") and Southern Peru Holdings, LLC (both

of which are currently in bankruptcy) brought an adversary action in this Court, in their capacities

as debtors in possession and on behalf of ASARCO's creditors, to recover from Defendant Americas

Mining Corporation (hereinafter "AMC") stock representing 54.18% of the outstanding shares of

Southern Peru Copper Company (hereinafter "SPCC") and damages resulting from having been

wrongly deprived of this stock ownership.[1]  (Doc. No. 1).  The Court held a four-week bench trial

and then issued its findings of facts and conclusions of law on the issue of liability (Doc. No. 465

("Liability Opinion")).  Specifically, the Court found AMC liable for actual fraudulent transfer,

aiding and abetting a breach of fiduciary duty, and conspiracy to fraudulently transfer and conspiracy

to breach fiduciary duty.  The Court granted leave for each side to file additional briefing on the issue

of damages, heard oral argument, and then entered its Amended Memorandum Opinion and Order

on the issue of damages.  (Doc. No. 507 ("Damages Opinion")).  The Court's Final Judgment was

---

[1] Through a variety of business maneuvers, the stock is no longer the discrete 54.18% of SPCC that it was at the time of the transaction in question. Nonetheless, it remains identifiable, and for the purposes of this Order, the Court will refer to the stock in the manner in which it existed at the time of the transfer. The Court will refer to Southern Peru Copper Company as SPCC, although its name has been changed, as well.

entered on April 15, 2009.  (Doc. No. 508).

On April 29, 2009, Defendant AMC filed a Motion to Alter or Amend Judgment or for New Trial, asking this Court to modify the monetary portion of its Final Judgment and to reconsider several of its conclusions regarding Plaintiffs' standing to bring its fraudulent-transfer, aiding-and-abetting, and conspiracy claims.  (Doc. No. 514 at 2).  Plaintiffs filed their Response on May 18, 2009 (Doc. No. 519), to which Defendant replied on May 22, 2009 (Doc. No. 524).  The Court heard oral argument at a hearing held on May 27, 2009.

Having considered Defendant's Motion to Alter or Amend Judgment or for New Trial, Plaintiffs' Response, Defendant's Reply, the argument of counsel, and all relevant facts and law, Defendant's Motion to Alter or Amend or for New Trial (Doc. No. 514) is hereby DENIED.

## Legal Standard

Rule 59(e) provides simply: "A motion to alter or amend a judgment must be filed no later than 10 days after the entry of the judgment."  FED. R. CIV. P. 59(e).  A Rule 59(e) motion to alter or amend a judgment "calls into question the correctness of a judgment."  *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (internal quotations omitted).  "[S]uch a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment."  *Id.*  Rather, "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence."  *Id.* (internal quotations omitted).  To this extent, a Rule 59(e) motion "must clearly establish either a manifest error of law or fact or must present newly discovered evidence."  *Marseilles Homeowners Condo. Ass'n, Inc. v. Fidelity Nat'l. Ins. Co.*, 542 F.3d 1053, 1058 (5th Cir. 2008) (internal quotations omitted).  Finally, "[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly."  *Templet*, 367 F.3d at 478; *see* 11 CHARLES ALAN WRIGHT,

ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2810.1, at 124 (2d ed. 1995).

Rule 59(a)(2) provides that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." FED. R. CIV. P. 59(a)(2). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (internal quotations omitted).

### Discussion

AMC offers three main grounds for this Court's reconsideration of the conclusions reached in its Liability and Damages Opinions: (1) Arizona conspiracy law provides no basis for any award of damages to ASARCO, including prejudgment interest; (2) the Court's conclusion that ASARCO proved its alter-ego claim constitutes manifest legal error; (3) the doctrine of *in pari delicto* precludes ASARCO from asserting claims of aiding and abetting breach of fiduciary duty and conspiracy arising out of the pre-petition conduct of ASARCO's own directors and management.

### I.     AMC's Objections on the Conspiracy Claim

AMC contends that Arizona conspiracy law provides a basis for neither the award as a whole, nor the prejudgment interest award in particular, for three distinct reasons: (a) conspiracy is not an independent cause of action, but rather a mechanism for subjecting alleged co-conspirators to joint liability based upon underlying tortious conduct; (b) there is no cognizable cause of action under either Arizona or Delaware law for conspiracy to commit a fraudulent transfer on the facts of this case; and (c) conspiracy to breach a fiduciary duty is duplicative of, and not separately cognizable

from, a claim of aiding and abetting a breach of fiduciary duty.

### A.      Conspiracy is not an independent cause of action

AMC contends that Arizona law does not recognize an independent cause of action for conspiracy; instead, conspiracy becomes "actionable" only when the conspirators accomplish the underlying tort they agreed to commit, in which case the actors are simply joint tortfeasors. (Doc. No. 514 at 4). Thus, according to AMC, conspiracy is a derivative claim that merely forms a basis for apportioning liability and is not an independent cause of action. (*Id.* at 4–5). AMC concludes from this that since conspiracy is not an independent tort in Arizona, Arizona law should not govern the determination of prejudgment interest. (*Id.* at 5).

ASARCO offers three responses to this argument. First, ASARCO contends that this issue ultimately turns on choice-of-law principles. According to ASARCO, the Restatement (Second) of Conflicts directs that the law selected by Restatement § 145, which this Court used to determine that the law of Arizona controls the conspiracy claim, also determines the applicable law concerning damages on that claim–which includes calculation of prejudgment interest. (Doc. No. 519 at 5). ASARCO argues that neither the Restatement nor any other authority requires that the law of the relevant state be articulated as a separate cause of action in order for that law to apply to damages. (*Id.*). Finally, ASARCO notes that AMC cites no authority requiring courts to apply the law of the state governing the underlying tort of the conspiracy claim, rather than of the conspiracy claim itself. (*Id.*). Thus, according to ASARCO, even if it were true that Arizona does not recognize conspiracy as an independent claim, AMC cites nothing suggesting that this matters in applying the relevant choice-of-law principles.

Second, ASARCO insists that Arizona does in fact recognize conspiracy as an independent claim. ASARCO relies on the following language from the Arizona Supreme Court: "there is no

such thing as a civil action for conspiracy . . . [T]he action is one for damages arising out of the acts committed pursuant to [a] conspiracy." (*Id.* (quoting *Tovrea Land and Cattle Co. v. Linsenmeyer*, 412 P.2d 47, 63 (Ariz. 1966))).

Third, ASARCO asserts that AMC has waived this argument since AMC never raised it in its damages brief, and cites this Court's observation that AMC's brief did "not specifically address the issue of prejudgment interest in the context of either the aiding and abetting . . . claim *or the conspiracy claim.*" (*Id.* at 6 (quoting *ASARCO LLC v. Americas Mining Corp.*, No. 1:07-CV-00018, 2009 WL 1045993, at *25 n.11 (S.D. Tex. Apr. 14, 2009) (emphasis in ASARCO's brief))). AMC contends that it raised this issue when it argued in its damages brief that "establishing a conspiracy does not alter the measure or type of damages recoverable, but merely makes all persons involved in the conspiracy equally liable." (Doc. No. 524 at 5–6).

The Court finds that it made no manifest error of law or fact when it awarded ASARCO damages based on Arizona conspiracy law. The Court first notes that AMC is correct in its initial assertion. Civil conspiracy under Arizona law, like the prevailing law in most jurisdictions, requires not only an agreement between two or more individuals, but further requires that the agreement must be to accomplish an unlawful purpose, or a lawful purpose by unlawful means, and that such a goal be accomplished. Indeed, this is the law that the Court recited and implemented in its Liability Opinion. The Court found that AMC conspired with the directors of ASARCO to effect a fraudulent transfer and to breach their fiduciary duty.[2] *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 419, 420 (S.D. Tex. 2008). Thus, the Court found AMC liable not merely for "conspiracy," but for conspiracy *to commit a fraudulent transfer* and conspiracy *to breach fiduciary duty.*

---

[2]The Court rejected the claim that Grupo Mexico S.A.B. de C.V. (hereinafter "Grupo") and AMC conspired together, finding that Grupo and AMC–the latter being the wholly owned subsidiary of the former–did not fulfill the "two person" requirement for conspiracy liability under Arizona law. *ASARCO LLC*, 396 B.R. at 418.

Further, the Court found in its Liability Opinion that AMC and ASARCO's directors accomplished the underlying torts that were the objects of their conspiracy and thereby caused ASARCO injury. *See id.* at 419–21. To the extent, then, that Arizona recognizes a cause of action for "acts committed pursuant to the conspiracy," Arizona law provides a basis for awarding ASARCO relief based on its conspiracy claim, including pre-judgment interest.[3]

Nevertheless, it is worth mentioning that all three causes of action giving rise to liability in this case provide for prejudgment interest. Arizona law was used by this Court in its judgment because this Court was obligated to use the law most beneficial to the plaintiff, who prevailed in this case. Arizona law provides for a 10 percent rate for prejudgment interest. Delaware provides for 5 percent plus the Federal Discount Rate, and New Jersey provides for 2 percent plus the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year of the State of New Jersey Cash Management Fund. Thus, even were AMC correct in its conspiracy analysis, the actual damages would remain the same (both in terms of the return of the stock and repayment of dividends) and the prejudgment interest would then be controlled by New Jersey or Delaware law, depending on which rate is higher.

Finally, AMC concedes in its brief that "Arizona has recognized a cause of action for conspiracy to commit fraudulent transfer . . . ." (Doc. No. 514 at 6). It is thus difficult to understand how AMC can at the same time maintain that Arizona law does not recognize conspiracy as an independent cause of action, while conceding the existence of one of the causes of action recognized by this Court. Moreover, as ASARCO points out, even if it were true that Arizona does not

---

[3]It is also worth noting that all parties have conceded that Arizona law governs the conspiracy claim and that this Court certified to the Supreme Court of Arizona this and other questions concerning the availability of conspiracy claims under Arizona law. (*See* Doc. No. 193 at 10–11). These certification requests, however, were denied, leaving this Court with the necessity of predicting what Arizona law would be were one of its own courts to face these issues.

recognize conspiracy as an independent claim, AMC cites nothing suggesting that this matters in applying the relevant choice-of-law principles, nor does AMC define "independent cause of action" in the choice-of-law context.  For these reasons, among others, the Court cannot conclude that it has made a manifest error of law or fact on this issue.

**B.      There is no cognizable cause of action under either Arizona or Delaware law for conspiracy to commit a fraudulent transfer on the facts of this case**

AMC argues next that while Arizona law recognizes a cause of action for conspiracy to commit a fraudulent transfer, it has only done so in cases with different facts from this one.  (*Id.* at 6).  AMC contends that "Arizona has only recognized this cause of action in circumstances where the remedies under the Uniform Fraudulent Transfer Act are inadequate."  (*Id.* (citing *In re Hashim*, 379 B.R. 912, 916 n.2 (9th Cir. B.A.P. 2007), *Pearce v. Stone*, 720 P.2d 542, 545 (Ariz. 1986), *McElhanon v. Hing*, 728 P.2d 256, 263–64 (Ariz. Ct. App. 1985))).  According to AMC, "[t]his Court's finding that the remedies for ASARCO's actual fraudulent transfer count and conspiracy count are the same precludes a finding that the UFTA remedy is inadequate."  (*Id.* at 7).

AMC mischaracterizes the holding of the *McElhanon* court, which articulated the rule on which AMC rests this argument.  In that case, the court held that "*the action for damages* arising from conspiracy to commit a fraudulent conveyance is a *remedy* that should be used only where the remedies under the UFCA are inadequate."  *McElhanon*, 728 P.2d at 263 (emphasis added).  Thus, by its terms, this holding concerns the *remedies* available in a claim for conspiracy to commit a fraudulent transfer, not the requirements necessary for prevailing on the cause of action itself.  Put another way, if one prevails on a conspiracy to commit a fraudulent transfer claim, money damages are only available (as opposed to return of the property and the like) if the remedies available under the UFCA–e.g., return of the property–are either unavailable (i.e., the property no longer exists or

it has been transferred to a good-faith purchaser) or the property has so diminished in value that its return would not make the plaintiff whole. The *Pearce* court confirmed this reading when it characterized *McElhanon* as holding "that a judgment creditor states *a claim for damages* arising from a conspiracy to commit a fraudulent conveyance provided that he introduces evidence of . . . [the] inadequacy of the equitable remedies under the UFCA." *Pearce*, 720 P.2d at 545 (emphasis added). These equitable remedies include having "the conveyance set aside." *McElhanon*, 728 P.2d at 263. Thus, to the extent that the remedy this Court afforded ASARCO on its conspiracy claim consisted of having "the conveyance set aside" by awarding ASARCO a return of the SCC stock and related dividends, there is no "claim for damages" arising from the conspiracy cause of action. Accordingly, the *McElhanon* rule is not applicable to ASARCO's conspiracy claim. For this reason, among others, the Court finds that AMC has failed to show a manifest error of law or fact on this issue.

### C.   Conspiracy to breach fiduciary duty is duplicative of, and not separately cognizable from, a claim of aiding and abetting a breach of fiduciary duty

Finally, AMC argues: (1) since the elements of aiding and abetting a breach of fiduciary duty and conspiracy to breach such a duty are "essentially the same," the conspiracy claim should be dismissed as duplicative (citing cases from Michigan, Delaware, and the Second Circuit); and (2) conspiracy to breach a fiduciary duty is actionable only if all members of the alleged conspiracy independently owe a fiduciary duty to the plaintiff (citing cases from Maryland and the Second Circuit). (Doc. No. 514 at 7).

Regarding the first issue, ASARCO points out that this Court previously found in its Liability Opinion that in light of Arizona case law, there is a "significant difference" between civil conspiracy and aiding and abetting. (Doc. No. 519 at 7 (quoting *ASARCO LLC*, 396 B.R. at 419)). Further,

AMC cites no Arizona law to the contrary, and indeed AMC conceded this point when it argued

earlier that there is a "qualitative" difference between these two causes of action. (*Id.* at 6, 7 (quoting

Americas Mining Corporation's Proposed Findings of Fact and Conclusions of Law at 167, ¶ 265

(Doc. No. 439))). The Court finds its earlier discussion of this issue in its Liability Opinion

sufficient for the purposes of AMC's Motion and so reiterates its conclusion that there is indeed a

"significant difference" between civil conspiracy and aiding and abetting.

Regarding the second issue, ASARCO notes that AMC cites no Arizona case law for the

proposition that all members of the conspiracy must owe an independent fiduciary duty to the

plaintiff, and ASARCO cites *Navajo Nation v. MacDonald*, 885 P.2d 1104 (Ariz. Ct. App.1994) as

an example of a case in which a claim for conspiracy to breach fiduciary duty was successfully

brought against a non-fiduciary defendant. (*Id.* at 7–8). AMC disputes ASARCO's characterization

of this case, arguing that it held only that challenges to the trial court's conspiracy findings were

waived, and pointing out that case law in other jurisdictions holds that one cannot be a co-conspirator

when one is legally incapable of committing the underlying tort, i.e., breach of fiduciary duty. (Doc.

No. 524 at 7).

AMC's argument essentially reduces to the proposition that since AMC had no fiduciary duty

to ASARCO, AMC cannot be liable for conspiracy to breach a fiduciary duty that AMC did not itself

owe.[4] This argument, while possessing an initial surface appeal, does not withstand thorough

analysis, especially when viewed in light of the record established at trial. One who conspires with

another (and meets all the other elements of a civil conspiracy claim) to get the other to commit an

unlawful act is not immune from liability solely because it is not the party who commits the

---

[4]It is interesting to note that both the *McElhanon* and *Pearce* cases, cited by AMC for other propositions, hold that one may be liable for conspiracy to fraudulently transfer assets even where performing a fiduciary duty owed to another.

underlying unlawful or tortious act–in this case, breaching a fiduciary duty. If that were the case, then in any civil conspiracy, only the conspirator(s) who actually carried out the ultimate act could ever be found accountable.

More importantly, this Court questions the premise underlying AMC's entire argument. AMC contends that since it did not owe a fiduciary duty to ASARCO, it cannot be liable in a conspiracy to breach fiduciary duty. AMC planned, ordered, and engineered the transfer of ASARCO's "crown jewel" (i.e., the SPCC stock) and then reaped the benefits of this illicit transfer. It was aware of the fiduciary duty owed by ASARCO's directors and was on notice that this transfer would be considered a violation of that duty. For AMC to claim immunity from liability for these wrongful actions simply because, rather than directly effecting the transfer itself, AMC accomplished its goals by inducing ASARCO's inside directors, over whom AMC had total control, to breach their fiduciary duty to ASARCO's creditors, is contrary not only to law, but to principles of equity and any plausible notion of ethical conduct.[5] AMC knew what it was doing, it was warned by both its legal and financial experts before the fact that its plan, which it carried out by means of its agreement with ASARCO's directors, would be viewed as a fraudulent transfer, yet AMC nonetheless plunged

_____

[5]The underlying premise of AMC's argument is based upon this Court's finding in its Liability Opinion that a parent owes no fiduciary duty to the creditors of its subsidiary. However, part of the rationale behind that finding was the Court's belief that imposing such a duty on AMC is unnecessary since AMC can be found liable for its actions under a conspiracy theory regardless of whether or not it owed a fiduciary duty to ASARCO's creditors. It is useful to recall that the Court found AMC liable for conspiracy to fraudulently transfer an asset as well as for conspiracy to breach a fiduciary duty. Were this Court to find that a third party cannot be held liable for conspiring to breach a fiduciary duty that it does not itself owe, the result would be that a parent–or any third party for that matter–that planned an illicit scheme to snatch an insolvent company's good assets away from its creditors, and accomplished that scheme with the help of the insolvent company's directors, might never face liability. Such a third party could hypothetically bribe a director to breach his fiduciary duty to his company, split the profits with that director, and face no liability. To the extent that the authorities cited by AMC support this result, this Court rejects those authorities. Indeed, in the nearest case on point (and the only Arizona case found by either party or this Court), the Arizona court rejected this very argument. In that case, a third party owing no fiduciary duty to the plaintiff conspired with a trustee owing such a duty to sell an asset to the plaintiff at an inflated price. The conspirators would make a profit and the trustee would get a kickback. The Court affirmed the judgment against the third party for conspiracy to breach a fiduciary duty. *See Navajo Nation v. MacDonald*, 885 P.2d 1104, 1107–09 (Ariz. Ct. App. 1994).

ahead and implemented its plan.

Accordingly, it is the view of this Court that AMC cannot meet its burden to clearly demonstrate a manifest error of law or fact on this issue.

## II.   AMC's Objections to the Court's Holding on Alter Ego

AMC challenges this Court's holding in its Liability Opinion that ASARCO proved the second prong of its Delaware alter-ego claim, i.e., that AMC used SPHC's corporate form to effect fraud, injustice, or unfairness, on three separate grounds:

(a)     SPHC did not exist for the sole purpose of serving as a vehicle to commit fraud, as required to establish alter ego under Delaware law;

(b)     There was no misuse of SPHC's corporate form under Delaware law because (1) there was no misrepresentation and (2) AMC's conduct did not induce detrimental reliance from any ASARCO creditor; and

(c)     The Court's finding of misuse by AMC of SPHC's corporate form does not support an alter-ego claim.

(Doc. No. 514 at 9).

### A.     SPHC did not exist for the sole purpose of serving as a vehicle to commit fraud, as required to establish alter ego under Delaware law

AMC cites a variety of case law in support of the proposition that to pierce the corporate veil, a plaintiff must show that the corporation whose veil is to be pierced "must be a sham and *exist for no other purpose than as a vehicle for fraud*." (*Id.* (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (emphasis in AMC's brief))). Since this Court found that SPHC was created for a legitimate reason, i.e., protection of super-voting rights attaching to the SPCC Shares, and since such a purpose existed when the transfer happened, AMC

contends that ASARCO failed to prove this element. (*Id.* at 10).[6]

ASARCO counters that this standard came from *dicta* in one case, an "offhand gloss" in *Wallace*, and that other cases do not require it. (Doc. 519 at 12). ASARCO also reminds the Court of all the equitable reasons to pierce in this case. (*Id.* at 9–11). AMC cites a Delaware Chancery case from September 2008 that cites the "no-other-purpose" standard and strenuously argues that the cases it cites more accurately reflect the current state of Delaware law. (Doc. No. 524 at 11–13 (citing *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184-VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008))).

The Court agrees with ASARCO that the language in *Wallace* at issue does not represent a specific holding requiring that a plaintiff show that the corporate form to be pierced "must be a sham and exist for no other purpose than to perpetrate a fraud." Under Delaware law, a court of equity may pierce the corporate veil on an alter-ego theory where (1) the companies operated as a single economic entity; and (2) an overall element of injustice or unfairness is present. *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr. D. Del. 2003). "Simply phrased, the standard may be restated as: whether [the two entities] operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them." *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990)).

This Court concluded in its Liability Opinion that "the overwhelming weight of the evidence indicates . . . that SPHC and ASARCO operated as a single economic unit" and disregarded corporate formalities. *ASARCO LLC*, 396 B.R. at 320; 319, 320, 323. Further, the Court concluded that preserving a legal distinction between SPHC and ASARCO under the circumstances of this case

---

[6]While this Court found that SPHC was created for a legitimate business purpose, the Court notes that according to record, the result of this transaction left SPHC without any meaningful business purpose. SPHC did not even receive the proceeds from the transfer of its only asset.

would be inequitable on a number of grounds. *Id.* at 323.  The Court found that AMC used SPHC's corporate form as a tool to perpetrate "an unjust and inequitable transfer" and that AMC is only now asserting SPHC's corporate separateness "so that [AMC] may be shielded from potential liability." *Id.*  "In such a situation, equity demands that the Court disregard the corporate separateness of ASARCO and SPHC." *Id.*

This finding is consistent with the broad purpose of veil piercing under Delaware law, which is permitted "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved." *Pauly Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968).  The "fiction of a legal corporate entity should be ignored when it has been used as a shield for fraudulent or other illegal acts," and recognition of corporate separateness "is never resorted to when it would work an injury to anyone, or allow the corporation to perpetrate a fraud upon anybody." *Martin v. D.B. Martin Co.*, 88 A. 612, 613 (Del. Ch. 1913).  For these reasons, among others, the court concludes that it has not made a manifest error of law or fact on this issue.

### B. There was no misuse of SPHC's corporate form under Delaware law because (1) there was no misrepresentation and (2) AMC's conduct did not induce detrimental reliance from any ASARCO creditor

AMC points out that in its Liability Opinion, this Court did not rely on any of the grounds advanced by ASARCO to show that SPHC's corporate form was misused, but rather based its holding on the finding that since its creation, AMC had treated ASARCO as the owner of the SPCC stock.  (Doc. No. 514 at 10–11).  AMC also notes that this Court cited no Delaware authority suggesting that such a finding suggests misuse of corporate form. (*Id.* at 11).  Instead, according to AMC, the Court appears to have relied on *In re Foxmeyer*'s "misleading and reliance" theory; however, AMC contends that the facts of this case do not support this test. (*Id.*).  AMC questions

13

in particular this Court's use of documents pertaining to the 2001 AMC loan to ASARCO of $41.75 million and two press releases as evidence that AMC and its parent Grupo misled the public regarding the ownership of the SPCC shares, arguing that neither the loan documents nor the press releases contain anything misleading since ASARCO had always been an indirect owner of the shares and these documents never suggested otherwise. (*Id.* at 12–13). Further, AMC notes that the Court cited no evidence showing that any creditor relied on any deceptive information to its detriment. (*Id.* at 13).

AMC is mistaken to suggest that this Court invoked the "misleading and reliance test" in its Liability Opinion to find misuse of corporate form. The Court did not raise the issue of the loan documents and press releases solely to show misleading practice, although in several aspects they do support an inference of misleading conduct. The Court pointed to these documents as proof that AMC and its parent, Grupo, routinely used language in its corporate communications suggesting that for all practical purposes, ASARCO owned the SPCC stock, i.e., the "the stock in question was ASARCO's stock." *ASARCO LLC*, 396 B.R. at 323. This fact was relevant to the Court not in order to meet some standard of creditor "reliance," but rather to show the extent to which AMC/Grupo had failed to treat ASARCO and SPHC as separate corporate entities in the period before the transfer and why it would therefore be inequitable to allow AMC to suddenly insist on such separateness as a shield against liability. *Id.* To this extent, AMC's arguments on this point are unavailing, if not simply irrelevant.

### C. The Court's finding that the corporate forms of ASARCO and SPHC should be disregarded does not support the judgment

AMC next emphasizes that this Court found that *AMC*, not ASARCO, misused SPHC's corporate form, whereas applicable law requires that *ASARCO* caused a fraud or injustice through

the use of SPHC's corporate form. (Doc. No. 514 at 14).[7] AMC analyzes a pair of Delaware cases, *Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546 (Bankr. D. Del. 2002) ("*FM I*") and *Brown v. GE Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229 (Bankr. D. Del. 2003) ("*FM II*") (collectively, "Foxmeyer"), at length to support this claim. (*Id.* at 14–18).

In *FM I*, the Delaware bankruptcy court refused to pierce the corporate veil between a mid-level subsidiary and its subsidiary, and so granted summary judgment against the bankruptcy trustee's § 544(b) fraudulent-transfer claims. The corporate ownership structure in *Foxmeyer* involved three corporations in a vertical corporate relationship: Avatex was the parent of FoxMeyer Corp. ("FM Corp."), which was the parent of FoxMeyer Drug Co. ("FM Drug"). Before June 1996, FM Drug was indebted to certain lenders (the "Pre-existing Lenders") for approximately $575 million, and the loan documents prohibited both FM Drug and FM Corp. from declaring a dividend to the parent, Avatex. *See FM I*, 286 B.R. at 553–54. In June 1996, FM Drug refinanced its debt with loans totaling $575 million from different lenders (the "New Lenders"). *Id.* at 551–52. While the debt to the New Lenders was secured by FM Drug's property and further guaranteed by FM Corp., the New Lenders agreed to allow a dividend to Avatex. *Id.* at 551, 553, 575. When the new financing closed, FM Drug and FM Corp. each declared a dividend to Avatex in excess of $575 million. *Id.* at 575.

FM Drug and FM Corp. both filed for bankruptcy less than three months later. *Id.* at 555. The bankruptcy trustee challenged the granting of liens to the New Lenders and the dividends to Avatex as a fraudulent transfer. Although the lien grant and the dividends were made by separate

---

[7]This assertion is not an accurate description of the overall resolution effectuated by this Court in its Liability and Damages Opinions. These Opinions clearly delineate that AMC, through its control of ASARCO's inside directors (and therefore ASARCO), instigated the abuse of SPHC's corporate form. This does not negate, however, ASARCO's own neglect of the corporate form, which AMC recognizes tacitly in the context of its *in pari delicto* argument.

debtors, i.e., the liens were against FM Drug's assets and guaranteed by FM Corp., and  FM Corp.
and FM Drug each declared dividends to Avatex in separate amounts, the trustee argued that "for
all practical and business purposes" the transactions should be combined for the purposes of a
fraudulent-transfer claim based on the proposition that FM Drug and FM Corp. "should legally be
viewed . . . as but one entity." *Id.* at 553 (quotations and citations omitted).  The trustee therefore
requested that the court pierce the corporate veil of FM Drug such that FM Corp. could be viewed
as the sole transferor of both the liens to the New Lenders and the total dividends granted to Avatex.
*FM II*, 290 B.R. at 234.  The trustee argued, *inter alia*, that through these combined transactions,
Avatex had "effected a drain of assets" from FM Drug and FM Corp., and that "such adverse effect
constitutes an injustice sufficient to merit a piercing of Fox Drug's corporate veil." *Id.* at 237.

       The bankruptcy court rejected the trustee's theory, noting that:

> [T]he evidence establishes that Avatex, the parent to Fox Corp. and, thus, ultimately
> the parent to Fox Drug as well, is the entity that drained assets out of both Fox Drug
> and Fox Corp. via the June 19, 1996 Transactions.  Therefore, such drain of assets
> provides an injustice for veil piercing but only if the corporate veils of both Fox Drug
> and Fox Corp. are pierced–i.e., only if the corporate veils of both Debtors are pierced
> all the way up to Avatex; such drain of assets does not provide an injustice that
> would support piercing only the corporate veil of Fox Drug and leaving intact the veil
> of Fox Corp.

*Id.* at 242.  Elaborating on its reasoning, the court declared:

> The Court holds as it does because (a) the fraud or injustice necessary to pierce a
> corporate veil must, as set forth above, pertain to the misuse of the corporate veil
> sought to be pierced, (b) the Dividend of the $190 million worth of assets by Fox
> Corp. to Avatex, rather than relating to or, stated more aptly, arising because of the
> misuse of the corporate form of Fox Drug, instead relates to or arises because of the
> misuse of the corporate form of Fox Corp. (thus, it is a reason to pierce corporate
> veils up to Avatex), and (c) the Dividend of $8 million worth of assets from Fox
> Drug to Avatex likewise constitutes a reason to pierce the corporate veil up to Avatex
> rather than just of Fox Drug given that said $8 million Dividend ultimately also
> wound up in the hands of Avatex rather than Fox Corp.

*Id.* at 243.

AMC contends that such an analysis applies to the facts of the instant case, as well. "Like the trustee in the *Foxmeyer* case," AMC explains, "ASARCO did not allege and the Court did not find that ASARCO (as a mid-level corporate parent) misused SPHC's corporate form." (Doc. No. 514 at 17). Instead, "the Court found that ASARCO's corporate parent–AMC–misused SPHC's corporate form." (*Id.*) Thus, "this Court's finding that the misuse of SPHC's corporate form was perpetrated by AMC is fatal to ASARCO's fraudulent transfer claims because all corporate separateness from SPHC to AMC would be disregarded, thereby eliminating any 'transfer' under the Uniform Fraudulent Transfer Act." (*Id.* at 17–18). For these reasons, AMC urges the Court to reconsider its decision to pierce only the corporate veil of SPHC.

ASARCO attempts to distinguish *Foxmeyer* by noting that *Foxmeyer* concerned a suit for constructive, not actual, fraudulent transfer, and that in *Foxmeyer* the plaintiff, unlike here, could not show that piercing the veil between the mid-level subsidiary and its subsidiary would resolve an injustice. (Doc. No. 519 at 13–14). ASARCO also emphasizes that the *Foxmeyer* defendants were not the ones who misused the corporate form, unlike the defendant in this case. (*Id.* at 14). For these reasons, ASARCO contends, *Foxmeyer* should be distinguished and the Court should uphold its decision to pierce SPHC's corporate veil. AMC rejects these arguments as distinctions without a difference. (Doc. No. 524 at 13–14).

It is this Court's view that *Foxmeyer* is crucially distinguished on the facts from the instant case. Specifically, the defendants in *Foxmeyer* were not the parties found to have misused the corporate form, unlike here, and so the trustee could not show that piercing the veil between the two subsidiaries, without piercing all the way through the corporate structure, would resolve an injustice.

*FM II*, 290 B.R. at 242.[8] The *FM II* court explained that "the fraud or similar injustice that must be demonstrated . . . must, in particular, be found in the *defendants'* use of the corporate form." (*Id.* at 236 (internal quotations omitted) (emphasis added)).

In the instant case, however, the defendant is AMC, an active participant in the plot and the recipient of the fraudulent conveyance, and so piercing the corporate veil between ASARCO and SPHC would prevent an injustice by giving ASARCO standing to pursue its claims against AMC and recover the fraudulently conveyed stock. As discussed both *supra* and in the Court's Liability Opinion, under Delaware law, preventing an injustice is the core rationale for piercing the corporate veil. Both prongs of the test for piercing the veil involve considerations of equity. The court in *Harper v. Delaware Valley Broadcasters, Inc.*, which the *Foxmeyer* court cites in setting out the test for alter ego, recognized the presence of equitable considerations in the first prong, i.e., the companies operated as a single economic entity, when it declared: "Simply phrased, the standard may be restated as: whether [the two entities] operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them." *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990)). The second prong of the test does so on its own terms, requiring that "'an overall element of unfairness or injustice [be] present.'" *FM II*, 290 B.R. at 235 (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451,1457 (2d Cir. 1995)). Thus, to the extent that piercing the veil in the *Foxmeyer* case along the lines requested by the trustee would not have prevented an injustice–since the party ultimately responsible for and benefitting from the misuse of the corporate form was not the defendant–the court declined to pierce the veil. In the instant case, however, AMC is both the party found to have orchestrated the misuse of the corporate

---

[8]In the instant case, it would be as if ASARCO asked this Court to enter judgment against Grupo despite the fact that Grupo was not a defendant and no attempt had been made to pierce the veil all the way to the ultimate parent.

form and the defendant.  Additionally, AMC had possession of the ill-gotten stock.  Under these circumstances, it would be "inequitable to uphold a legal distinction" between ASARCO and SPHC, and were the Court to do so, "an overall element of unfairness or injustice" would be more than present. For these reasons, the Court finds that it has not made a manifest error of law or fact on this issue.

## III.   AMC's Argument on Standing

Finally, AMC converts the *in pari delicto* defense it offered at trial into an argument that ASARCO lacks standing to pursue its claims, citing two cases from the Second Circuit, *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) and *In re The Mediators, Inc.*, 105 F.3d 822 (2d Cir.1997).  (Doc. No. 514 at 18).  The pertinent rule derived from these cases is that the debtor in possession "has no standing to assert aiding-and-abetting claims against third parties for cooperating in the very misconduct that it had initiated." (*Id.* (quoting *In re The Mediators, Inc.*, 105 F.3d at 826)).  To the extent that this Court found in its Liability Opinion that ASARCO's inside directors participated in the very misconduct for which it found AMC liable, AMC urges that the *Wagoner* rule "squarely" applies.  (*Id.* at 19).

ASARCO contends that this is just a recycled version of the *in pari delicto* defense, which this Court already rejected in its Liability Opinion. (Doc. No. 519 at 14).  Since AMC offers no new arguments on the *in pari delicto* defense, ASARCO recommends that the Court rely on its earlier conclusions to reject any attempt by AMC to resurrect it.  (*Id.* at 15).

ASARCO also urges the Court to reject AMC's attempt to use similar grounds to attack ASARCO's standing to sue.  As an initial matter, ASARCO points out that it has met the three-part test for standing, i.e., injury-in-fact, causation, and redressability.  (*Id.* at 17 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998))).  Second, ASARCO notes that Delaware

law (to which New Jersey looks for guidance) clearly allows ASARCO to assert claims against its fiduciaries, i.e., the AMC-controlled ASARCO directors, for aiding and abetting the breach of fiduciary duty by those fiduciaries. (*Id.* at 17–18). Third, ASARCO contends that the cases on which AMC relies have been "unfavorably characterized" by Delaware courts as advocating a doctrine that is neither "cogent" nor "well-thought out." (*Id.* at 18 (quoting *Am. Int'l Group, Inc. v. Greenberg*, 965 A.2d 763, 828 n.246 (Del. Ch. 2009))). Further, ASARCO asserts that *Wagoner* has been routinely rejected outside the Second Circuit and "appears to be inconsistent with law within the Fifth Circuit," which distinguishes between standing to pursue a claim and any defense thereto. (*Id.* at 18–19, 19). Finally, ASARCO argues, even if *Wagoner* controlled, its holding is limited and does not apply here for the same reasons that *in pari delicto* does not: "The *Wagoner* rule only deals with claims against third parties. It does not proscribe actions against insiders for breach of fiduciary duty, which are properly claims of the trustee." (*Id.* at 19–20 (quoting *In re Hampton Hotel*, 289 B.R. 563, 577 n.23 (S.D.N.Y. 2003))).

The Court finds that it has adequately addressed the *in pari delicto* defense in its Liability Opinion and will not repeat it here. *See ASARCO LLC*, 396 B.R. at 430. To the extent that AMC advances similar grounds to attack ASARCO's standing to sue along the lines of *Wagoner*, the Court declines to follow this non-binding authority. The Court finds that there has been no manifest error of law or fact on this issue.

Further, the Court finds that with regard to this, as well as all other issues raised in Defendant's Motion, there has been no "prejudicial error," nor has "substantial justice has not been done" such that the Court should grant a new trial pursuant to Rule 59(a)(2). All other claims for relief not granted above are DENIED.

For all the aforementioned reasons, Defendant's Motion to Alter or Amend or for New Trial (Doc. No. 514) is hereby **DENIED**.

Signed this 20th day of July, 2009.

Andrew S. Hanen
United States District Judge